2003 U.S. Dist. LEXIS 17713

Wyeth, formerly known as American Home Products Corporation, a Delaware corporation, Plaintiff, v. Natural Biologics, Inc., a Minnesota corporation, and Natural Biologics LLC, a Minnesota limited, liability company, Defendants.

Civ. No. 98-2469 (JNE/JGL)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2003 U.S. Dist. LEXIS 17713

October 2, 2003, Decided

**SUBSEQUENT HISTORY:** Subsequent appeal at Wyeth v. Natural Biologics, Inc., 2005 U.S. App. LEXIS 1132 (8th Cir. Minn., Jan. 24, 2005)

**DISPOSITION:** Non-Confidential Findings of Fact and Non-Confidential Conclusions of Law made; injunction ordered.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff pharmaceutical company sued defendant competitor for trade secret misappropriation under the Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-.08 (2002), seeking a permanent injunction. After trial, the court issued this opinion.

**OVERVIEW:** The pharmaceutical company produced a hormone replacement therapy drug. After communication with the pharmaceutical company's former employee, the competitor began producing a similar product. Eventually the pharmaceutical company discovered that the competitor was using a process that the pharmaceutical had taken great pains to keep secret to manufacture its product. Inter alia, the court held that the evidence showed the competitor misappropriated the trade secrets, which were not generally ascertainable and which the pharmaceutical company had taken reasonable effort to protect. Moreover, the information derived an independent economic value from secrecy. If the competitor were permitted to use the misappropriated information, the pharmaceutical company would experience irreparable harm in that it would lose market share, leading to a decline in revenues, research, and employment. A permanent injunction was necessary to prevent the harm. The pharmaceutical company's action was timely and the equitable defenses of laches, unclean hands, and estoppel did not apply.

**OUTCOME:** The court issued a permanent injunction.

**CORE TERMS:** estrogen, trade secret, misappropriation, urine, plant, generic, patent, conjugated, secrecy, chemical, synthetic, misappropriated, consisting, brochure, injunction, entity, fax, readily ascertainable, telephone, bulk, extraction, confidential, batch, false testimony, floor plan, confidentiality, indirectly, marketing, conceal, expired

**LexisNexis(TM) Headnotes**

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Misappropriation Actions > Elements > Existence & Ownership***

[HN1]The Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-.08 (2002), protects certain information by providing for an action for misappropriation. The threshold issue in an action for misappropriation of a trade secret is whether a trade secret exists. Without a proven trade secret there can be no action for misappropriation, even if a defendant's actions were wrongful.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Protection of Secrecy > Reasonable Measures > General Overview***

***Trade Secrets Law > Factors > Economic Value***

[HN2]In Minnesota, a trade secret is information, including a process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Minn. Stat. § 325C.01, subd. 5. In other words, for information to qualify as a trade secret: (1) the information must be neither generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy.

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN3]In Minnesota, to determine whether a trade secret exists, the court must first determine what the plaintiff claims as its trade secret.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Factors > Ready Availability***

[HN4]Matters which are generally known or which are commonly known in the trade in which the putative trade secret owner is engaged cannot be considered trade secrets. Difficulty in replicating information is evidence that it is not generally known or readily ascertainable.

***Trade Secrets Law > Factors > Novelty***

***Trade Secrets Law > Protection of Secrecy > General Overview***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN5]In Minnesota, although mere variations on widely used processes cannot be trade secrets, a unique combination of known elements may constitute a trade secret. Accordingly, it is the secrecy of the process as a whole, not the individual elements, that determines whether a trade secret exists.

***Trade Secrets Law > Factors > Competitive Advantage***

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Federal & State Regulation > Common Law***

[HN6]In a Minnesota trade secret appropriation case, the statutory requirement of independent economic value from secrecy carries forward the common law requirement that information must provide a competitive advantage to constitute a trade secret. If an outside would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Protection of Secrecy > Absolute & Relative Secrecy***

[HN7]In Minnesota, a trade secret must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Minn. Stat. § 325C.01, subd. 5. Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets. "Absolute secrecy" is not required. Express notice that the information is a trade secret is not required.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Protection of Secrecy > General Overview***

[HN8]See Minn. Stat. § 325C.01 , subd. 5.

***Trade Secrets Law > Misappropriation Actions > Elements > Acquisition***

***Trade Secrets Law > Misappropriation Actions > Elements > Disclosure***

***Trade Secrets Law > Misappropriation Actions > Elements > Improper Means***

[HN9]In Minnesota, misappropriation involves the acquisition, disclosure, or use of a trade secret through improper means.

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN10]See Minn. Stat. § 325C.01, subd. 2.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Misappropriation Actions > General Overview***

[HN11]In Minnesota, slight alteration of a competitor's protected secret implicates the same concerns as cases of outright misappropriation. Trade secret protection extends not only to the misappropriated trade secret but also to materials "substantially derived" from that trade secret.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Misappropriation Actions > General Overview***

[HN12]In Minnesota, direct evidence of industrial espionage is rarely available and not required to establish a claim of trade secret misappropriation.

***Governments > Legislation > Statutes of Limitations > Time Limitations***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN13]See Minn. Stat. § 325C.06.

***Trade Secrets Law > Civil Actions > Statutes of Limitations***

***Governments > Legislation > Statutes of Limitations > Time Limitations***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN14]In a Minnesota trade secret appropriation case, the statute of limitations begins to run when a plaintiff discovers, or in the exercise of reasonable diligence should have discovered, sufficient facts from which a reasonable jury could infer misappropriation.

***Trade Secrets Law > Civil Actions > Statutes of Limitations***

***Governments > Legislation > Statutes of Limitations > Time Limitations***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN15]In a Minnesota trade secret appropriation case, under the discovery rule, the statute of limitations does not begin to run based on "concerns and suspicions" of misappropriation. Rather, the statute of limitations begins to run when a plaintiff knew or should have known of the misappropriation.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***

[HN16]He who seeks equity must do equity, and he who comes into equity must come with clean hands. A defendant with unclean hands cannot invoke equitable defenses.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***

[HN17]Laches is an equitable doctrine applied to prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay. The basic question in applying laches is whether there has been such unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for. Although evidence of prejudice is not always essential to the application of laches, it is a circumstance of importance in determining whether a plaintiff's delay was reasonable. The prejudice must result from the delay. If the party asserting laches would not have acted differently with earlier notice, laches does not apply. Even a considerable investment during a delay period is not a result of the delay if it was a deliberate business decision to ignore a warning, and to proceed as if nothing had occurred. A defendant whose prejudice is largely self-imposed may not prevail on the affirmative defense of laches.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***

[HN18]The defense of unclean hands may deny equitable relief to a plaintiff if the plaintiff has engaged in unconscionable conduct: The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others. The plaintiff's conduct must be "egregious" to support a finding of unclean hands. Unclean hands in a collateral matter is not a defense to equitable relief.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***

[HN19]Waiver is an equitable defense. Waiver is the intentional relinquishment of a known right; it is the expression of an intention not to insist upon what the law affords; it is consensual in its nature; the intention may be inferred from conduct, and the knowledge may be actual or constructive, but both knowledge and intent are essential elements.

***Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses***

[HN20]Estoppel is an equitable defense. Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. To establish a claim of estoppel, a defendant must prove that the plaintiff made representations or inducements, upon which the defendant reasonably relied, and that the defendant will be harmed if the claim of estoppel is not allowed.

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Threatened Misappropriation***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN21]In Minnesota, actual or threatened trade secret misappropriation may be enjoined. Minn. Stat. § 325C.02(a). Where injunctive relief is explicitly authorized by statute, proper exercise of discretion requires issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose.

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Irreparable Harm***

***Civil Procedure > Injunctions > Permanent Injunctions***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN22]Misappropriation of a trade secret constitutes irreparable harm warranting injunctive relief.

***Torts > Business & Employment Torts > Unfair Business Practices***

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview***

[HN23]The protection afforded trade secrets is not intended to reward or promote the development of secret processes (although it does, of course, benefit the enterprising developer), but rather is to protect against breaches of faith and the use of improper methods to obtain information. Trade secret law seeks to maintain standards of loyalty and trust in the business community.

***Civil Procedure > Injunctions > Permanent Injunctions***

[HN24]See Fed. R. Civ. P. 65(d).

***Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview***

***Civil Procedure > Injunctions > Permanent Injunctions***

***Torts > Business & Employment Torts > Unfair Business Practices***

[HN25]The common rationale for imposing a production injunction in a trade secret misappropriation case is that, where the misappropriated trade secrets are inextricably connected to the defendant's manufacture of the product, a use injunction is ineffective because the misappropriator cannot be relied upon to unlearn or abandon the misappropriated technology.

***Civil Procedure > Injunctions > Preliminary & Temporary Injunctions***

***Civil Procedure > Injunctions > Permanent Injunctions***

[HN26]Normally, the duration of an injunction is designed to preclude defendants' wrongful activities for a period of time reasonably necessary to protect plaintiff's interest; the period of time that would be required for independent development of the protected information is the prevailing standard.

**COUNSEL: [*1]** David J. F. Gross, Esq., Calvin L. Litsey, Esq., Kara L. Benson, Esq., James W. Poradek, Esq., and Michelle Paninopoulos, Esq., Faegre & Benson LLP, and Mark W. Lynch, Esq., Wyeth, appeared for Plaintiff Wyeth.

Richard G. Mark, Esq., Eric J. Rucker, Esq., Kristin L. C. Haugen, Esq., Kurt J. Niederluecke, Esq., and Jason R. Asmus, Esq., Briggs and Morgan, appeared for Defendants Natural Biologics, Inc. and Natural Biologics LLC.

**JUDGES:** JOAN N. ERICKSEN, United States District Judge.

**OPINIONBY:** Joan N. Ericksen

**OPINION: AMENDED NON-CONFIDENTIAL FINDINGS OF FACT, NON-CONFIDENTIAL CONCLUSIONS OF LAW, AND ORDER**

This case came before the Court for trial starting November 12, 2002, and ending November 26, 2002. Based on the evidence received at trial, the Court makes the following Non-Confidential Findings of Fact, Non-Confidential Conclusions of Law, and Order. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Non-Confidential Findings of Fact and Non-Confidential Conclusions of Law consist of redacted Confidential Findings of Fact and Confidential Conclusions of Law. Redactions are are denoted by ***.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*2]**

**NON-CONFIDENTIAL FINDINGS OF FACT**

**I. Parties**

**A. Wyeth**

1. Wyeth, formerly known as American Home Products Corporation, is a Delaware corporation with its principal place of business in Madison, New Jersey. The Court will refer to Wyeth and its historical and current subsidiaries and related companies, including Ayerst, McKenna & Harrison, Wyeth Pharmaceuticals, Wyeth-Ayerst Pharmaceuticals, Wyeth-Ayerst Laboratories, Wyeth-Ayerst Canada, Inc., and Ayerst Organics Ltd., as "Wyeth."

2. Wyeth makes and sells Premarin, a hormone replacement therapy drug. Wyeth makes Premarin from the estrogens found in pregnant mare urine (PMU). The alleged trade secret at issue in this case is the chemical process Wyeth uses to extract estrogens from PMU.

**B. Natural Biologics**

3. Natural Biologics LLC is a Minnesota limited liability company with its principal place of business in Albert Lea, Minnesota. Natural Biologics, Inc. is a Minnesota corporation with its principal place of business in Albert Lea, Minnesota. The Court will refer to Natural Biologics LLC and Natural Biologics, Inc. as "Natural Biologics."

4. David Saveraid is the founder and President of Natural **[*3]** Biologics.

5. Natural Biologics operates a commercial production facility in Albert Lea, Minnesota, where it extracts natural conjugated estrogens from PMU in the form of a dry bulk product. Natural Biologics, with the assistance of a tablet manufacturer, intends to market a generic form of Premarin.

**II. The Premarin Market**

6. Premarin has been sold in the United States since 1942, when the Food and Drug Administration approved it for use in the United States.

7. From 1992 to 2001, gross sales of Premarin in the United States grew from over $ 500 million to over $ 2 billion.

8. Premarin is the only estrogen replacement product on the market that is derived from a natural source.

9. There are hormone replacement therapy drugs derived from synthetic estrogens. The synthetics are not approved by the FDA as generic substitutes for Premarin.

10. In May 1997, Dr. Janet Woodcock, the Director of the Center for Drug Evaluation and Research at the FDA, set forth the FDA's position with respect to approval of a synthetic generic version of Premarin: "Because the reference listed drug Premarin is not adequately characterized at this time, the active ingredients of Premarin cannot **[*4]** be definitively identified. Until the active ingredients are sufficiently defined, a synthetic generic version of Premarin cannot be approved." Dr. Woodcock did not, however, foreclose the possibility of subsequent approval of a synthetic generic version of Premarin:Despite the fact that at this time Premarin is not adequately characterized, the Agency could approve generic copies of Premarin that originate from the same natural source material (pregnant mares' urine) before the active ingredients are defined, provided that detailed chemical composition of the product is known. This is because Premarin is manufactured and controlled using certain methods, and there could be confidence that generic copies using the same source materials and controlled in the same manner, based on the known composition of Premarin, would have the same level of assurance that the same active ingredients are in the generic product as are in Premarin.**III. Trade Secret Misappropriation**

**A. The Brandon Process**

11. Wyeth extracts and purifies estrogens found in PMU at its plant in Brandon, Manitoba,

***

As described in the expert report of Dr. Larry Miller, a Professor of Chemistry **[*5]** and former Chair of the Department of Chemistry at the University of Minnesota, the specific chemical steps of the Brandon Process are:

***

12. Wyeth claims the Brandon Process is its trade secret.

13. The Brandon Process extracts estrogens from PMU and transforms them into a purified, dry powder known as Preserved Condensed Urine Desiccated (PCUD). Different batches of PCUD are *** together, processed further, and ultimately converted into tablets, creams, and injectables.

14. In the 1930s, Wyeth developed the first commercial process for extracting estrogens from PMU. Further research and experimentation by Wyeth throughout the 1940s and 1950s led to the development of the Brandon Process. Wyeth performed tests and experiments for every step in the Brandon Process.

15. As set forth below, the Brandon Process is neither generally known nor readily ascertainable, derives independent economic value from secrecy, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Accordingly, Wyeth has established that the Brandon Process is its trade secret.

**B. The Brandon Process is neither generally known nor readily ascertainable**

16. The **[*6]** Brandon Process is not patented. In the 1940s and 1950s, Wyeth obtained patents on several methods discovered in connection with its estrogen extraction research. The patents include: (1) the '398 patent (issued October 21, 1947); (2) the '121 patent (issued December 12, 1950); (3) the '205 patent (issued May 1, 1951); (4) the '265 patent (issued August 21, 1951); (5) the '399 patent (issued August 18, 1953); (6) the '988 patent (issued June 28, 1955); and (7) the '712 patent (issued May 13, 1958). The last patent, the '712 patent, expired in May 1975. Natural Biologics is the only company to claim to have developed a generic equivalent of Premarin based on Wyeth's expired

patents. Approximately 20 years passed between the expiration of the '712 patent and the development of Natural Biologics' process. Wyeth's expired patents do not render the Brandon Process generally known or readily ascertainable.

17. In August 1993, David Saveraid obtained waste manifests from the Manitoba Department of Environment. The manifests list chemicals disposed by the Brandon plant from 1990 to 1993. Some documents reveal the source of the hazardous waste to be the extraction of estrogens from PMU. The **[*7]** manifests do not render the Brandon Process generally known or readily ascertainable.

18. In December 1984, an employee newsletter was published. The newsletter contains photographs of Brandon employees on the plant floor. The captions refer to pieces of equipment used at the plant. In 1992, a company newsletter contained an article stating that the original process involved *** and that extraction with *** came much later. The information contained in the employee newsletters does not render the Brandon Process generally known or readily ascertainable.

19. The Brandon Process cannot be inferred from the public record.

20. The Brandon Process is neither generally known nor readily ascertainable.

**C. The Brandon Process derives independent economic value from secrecy**

21. The Brandon Process is used to make the active ingredient in Premarin. There are no FDA-approved generic substitutes for Premarin. By obtaining the Brandon Process, a prospective competitor would gain a valuable share of the Premarin market.

22. Wyeth's experimentation over the course of several decades led to the development of the Brandon Process. A prospective competitor could not develop a comparable **[*8]** process without a substantial investment of time and money.

23. The Brandon Process derives independent economic value from not being generally known and not being readily ascertainable.

**D. The Brandon Process is the subject of reasonable efforts to maintain its secrecy**

24. The Brandon plant opened in 1966. In the early years of its operation, the plant consisted of a single building that was protected during all non-working hours by a security guard. By the time the plant expanded in the early 1990s, physical security at Brandon included complete perimeter fencing, controlled gate access, closed-circuit cameras, and a guard force that regularly inspected the premises.

25. Wyeth limited access to the Brandon plant. In the early years, employees controlled access to the plant during working hours. Over the years, the plant manager implemented additional security measures, including badges for visitors and employees, sign-in and sign-out sheets, card-access door entry, locked and user-protected copiers, locked storage for documents, and closed circuit television cameras. Wyeth did not offer tours of the Brandon plant, even for employees from other Wyeth facilities, absent special **[*9]** circumstances. The list of outsiders gaining physical access to the Brandon plant consists of government officials, the Brandon Fire Department which was given a tour and information on where flammable solvents were stored, and the executive director of an affiliated horse rancher's association.

26. The Brandon plant manager personally briefed each new employee on the importance of maintaining secrecy. Information about the Brandon process was provided to employees on a need-to-know basis. Wyeth regularly discussed the importance of confidentiality with third parties, such as contractors and engineers, who might come into contact with information about the process. Wyeth disclosed information to contractors on a need-to-know basis. Wyeth required contractors to destroy or return documents related to the Brandon Process at the conclusion of a project.

27. From 1966 to 1979, Wyeth did not create a written description of the Brandon Process. Wyeth first committed the Brandon Process to writing in 1979 in response to regulations that required the drafting of formal operating procedures. Wyeth stored documents relating to the Brandon Process in locked filing cabinets or locked file rooms. **[*10]** Regulations required batch records to remain with the batch during production. Only processors had access to the batch records during production. When the batch was complete, the batch records were filed in locked cabinets.

28. Documents related to the Brandon Process were provided to employees on a need-to-know basis. Employees had to check out the documents. The documents were rarely sent outside the Brandon plant.

29. Not all documents maintained within the Brandon plant were stamped "confidential." The plant manager did not consider it necessary to mark all internal documents; the plant had a small group of employees, all of whom knew that information related to the Brandon Process was confidential. Sensitive

documents sent outside the plant were generally marked confidential before leaving the plant.

30. Wyeth adopted a global corporate policy regarding Proprietary Information Protection (PIP policy) in 1993. The PIP policy recommended classifying documents into categories such as "restricted" and "confidential" and marking, storing, and transmitting them according to their classification. Each location was expected to tailor the PIP policy to meet its needs. The Brandon plant **[*11]** implemented the PIP policy in July 1994. In practice, the treatment of documents at the Brandon plant did not change after implementation of the PIP policy. The Brandon plant did not mark every document in the plant because the plant employed a small group of trusted employees who were aware of the confidentiality of the Brandon Process.

31. Canadian law required Wyeth to disclose information about certain waste chemicals to governmental entities. This information revealed the chemical composition of hazardous waste products, but did not describe the Brandon Process. Wyeth understood that the governmental entities would keep the information confidential.

32. Wyeth required every employee at the Brandon plant to sign a confidentiality agreement at the time of hiring. Due to the seasonal nature of PMU production, Wyeth employed some employees as seasonal temporaries, most of whom returned to the plant year-after-year. Wyeth required the temporaries to sign a new confidentiality agreement each year.

33. Wyeth required its employees to review and acknowledge compliance with its business ethics policy. The policy prohibited employees from disclosing Wyeth's confidential business information **[*12]** or trade secrets during or after their employment. The policy also prohibited the use of such information for an employee's personal benefit or to Wyeth's detriment during or after the employment.

34. Wyeth distributed a handbook to contractors working at the Brandon plant discussing confidentiality requirements. Wyeth required contractors to sign confidentiality agreements before receiving information about the Brandon Process.

35. Wyeth required some of its vendors to sign confidentiality agreements. Equipment vendors that performed installation or other work that required disclosure of information about the Brandon Process had to sign confidentiality agreements. Wyeth did not require its chemical suppliers and its waste haulers to sign confidentiality agreements. Neither the chemical suppliers nor the waste haulers had access to information about the Brandon Process.

36. There have not been repeated losses of information related the Brandon Process. In the history of Premarin, there has been only one instance, apart from the allegations in this case, where a person attempted to improperly disclose confidential information about Premarin or the Brandon Process. A Wyeth engineer, **[*13]** Ashok Tankha, tried to sell proprietary information that he had obtained through his work concerning Premarin to a competitor. Wyeth sought and obtained a permanent injunction prohibiting Tankha from disclosing or using this information.

37. The Court finds the testimony of Wyeth's expert witness on security, George Murphy, credible and agrees that, based on all of the evidence and factors discussed in his testimony and report, Wyeth's information protection efforts fell in the "upper end" of the range of reasonableness for corporate security programs.

38. Wyeth subjected the Brandon Process to efforts reasonable under the circumstances to maintain its secrecy.

**E. Development of Natural Biologics' Process before contacts between David Saveraid and a former Wyeth chemist**

39. In 1991, David Saveraid's brother, Steve Saveraid, investigated making a bulk natural conjugated estrogen product because pharmaceutical companies he had contacted expressed an interest in buying bulk natural conjugated estrogens.

40. In late 1991 and early 1992, David Saveraid reviewed information, including Wyeth's expired patents, that Steve Saveraid had collected concerning the manufacture of bulk **[*14]** natural conjugated estrogens.

41. By May 1992, the Saveraids had identified the *** patents and had indicated that they thought the *** patent was the most important patent. Having identified these patents, the Saveraids then considered using one of them to run a process to produce bulk natural conjugated estrogens.

42. In about June 1992, David Saveraid contacted Dr. Michael Stahr, a Professor and head of the Chemistry Department in the Veterinary Diagnostics Lab at Iowa State University. Stahr was also an owner of Spectrochrom, a company associated with Iowa State University.

43. After meeting with David Saveraid in mid-1992, Spectrochrom agreed to create a proposal for a process based on expired Wyeth patents identified by the Saveraids.

44. In August 1993, Spectrochrom presented a proposal to David Saveraid. The proposal complied with the directive given to Spectrochrom to comply exactly with the patents. The proposal recommended two extraction processes and discussed the possibility of a third. The processes followed examples in the *** patents. David Saveraid did not respond to Spectrochrom's offer of a business relationship. Spectrochrom did no other significant work for **[*15]** Natural Biologics.

45. In August 1993, David Saveraid obtained waste manifests listing chemicals disposed by the Brandon plant. After reviewing the manifests, David Saveraid decided to try the ***-based extraction process described in the Spectrochrom proposal that followed an example in the *** patent.

46. In December 1993, David Saveraid contacted the Agricultural Utilization Research Institute (AURI). AURI agreed to provide facilities and partial funding. David Saveraid sent the procedure based on the *** patent from the Spectrochrom proposal to AURI. AURI understood that he wanted AURI to run this process. David Saveraid did not want AURI to conduct experiments or research alternative processes for extracting estrogen from PMU.

47. In May and June 1994, AURI ran the process based on the *** patent on a laboratory scale using PMU provided by the Saveraids. AURI did not conduct any research while carrying out this work and did not have any technical discussions with David Saveraid while it ran the process.

48. After concluding trial runs of the process, AURI prepared a report dated October 17, 1994. The report stated: "The extraction of estrogens derived from pregnant mare urine **[*16]** was carried out according to patent literature identified by the client using ***." The report also indicated that the results of the trial runs appeared encouraging and that "the process can likely be scaled to pilot size." David Saveraid did not ask AURI to do any further work, and AURI did not perform any for him. Because AURI did not have facilities to scale up the process, David Saveraid looked elsewhere for such a facility.

49. On November 14, 1994, David Saveraid met with Dr. John Frey at Mankato State University. They discussed using Mankato State's facilities to scale up the process described in the AURI report. David Saveraid instructed Frey to run the process on a larger scale. On November 21, 1994, Frey sent a proposal to David Saveraid that stated the purpose of the project was to scale up the process described in the AURI report. At a meeting between Frey and David Saveraid on January 20, 1995, David Saveraid learned that Mankato State would not be able to perform the project.

**F. Contacts between David Saveraid and a former Wyeth chemist**

50. David Saveraid began communicating with Dr. Douglas Irvine (Dr. Irvine), a former Wyeth senior research chemist, in the **[*17]** fall of 1994. Dr. Irvine was one of Wyeth's preeminent authorities on Premarin and the Brandon Process.

51. Dr. Irvine worked for Wyeth from 1956 to 1977. By 1963, he had focused on the Brandon Process, which remained the focus of his work at Wyeth until 1977. In 1977, he went on disability due to the loss of his eyesight.

52. Dr. Irvine consulted for Wyeth on Premarin and the Brandon Process into the early 1990s. For example, in 1993, he wrote a detailed confidential memorandum suggesting that a chemical used as a *** in the Brandon Process *** could be eliminated and its function replaced with ***. In January 1994, he advised the quality control specialist at the Brandon plant that *** is a critical step in the Brandon Process and that the amount added had to be within a narrow range of the optimum.

53. In 1994, Wyeth asked Dr. Irvine to consult exclusively for Wyeth. Dr. Irvine declined, and his consulting for Wyeth ended.

54. The first contact between David Saveraid and Dr. Irvine took place in the fall of 1994. Dr. Irvine called David Saveraid after receiving a marketing brochure prepared by Natural Biologics. Dr. Irvine introduced himself to David Saveraid as a former Wyeth **[*18]** research chemist.

55. David Saveraid first called Dr. Irvine on October 31, 1994; that call lasted 38 minutes. David Saveraid called Dr. Irvine again in December 1994. That call lasted 70 minutes. From October 1994 to early 1996, David Saveraid made over 50 calls, lasting more than 1,000 minutes, to Dr. Irvine's home phone and fax numbers. David Saveraid also sent at least three faxes to Dr. Irvine from a hardware store near his home between February and June 1995.

56. Dr. Irvine made calls and faxes to David Saveraid. The number and length of calls and faxes from Dr. Irvine to David Saveraid are unknown because records for Dr. Irvine's telephone number are not available.

**G. Development of Natural Biologics' Process after contacts between David Saveraid and Dr. Irvine**

57. After learning that Mankato State could not scale up the AURI process, David Saveraid contacted Dr. Jeffrey Tate (Dr. Tate), the assistant to the director of

the Biological Process Technology Institute (BPTI) at the University of Minnesota. The first telephone contact between David Saveraid and Dr. Tate took place on January 24, 1995. Their first meeting took place on February 6, 1995, when David Saveraid [*19] toured BPTI's facilities.

58. On February 15, 1995, another meeting at BPTI was held. David Saveraid brought to BPTI a typed protocol for a new process to extract estrogen from PMU; it was the first protocol for estrogen and extraction and purification he had ever typed.

59. David Saveraid provided all of the procedural steps to BPTI.

60. Craig Bremmon, the BPTI pilot plant and laboratory manager turned the process description brought by David Saveraid to the February 15, 1995, meeting into a flow diagram. The flow diagram eventually became a standard operating procedure for the Natural Biologics Process. The standard operating procedure is essentially the same as Natural Biologics' current manufacturing process.

61. BPTI ran seven batches using essentially the same standard operating procedure from February to mid-March 1995. Any revisions made to the standard operating procedure during these runs were incidental changes not to the process itself but to equipment and recording procedures.

62. On March 14, 1995, David Saveraid brought to BPTI a *** that detects the presence of estrogens. BPTI used it to test for the presence of estrogens in the batches. Further analytical testing [*20] was performed later that year by Huntingdon Labs, Iowa State University, and Scientific Associates.

63. By letter of March 29, 1995, to David Saveraid, Dr. Tate confirmed the nature of BPTI's work and the results: "Following the trial run in which all of the procedural steps you provided were worked out and standard operating procedure (SOP) was agreed upon, our pilot plant personnel have been successfully producing DUE [desiccated urine equine] by the SOP for four weeks."

64. The process protocol that David Saveraid brought to BPTI on February 15, 1995, and that was converted into the process that Natural Biologics currently uses, was markedly different from any of the processes previously considered by him.

**H. The Brandon Process and Natural Biologics' process are essentially the same**

65. The Court finds the testimony of Dr. Miller's comparison of the 1995 Natural Biologics process and the Brandon Process persuasive. Of the *** chemicals used in the Brandon Process, the 1995 Natural Biologics process uses *** of them in the same order. Whereas Wyeth adds *** to *** the PMU, Natural Biologics uses *** the PMU. Dr. Irvine was involved in research that indicated that *** [*21] could replace ***, and he wrote a confidential memorandum for Wyeth in 1993 on the topic. The Brandon Process ***. The 1995 Natural Biologics process does not use ***. Natural Biologics uses *** in its scaled-up commercial operation.

66. Of the *** steps in the Brandon Process, *** are present in the same order in the 1995 Natural Biologics process. The processes' first steps are different in that the Brandon Process uses ***, and the 1995 Natural Biologics process uses *** the PMU. The processes' second steps are different in that the Brandon Process ***

67. Most of the details of the Brandon Process and the 1995 Natural Biologics process are the same are very similar. For example, ***, the exact concentration and volume used in the Brandon Process. Natural Biologics *** this also duplicates the Brandon process. Natural Biologics uses a *** the same as the Brandon process. Natural Biologics *** This too is precisely the same *** as used in the Brandon process, and it is calculated in the same way as Wyeth calculates *** for the Brandon process.

68. Natural Biologics believes that its process yields a bulk natural conjugated estrogen product that is the same as is used to manufacture [*22] Premarin.

69. The Court does not find the testimony of Dr. Edward Cussler, a Professor of Chemistry at the University of Minnesota, regarding alleged differences between the Brandon Process and the 1995 Natural Biologics persuasive.

70. The 1995 Natural Biologics process is essentially the same as the Brandon Process.

**I. Disclosure of information about the Brandon Process by Dr. Irvine would be improper**

71. Natural Biologics knew it would be improper for David Saveraid to obtain information about the Brandon Process from a former Wyeth employee.

72. David Saveraid knew it would be improper for him to obtain information about the Brandon Process from a former Wyeth employee.

73. Dr. Irvine knew it would be improper for him to disclose information about the Brandon Process to David Saveraid.

**J. Natural Biologics' motive for copying the Brandon Process**

74. To increase its chances of obtaining FDA approval of a generic version of Premarin, Natural Biologics attempted to copy the Brandon Process. Classification of Natural Biologics' product as a generic would permit Natural Biologics to avoid to time and expense of conducting clinical trials. Financial considerations **[*23]** also motivated Natural Biologics to copy the Brandon Process. Gross sales of Premarin exceeded $ 2 billion in 2001 in the United States. Natural Biologics believed its entry into the Premarin market as the only generic competitor would have a very small downward pricing effect.

**K. David Saveraid's lack of qualifications**

75. David Saveraid is the person principally responsible for developing Natural Biologics' process. Before forming Natural Biologics, he had worked most of his career as an agricultural salesman. None of his prior work experience involved chemistry lab work, chemistry processes, extraction processes, or chemistry of any kind. David Saveraid was not qualified to independently develop a process that is essentially the same as the Brandon Process.

**L. No company other than Natural Biologics has claimed to duplicate the Brandon Process**

76. Several companies, including Abbott Laboratories, Charles E. Frosst, Organics LaGrange, Prengen, and Merck, have attempted to extract estrogens from PMU. No company other than Natural Biologics has claimed to reproduce the Brandon Process based on Wyeth's expired patents. After the FDA rejected its application to develop **[*24]** a synthetic-based generic Premarin in 1997, Barr Laboratories began to explore alternatives to develop a generic product. Instead of developing its own extraction process, Barr Laboratories agreed in 2002 to pay up to $ 70 million to Natural Biologics for bulk conjugated estrogens.

**M. David Saveraid destroyed records relating to the development of Natural Biologics' process**

77. David Saveraid destroyed almost all records relating to the development of Natural Biologics' process after he began communicating with Dr. Irvine. The decision to destroy these records was unreasonable. Natural Biologics destroyed the records in bad faith, attempting to limit damaging evidence against it. Wyeth has been prejudiced by Natural Biologics' document destruction. Because defendants' document destruction was unreasonable and intended to limit damaging evidence, and because this action prejudiced Wyeth, the Court finds that David Saveraid's development notes would have revealed that he obtained trade secret information through Dr. Irvine and used that information to develop the 1995 Natural Biologics process.

**N. Contacts between David Saveraid and Dr. Irvine reveal that Dr. Irvine disclosed [*25] the Brandon Process to David Saveraid**

78. The timing and pattern of the telephone calls between David Saveraid and Dr. Irvine reveal that David Saveraid used information from Dr. Irvine to develop Natural Biologics' process. Again, David Saveraid made significant changes to the process run at AURI during the 4 months between his receipt of AURI's report in October 1994 and his meeting at BPTI on February 15, 1995, the day he brought the typed protocol to BPTI. During that time period, David Saveraid and Dr. Irvine communicated at length. In the weeks leading up to the meeting at BPTI on February 15, 1995, David Saveraid placed several telephone calls to Dr. Irvine. For example, on December 27, 1994, a 70-minute call took place. On January 17, 1995, a 30-minute call took place. On January 25, 1995, they spoke for 8 minutes. David Saveraid made five telephone calls and one fax to Dr. Irvine from February 2, 1995, to February 15, 1995. Telephone calls from David Saveraid to Dr. Irvine resumed on March 14, 1995, the day that David Saveraid brought the *** to BPTI. Between March 14, 1995, and April 20, 1995, when BPTI verified the extraction process, David Saveraid placed 9 telephone **[*26]** calls and sent 2 faxes to Dr. Irvine.

79. The juxtaposition of David Saveraid's calls to Dr. Irvine with his calls to Dr. Tate reveals that David Saveraid used information from Dr. Irvine to develop Natural Biologics' process. For example, on February 6, 1995, the day of David Saveraid's tour of BPTI, David Saveraid called Dr. Irvine in the morning, faxed Dr. Irvine at 1:05 p.m., and called BPTI at 1:31 p.m. The next morning, after a 20-minute telephone call to BPTI, David Saveraid called Dr. Irvine. On February 15, 1995, David Saveraid placed a telephone call to Dr. Irvine at 2:38 p.m., spoke for 9 minutes, and called BPTI at 2:48 p.m.

80. Dr. Irvine concealed his contacts with David Saveraid and denied knowing David Saveraid. Wyeth interviewed Dr. Irvine in January 2000 and February 2001. In those interviews, Dr. Irvine denied any knowledge of David Saveraid, Ken Saveraid, Steven Saveraid, or Natural Biologics, and denied ever meeting or speaking with any of them. Before he made those denials, Dr. Irvine had called David Saveraid to report that he was going to be interviewed by Wyeth's lawyers. Dr. Irvine's concealment of his contacts with David Saveraid reveals that Dr. Irvine **[*27]** discussed the Brandon Process with David Saveraid.

81. Only after Wyeth discovered David Saveraid's phone calls to Dr. Irvine did Dr. Irvine admit that he had numerous telephone conversations with David

Saveraid. Dr. Irvine admitted that he introduced himself to David Saveraid as a former Wyeth research chemist, that he discussed the Brandon Process with David Saveraid, and that he engaged in extensive discussions with David Saveraid about the extract and purification of estrogens from PMU. The Court finds Dr. Irvine's concessions about the content of his conversations with David Saveraid credible. Notwithstanding these concessions, Dr. Irvine did not give wholly truthful testimony about his conversations with David Saveraid. For example, Dr. Irvine denied disclosing trade secret information to David Saveraid, but the Court finds that he disclosed the Brandon Process to David Saveraid.

**O. Documentary evidence of Dr. Irvine's involvement in the development of Natural Biologics' process**

82. On November 10, 1994, 10 days after he first called Dr. Irvine, David Saveraid faxed a letter to Michael Czarny at Salsbury Chemicals. In that letter, David Saveraid wrote: "We have involved **[*28]** a consultant previously involved in the design and development of the innovator drug currently being manufactured in Canada by [Wyeth]." The consultant referred to in the letter is Dr. Irvine.

83. On November 10, 1994, 10 days after he first called Dr. Irvine, David Saveraid faxed a letter to William Tillman at Alpharma. In that letter, David Saveraid wrote: "We have a consultant available with 20 years of experience working in development of the original product now being manufactured by [Wyeth]. He has substantial experience with natural conjugated estrogen bulk and preparation manufacture. He may be of value in expanding our procedure to fit your needs." The consultant referred to in the letter is Dr. Irvine.

84. The *** is a photocopy of "page 2" of a fax sent to David Saveraid describing a procedure, *** Dr. Irvine and David Saveraid spoke on March 14, 1995, the day that David Saveraid delivered the *** to BPTI. The *** fax states: "I have only been able to find this article on cassette tape." Dr. Irvine is blind. The *** fax that was produced bears several indicia of improper redaction. It is missing a cover page, a fax line, and the bottom portion of the page where a signature **[*29]** line would be expected to appear, all of which would identify its source. Notwithstanding these absences, the Court finds that Dr. Irvine wrote the *** fax and sent it to David Saveraid.

85. The original version of the *** fax was in the possession or control of Natural Biologics. Natural Biologics lost the original after the commencement of this litigation. Natural Biologics redacted the *** fax to conceal Dr. Irvine as its source.

86. A document Bates-stamped AUR00656 is a page of the October 17, 1994, AURI report describing the *** process. AUR00656 also contains David Saveraid's handwritten notes made during the period when he began talking to Dr. Irvine. The notes are the result of David Saveraid's conversations with Dr. Irvine.

87. Wyeth's Exhibit 163 contains more of David Saveraid's handwritten notes. The notes include the following passage:-- Irvine Contributions-- review our procedure, guide our preliminary manufacture.

-- carry existing BNCE to I.V. levelDavid Saveraid wrote the notes in late 1994, after he began communicating with Dr. Irvine. "Irvine" refers to Dr. Irvine. Dr. Irvine made contributions to Natural Biologics' process, **[*30]** reviewed Natural Biologics' procedure, and guided Natural Biologics' preliminary manufacture.

88. After producing a copy of Exhibit 163 during discovery, Natural Biologics lost the original. The original was in the possession or control of Natural Biologics, and Natural Biologics lost it after the commencement of this litigation. Natural Biologics provided no explanation for the loss of the original and Wyeth has been prejudiced by the loss. Wyeth has been prejudiced because the document contains a note with the date "March 1994" that appears to have been written over another date. This note is the only portion of the document that is inconsistent with a fall 1994 creation date. Natural Biologics' loss of the original warrants an adverse finding that the original document would have further established that the notes in Exhibit 163 were written in late 1994, after David Saveraid's contacts with Dr. Irvine began.

**P. Natural Biologics concealed and gave false testimony about its contacts with Dr. Irvine**

89. Before this litigation, David Saveraid did not tell anybody about his communications with Dr. Irvine. David Saveraid represented to the FDA that a Wyeth chemist was not involved **[*31]** in the development of Natural Biologics' process.

90. David Saveraid continued to conceal his contacts with Dr. Irvine during discovery in this litigation, including on many occasions when he was under oath. After Wyeth requested telephone records, David Saveraid reviewed the records before they were produced and redacted certain calls, including calls to Dr. Irvine. Wyeth's review of the records revealed one page showing several calls to Dr. Irvine that had not been redacted. Production of a full set of unredacted telephone records revealed more than 50 telephone calls from David Saveraid to Dr. Irvine. After

reviewing the unredacted records, Wyeth moved to redepose David Saveraid. The Magistrate Judge granted the motion, concluding that David Saveraid had "actively concealed" the calls to Dr. Irvine, had not complied with Court orders, and had given "evasive or false" testimony about his contacts with Dr. Irvine. At David Saveraid's subsequent deposition, he continued to give false testimony, denying that he had discussed the Brandon Process with Dr. Irvine, that he knew Dr. Irvine had worked for Wyeth, and that he had ever sent faxes to Dr. Irvine. David Saveraid made a conscious **[*32]** and deliberate decision to give false testimony about whether he knew Dr. Irvine.

91. David Saveraid continued to give false testimony at trial. He falsely testified that he had not violated Court orders, that he had not destroyed evidence, that he had not deceived the FDA, that he did not know until 2001 that Dr. Irvine was a former Wyeth chemist, and that Dr. Irvine had no role in the development of Natural Biologics' process.

**Q. No record of development of Natural Biologics' process**

92. There is no record showing how Natural Biologics changed the process run at AURI into the process David Saveraid brought to BPTI on February 15, 1995.

93. Natural Biologics did not conduct any tests or experiments in connection with the transformation of the process run at AURI into the process brought to BPTI by David Saveraid on February 15, 1995.

94. David Saveraid did not receive any assistance from anybody at AURI, Spectrochrom, Mankato State, or BPTI in transforming the process run at AURI into the process he brought to BPTI on February 15, 1995. Dr. Tate falsely testified that he and David Saveraid developed Natural Biologics' process at a series of white-board meetings in the late **[*33]** summer and fall of 1994. Again, the first contact between David Saveraid and Dr. Tate took place on January 24, 1995.

95. Natural Biologics' explanation that it pieced together its process from Wyeth's expired patents, waste manifests, and other public information is neither credible nor feasible.

96. Natural Biologics misappropriated the Brandon Process.

**IV. Natural Biologics' growth after David Saveraid and Dr. Irvine began communicating**

**A. Size and assets**

97. Before David Saveraid and Dr. Irvine began communicating, David Saveraid had received less than $ 10,000 in income as an officer of Natural Biologics. Natural Biologics itself had not received any income, had not hired any employees other than David Saveraid, had no private investors, had no office space, had no agreements with third parties to build a plant, had received approximately $ 10,000 from public entities, and had assets consisting of a leased truck, equipment to collect urine, and improvements to a barn for seven or eight horses.

98. After David Saveraid and Dr. Irvine began communicating, Natural Biologics hired employees, obtained investment money from a private investor, obtained equipment, **[*34]** and built a commercial facility. Natural Biologics is a company built on misappropriation.

**B. Natural Biologics' pilot plant**

99. After BPTI completed its process runs in the spring of 1995, David Saveraid searched for a facility to begin pilot-scale production, sought analytical results, solicited urine producers, and spoke to pharmaceutical companies about providing them with bulk material.

100. In July or August 1995, David Saveraid met John Albers, the former chief executive officer, President, and Chairman of the Board of Dr. Pepper. Albers is a venture capitalist who has investments in 8 to 10 start-up companies. Albers's investment in each company exceeds $ 1 million, and his total investment in the companies exceeds ***.

101. Albers believed that Natural Biologics presented an attractive investment opportunity. David Saveraid told Albers that Natural Biologics' process came from Wyeth's expired patents and publicly available information about the Brandon Plant's waste stream. David Saveraid did not disclose his communications with Dr. Irvine to Albers. Albers did not investigate whether Natural Biologics obtained its process from a former Wyeth employee. In 1995, Natural **[*35]** Biologics received $ 400,000 from Albers's company, Fairfield Enterprises, to set up a pilot plant and to pay horse ranchers to supply urine.

102. In late 1995, Natural Biologics began assembling a pilot manufacturing facility at the Hormel Institute in Austin, Minnesota. After obtaining space there, Natural Biologics began hiring employees.

103. In April 1996, Natural Biologics began processing batches of urine at the Hormel Institute. Natural Biologics completed processing those batches in May or June 1996.

104. The 1996-97 production season began in November 1996. At the end of that production season, Natural Biologics *** one batch to meet the requirements of USP 23, which is a monograph published by the United States Pharmacopeia that

establishes compendial standards for natural conjugated estrogens. Natural Biologics also completed validation of its process and equipment, and began its Drug Master File for submission to the FDA.

**C. Natural Biologics' commercial facility**

105. In early 1997, Albers decided to build a commercial facility for Natural Biologics. Natural Biologics purchased property in Albert Lea, Minnesota, in July 1997. Later that summer, construction **[*36]** of Natural Biologics' commercial plant began. Construction of the plant, installation of equipment, and production began by December 1997.

**D. Wyeth's lawsuit and Albers's investment decisions**

106. Wyeth's decision to commence this litigation had no effect on Albers's decisions to invest in Natural Biologics. Albers continued to invest in Natural Biologics after Wyeth commenced this action knowing that Wyeth was seeking a permanent injunction and believing that Natural Biologics' "position is valid in this matter." Natural Biologics remained a chief investment priority for Albers after Wyeth commenced this action. Natural Biologics spent millions of dollars after Wyeth commenced this action.

107. Before investing in Natural Biologics, Albers did not conduct a thorough investigation of how David Saveraid developed Natural Biologics' process. Albers received neither written representations nor warranties from David Saveraid regarding the development of Natural Biologics' process. Albers simply believed David Saveraid's assurances that Natural Biologics' process was legitimately developed.

108. Notwithstanding evidence of Natural Biologics' misappropriation of the Brandon Process, **[*37]** including phone calls and faxes between David Saveraid and Dr. Irvine, David Saveraid's letters to Czarny and Tillman, David Saveraid's note regarding Dr. Irvine's contributions, and the Magistrate Judge's Order regarding David Saveraid's false testimony, Albers continues to trust David Saveraid to the same extent as when he first invested in Natural Biologics.

**E. Barr Laboratories**

109. In March 2002, Barr Laboratories announced that it had entered into several agreements with Natural Biologics. Barr Laboratories agreed to contribute the pharmaceutical, regulatory, manufacturing, and sales and marketing expertise necessary to commercialize a generic conjugated estrogens product. Barr Laboratories also agreed to provide financing to Natural Biologics consisting of up to $ 35 million over a 3-year period, and up to $ 35 million in milestone payments through FDA approval of a generic product.

**V. Wyeth's knowledge of and contacts with Natural Biologics**

**A. Before November 17, 1995**

110. Before November 17, 1995, Wyeth had information about Natural Biologics from three sources: a 1994 marketing brochure; telephone contact between David Saveraid and Dr. Michael Dey; **[*38]** and a telephone call between Ken Saveraid and Ross Chambers, the Brandon plant's field supervisor.

**1. The Marketing Brochure**

111. In the summer of 1994, one of Wyeth's PMU suppliers sent a copy of a Natural Biologics marketing brochure to Chambers. The brochure was distributed to several Wyeth officials that summer. Wyeth regarded the brochure as an announcement of a PMU collection business that could compete in the bulk natural conjugated estrogens market. Wyeth did not read the brochure to announce that Natural Biologics had obtained the Brandon Process.

112. David Saveraid wrote the marketing brochure in the summer of 1994, before AURI had completed its runs and prepared its report. The brochure listed Natural Biologics' research objectives: "identify a market for natural conjugated estrogen as a bulk pharmaceutical"; "discover the trade secrets necessary to extract estrogen from mare's urine"; document the procedures used to collect urine"; "operate a pilot urine production farm"; "complete a preliminary study yielding a sample of bulk natural conjugated estrogen as described by analytical procedures supplied by the [FDA]"; and "identify pharmaceutical labs willing to **[*39]** purchase the product and begin FDA approval." The brochure stated that the "R & D objectives have been achieved."

113. David Saveraid drafted the brochure before his first contact with Dr. Irvine. Accordingly, the brochure did not and could not reveal that Natural Biologics had misappropriated the Brandon Process.

**2. Telephone calls between David Saveraid and Dey**

114. In the summer of 1994, Dey was vice president and general manager of a generic subsidiary of Wyeth, ESI Pharma. After reading the Natural Biologics marketing brochure, Dey told his superiors that he would look into what Natural Biologics had and what it knew.

115. Dey called David Saveraid on September 23, 1994. Dey inquired about the possibility of purchasing product from Natural Biologics. Dey learned: (1) Natural Biologics was in the very early stages of development; (2) Natural Biologics planned to start

collecting urine in October 1994; (3) Natural Biologics had submitted some samples for analysis; (4) Natural Biologics expected to have samples from the 1994-95 season in early 1995; (5) the estrogens were more stable than Natural Biologics had anticipated; (6) Natural Biologics was using a government lab [*40] for testing; (7) Natural Biologics did not have any exclusive agreements; and (8) Natural Biologics was involved with an economic development group. David Saveraid did not disclose any information about the process Natural Biologics was using at that time. The conversation between Dey and David Saveraid took place before David Saveraid's contacts with Dr. Irvine.

116. In December 1994, David Saveraid called Dey and left a telephone message. David Saveraid inquired about Dey's interest in Natural Biologics' product. David Saveraid did not disclose that he had started speaking with Dr. Irvine in October 1994. On the advice of counsel, Dey did not return David Saveraid's call. At the time, Dey did not have any reason to believe that Natural Biologics had misappropriated the Brandon Process.

**3. Telephone call from Ken Saveraid to Chambers**

117. On September 29, 1995, Ken Saveraid called Chambers. Ken Saveraid told Chambers that Natural Biologics was funded by a pharmaceutical company in Chicago, and that a university was providing research to Natural Biologics. Ken Saveraid also stated that Natural Biologics intended to use the "Chicago Process" and that Natural Biologics expected [*41] to collect urine from approximately 200 mares in the upcoming production season. In 1995, Wyeth had approximately 25,000 to 30,000 mares.

118. Wyeth interpreted Ken Saveraid's reference to the Chicago Process to mean that Natural Biologics was using a process developed by Organics LaGrange, a Chicago pharmaceutical company.

**4. No additional information about Natural Biologics was available to Wyeth**

119. As of November 17, 1995, Wyeth had no information about Natural Biologics other than the brochure, the telephone call between Dey and David Saveraid, David Saveraid's message for Dey, and the telephone call between Ken Saveraid and Chambers.

120. By letter of September 12, 1995, Scientific Associates sent results of tests performed on the material produced at BPTI to Natural Biologics. Wyeth neither knew nor should have known of the test results before November 17, 1995.

121. Before November 17, 1995, David Saveraid did not disclose his contacts with Dr. Irvine to Wyeth. Wyeth first discovered the communications between David Saveraid and Dr. Irvine in 2001. Wyeth neither knew nor should have known about David Saveraid's contacts with Dr. Irvine before November 17, 1995. [*42]

122. Before November 17, 1995, David Saveraid did not disclose to Wyeth how Natural Biologics had developed its process.

123. Before November 17, 1995, samples of material produced by Natural Biologics' process were not available.

124. Before November 17, 1995, Wyeth neither knew nor should have known that Natural Biologics had misappropriated the Brandon Process.

125. Wyeth neither discovered nor by the exercise of reasonable diligence should have discovered the misappropriation of the Brandon Process by Natural Biologics before November 17, 1995.

**B. After November 17, 1995**

126. In early 1996, Wyeth received reports from its ranchers that Natural Biologics was soliciting ranchers for PMU. Carrie Smith-Cox, the head of marketing in Wyeth's Women's Health Care group, asked J.R. Hildreth, the head of Wyeth's competitive research department, to obtain information about Natural Biologics as a potential competitor.

127. Hildreth contacted Lois Thomas, an analyst at the Washington Information Group (WIG), a company regularly engaged by Wyeth to conduct business research. On April 3, 1996, Thomas prepared a summary of WIG's research for Hildreth. The summary stated:

Very [*43] few people are aware of Natural Biologics or its activities. Most who know of the company are reaching back five to ten years with no recent word. Those who are presumably working with Natural Biologics are so far unwilling to speak with us. Indications are, however, that Natural Biologics is actively developing processing capability and possibly already collecting PMU from ranchers in Minnesota and Iowa.

The summary also stated that Natural Biologics worked with AURI to develop a process for extracting conjugated estrogens from PMU.

128. In early April 1996, Thomas had a telephone conversation with David Saveraid. He told her that Natural Biologics was attempting to produce natural conjugated estrogen USP 23 and that Natural Biologics planned to submit an abbreviated new drug application. David Saveraid did not disclose any information about Natural Biologics' process to Thomas.

129. In April 1996, WIG obtained a floor plan dated December 18, 1995, of Natural Biologics' pilot facility at the Hormel Institute. Thomas sent a copy of the floor plan to Chambers and Lawrence on April 10, 1996. Lawrence reviewed the floor plan and spoke to Thomas about it on April 11. Lawrence **[*44]** noted that Natural Biologics was using some of the same equipment and chemicals as the Brandon Process, and that Natural Biologics had a "pretty good process." Lawrence also indicated that the floor plan did not reveal information about ***.

130. The floor plan includes the names of four chemicals-- *** --and three pieces of equipment-- ***. Hence, the floor plan indicates that Natural Biologics was using *** of the *** chemicals used in the Brandon Process, and *** pieces of equipment similar to that used in the Brandon Process. The floor plan does not indicate how the chemicals are used, the amounts of chemicals used, or the size of the equipment. The floor plan does not show a complete process; it lacks information about ***.

131. On April 17, 1996, Wyeth's PMU Steering Committee held a meeting. Hildreth spoke briefly about the business research on Natural Biologics. A blow-up or transparency of the floor plan was displayed. Someone commented that the floor plan's layout was similar to that of the Brandon plant. Hildreth stated that no link between Natural Biologics and another pharmaceutical company had been found. There was no discussion at the meeting about whether Natural **[*45]** Biologics had misappropriated the Brandon Process. The floor plan did not reveal to Wyeth that Natural Biologics had misappropriated the Brandon Process.

132. In November 1996, Michael Peskoe, a regulatory attorney for Wyeth, called David Saveraid to discuss the issue of synthetic generics. At that time, the FDA was considering whether to classify synthetically-derived estrogen products as generic substitutes for Premarin. Wyeth opposed such a classification on the ground that the synthetics did not include all of the components of Premarin. Natural Biologics agreed with Wyeth's position.

133. Peskoe asked David Saveraid whether Natural Biologics would submit comments to the FDA in support of Wyeth's opposition to the classification of synthetics as generic substitutes for Premarin. David Saveraid responded that he was aware of the issue, and agreed to submit comments to the FDA. In December 1996, Natural Biologics submitted comments to the FDA in opposition to the classification of synthetics as generic equivalents.

134. In January 1997, a Wyeth attorney wrote a letter to the FDA, enclosing a copy of Natural Biologics' comment letter. Wyeth's letter states that Natural Biologics **[*46]** "presents as an alternate source of equine-derived, natural conjugated estrogens raw material."

135. Wyeth's contacts with David Saveraid and with the FDA regarding synthetics were ordinary business contacts that benefited both Wyeth and Natural Biologics. Those contacts were not unfair, misleading, or inappropriate. Natural Biologics' submission to the FDA reflected its longstanding opposition to approval of synthetic generics. Natural Biologics' 1994 marketing brochure stated that "attempts have been made to duplicate the product synthetically, however, the natural content of precisely the right combination of estrogens cannot be duplicated." As of January 1997, Wyeth neither knew nor had reason to know that Natural Biologics had misappropriated the Brandon Process.

136. In June 1997, Natural Biologics announced that it intended to build a plant in Albert Lea, Minnesota, and the plant was operating by December 1997. Wyeth learned of Natural Biologics' plan to build the plant through WIG. A video of the plant site revealed that Natural Biologics was using some of the same vendors that had worked in Brandon. Wyeth retained outside counsel and later contacted one of the vendors to **[*47]** ensure that the vendor maintained the confidentiality of information relating to the Brandon Process.

137. Investigation by Wyeth's outside counsel revealed additional similarities between the Brandon Process and Natural Biologics' process. In the fall of 1997, Wyeth discovered that Natural Biologics was using ***. Wyeth uses these *** in the Brandon Process. Accordingly, in the fall of 1997, Wyeth knew of *** used by Natural Biologics, all of which are used in the Brandon Process.

138. In the spring of 1998, Wyeth learned from B & P Process & Equipment that the *** used by Natural Biologics had the same model number as the *** used in the Brandon Process. A technical specialist for B & P also told Wyeth that he believed Natural Biologics had inside information about the Brandon Process based on conversations he had with Natural Biologics' employees in the fall of 1997. In particular, a Natural Biologics employee commented about superior *** rates. The technical specialist understood the comment to reflect a specific understanding of the Brandon Process.

**VI. Harm to Wyeth**

139. If Natural Biologics were permitted to use misappropriated trade secret information to manufacture **[*48]** bulk estrogens to be used in a generic version of Premarin, Wyeth would experience irreparable harm.

140. If a generic version of Premarin is sold based on material produced by Natural Biologics, Wyeth would lose market share, leading to a decline in revenues, research, and employment. The Court finds the testimony of Dr. Michael Dey, the President of the Women's Health Care Division at Wyeth, regarding the impact on Wyeth to be credible. Wyeth's lost market share would result in decreased revenues. The decreased revenues in turn would result in layoffs of between 3,000 and 4,000 employees and reduced funding for marketing and research of several hundred million dollars.

141. Wyeth's relationships with physicians would also be harmed by the introduction of a generic version of Premarin based on material produced by Natural Biologics. Wyeth's ability to market its current and future products would be harmed by the damage to its relationships with physicians.

142. The introduction of a generic form of Premarin based on material produced by Natural Biologics would irreparably harm Wyeth by Wyeths' lost market share, damage to Wyeth's physician relationships, Wyeth's lost marketing **[*49]** opportunities, and Wyeth's loss of control over its trade secret information.

143. A permanent injunction is necessary to prevent irreparable harm to Wyeth.

144. David Saveraid knew that he risked the loss of his business if he acquired information about the Brandon Process from a former Wyeth employee. Natural Biologics has operated since 1998 knowing that Wyeth sought a permanent injunction. John Albers understood that Natural Biologics would be ordered to shut down if Natural Biologics had engaged in trade secret misappropriation.

145. Unless enjoined from doing so, Natural Biologics would inevitably use the information it learned about the Brandon Process in connection with any business involving extraction of bulk natural conjugated estrogens from urine. Natural Biologics would not be able to undertake future research and development efforts about any other estrogen-extraction process without relying on information gained from Natural Biologics' misappropriation of the Brandon Process.

146. Natural Biologics cannot be trusted to undertake future research and development into extraction processes without relying on information learned from its misappropriation of the Brandon **[*50]** Process. David Saveraid gave false testimony in an attempt to conceal his contacts with Dr. Irvine. Dr. Tate falsely testified that he met with David Saveraid and developed Natural Biologics' process in the fall of 1994 in a series of white-board sessions. Before and during this litigation, Natural Biologics destroyed records relating to the development of its process in an attempt to conceal evidence that it had misappropriated the Brandon Process.

## NON-CONFIDENTIAL CONCLUSIONS OF LAW

### I. Trade Secret Misappropriation

1. [HN1]The Minnesota Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01-.08 (2002), protects certain information by providing for an action for misappropriation. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 897 (Minn. 1983). The threshold issue in an action for misappropriation of a trade secret is whether a trade secret exists. "Without a proven trade secret there can be no action for misappropriation, even if [a defendant's] actions were wrongful." *Electro-Craft*, 332 N.W.2d at 897.

### A. Trade Secret

2. [HN2]A trade secret is information, including a process, that "derives **[*51]** independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5. In other words, for information to qualify as a trade secret: (1) the information must be neither generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy. *Electro-Craft*, 332 N.W.2d at 899; *Widmark v. Northrup King Co.*, 530 N.W.2d 588, 592 (Minn. Ct. App. 1995).

3. [HN3]To determine whether a trade secret exists, the Court must first determine what Wyeth claims as its trade secret. *See Electro-Craft*, 332 N.W.2d at 899. In this case, Wyeth claims the Brandon Process is its trade secret.

#### 1. Generally known or readily ascertainable

4. [HN4]"Matters which are generally known or which are commonly known in the trade in which the putative trade **[*52]** secret owner is engaged cannot be considered trade secrets." *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 688 (D. Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987); *see Electro-Craft*, 332

N.W.2d at 899 (affirming finding that process was not readily ascertainable because it could not be reverse engineered "quickly"); *Northwest Airlines v. Am. Airlines*, 853 F. Supp. 1110, 1114 (D. Minn. 1994) (difficulty in replicating information is evidence that it is not generally known or readily ascertainable).

5. [HN5]Although "mere variations on widely used processes cannot be trade secrets," a unique combination of known elements may constitute a trade secret. *Electro-Craft*, 332 N.W.2d at 899. Accordingly, it is the secrecy of the process as a whole, not the individual elements, that determines whether a trade secret exists. *See id.*

6. Because neither Wyeth's expired patents nor other public domain materials disclose the Brandon Process, no company other than Natural Biologics in the history of Premarin has claimed to duplicate the Brandon Process based on Wyeth's expired patents and other publicly available **[*53]** information, and Barr Laboratories agreed to provide up to $ 70 million to Natural Biologics instead of developing its own estrogen-extraction process, the Court concludes that the Brandon Process is neither generally known nor readily ascertainable.

**2. Independent value from secrecy**

7. [HN6]The statutory requirement of independent economic value from secrecy carries forward the common law requirement that information must provide a competitive advantage to constitute a trade secret. *Electro-Craft*, 332 N.W.2d at 900. "If an outside would obtain a valuable share of the market by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable." *Id.*

8. Because the Brandon Process yields the active ingredients in Premarin, sales of Premarin grew from $ 500 million in 1992 to over $ 2 billion in 2001, Barr Laboratories agreed to pay up to $ 70 million to Natural Biologics instead of developing its own process, a prospective competitor could not develop a process comparable to the Brandon Process without a substantial investment of time and money, and a prospective competitor would gain a valuable share of the **[*54]** market by acquiring the Brandon Process, the Court concludes that the Brandon Process derives independent economic value from secrecy.

**3. Reasonable efforts to maintain secrecy**

9. [HN7]A trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5; *see Surgidev Corp. v. Eye Tech., Inc.*, 828 F.2d 452, 455 (8th Cir. 1987) ("Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets."); *Lasermaster Corp. v. Sentinel Imaging*, 931 F. Supp. 628, 635 (D. Minn. 1996) (stating "absolute secrecy" not required). Express notice that the information is a trade secret is not required:

[HN8]The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a trade secret if, under all the circumstances, the employee or other person knows or has reason to know that the owner intends or expects the secrecy of the type of information comprising the trade secret to be maintained.

Minn. Stat. § 325C.01, subd. 5 **[*55]** .

10. Natural Biologics contends that Wyeth failed to subject the Brandon Process to reasonable efforts to protect its secrecy by commencing this action approximately four years after learning about Natural Biologics. Wyeth's investigation of Natural Biologics is relevant to the issue of whether the statute of limitations bars Wyeth's claim, not the issue of whether Wyeth subjected the Brandon Process to reasonable efforts to maintain its secrecy.

11. Based on the lack of repeated losses of confidential information regarding the Brandon Process and Wyeth's use of physical security, limited access to confidential information, employee training, document control, and oral and written understandings of confidentiality, the Court concludes that Wyeth subjected the Brandon Process to efforts that are reasonable under the circumstances to maintain its secrecy.

**B. Misappropriation**

12. [HN9]"Misappropriation involves the acquisition, disclosure, or use of a trade secret through improper means." *Electro-Craft*, 332 N.W.2d at 903; *see* Minn. Stat. § 325C.01, subd. 3. [HN10]"'Improper means' includes . . . breach or inducement of a breach of **[*56]** a duty to maintain secrecy." Minn. Stat. § 325C.01, subd. 2.

13. [HN11]"Slight alteration of a competitor's protected secret implicates the same concerns as cases of outright misappropriation." *Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir. 1994); *see Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 778 (D. Mass. 1994) ("Trade secret protection . . . extends not only to the misappropriated trade secret but also to materials 'substantially derived' from that trade secret."); *Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 735 F. Supp. 1555, 1570 (M.D. Ga. 1989) (stating that minor differences between

processes of plaintiff and defendants did not relieve defendants of liability because defendant's process was substantially derived from plaintiff's trade secret), *aff'd*, 908 F.2d 706, 712-13 (11th Cir. 1990).

14. [HN12]"Direct evidence of industrial espionage is rarely available and not required" to establish a claim of trade secret misappropriation. *Pioneer Hi-Bred*, 35 F.3d at 1239 (internal quotation marks omitted).

15. Based on the knowledge of Natural Biologics, **[*57]** David Saveraid, and Dr. Irvine that Dr. Irvine's disclosure of information about the Brandon Process would be improper, Natural Biologics' motives for copying the Brandon Process, David Saveraid's lack of qualifications to develop a process that is essentially identical to the Brandon Process, the historical absence of any duplication of the Brandon Process, the similarity between the Brandon Process and Natural Biologics' process, Natural Biologics' destruction of its development record, the contacts between David Saveraid and Dr. Irvine that coincided with dramatic changes to Natural Biologics' process without any testing or experimentation, the documentary evidence of Dr. Irvine's contributions to the development of Natural Biologics' process, Natural Biologics' attempts to conceal the contacts between David Saveraid and Dr. Irvine through false testimony and destruction of evidence, and the absence of a credible record of development by Natural Biologics, the Court concludes that Natural Biologics misappropriated the Brandon Process.

**II. Affirmative Defenses**

**A. Statute of Limitations**

16. [HN13]"An action for misappropriation must be brought within three years after **[*58]** the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Minn. Stat. § 325C.06. [HN14]The statute of limitations begins to run when a plaintiff discovers, or in the exercise of reasonable diligence should have discovered, sufficient facts from which a reasonable jury could infer misappropriation. *See* *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000).

17. Wyeth commenced this action on November 17, 1998. The statute of limitations therefore bars Wyeth's claim if Wyeth discovered or by the exercise of reasonable diligence should have discovered the misappropriation before November 17, 1995.

18. [HN15]Under the discovery rule, the statute of limitations does not begin to run based on "concerns and suspicions" of misappropriation. *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994). Rather, the statute of limitations begins to run when a plaintiff knew or should have known of the misappropriation. *See id.*

19. As of November 17, 1995, Wyeth had no information about Natural Biologics other than the brochure, the telephone call **[*59]** between Dey and David Saveraid, David Saveraid's message for Dey, and the telephone call between Ken Saveraid and Chambers. Neither the brochure nor the telephone call between Dey and David Saveraid could have alerted Wyeth to Natural Biologics' misappropriation of the Brandon Process because the misappropriation--David Saveraid's conversations with Dr. Irvine--had not yet taken place. The same conclusion is warranted with respect to the message left by David Saveraid for Dey and the telephone call between Ken Saveraid and Chambers. In the message, David Saveraid did not disclose his conversations with Dr. Irvine. Ken Saveraid represented that Natural Biologics was using the "Chicago Process."

20. Given Natural Biologics' extensive efforts to conceal the communications between David Saveraid and Dr. Irvine, the Court concludes that Wyeth could not have reasonably discovered the misappropriation before November 17, 1995.

21. The Court concludes that Wyeth neither discovered nor by the exercise of reasonable diligence should have discovered the misappropriation of the Brandon Process by Natural Biologics before November 17, 1995.

**B. Equitable Defenses**

22. [HN16]"He who seeks equity **[*60]** must do equity, and he who comes into equity must come with clean hands." *Johnson v. Freberg*, 178 Minn. 594, 228 N.W. 159, 160 (Minn. 1929). A defendant with unclean hands cannot invoke equitable defenses. *See* *Gully v. Gully*, 599 N.W.2d 814, 825 (Minn. 1999); *Froats v. Froats*, 415 N.W.2d 445, 447 (Minn. Ct. App. 1987).

23. Natural Biologics has engaged in brazen and unconscionable conduct designed to conceal its misappropriation of the Brandon Process. Natural Biologics' attempts to conceal the misappropriation include: (1) destruction of evidence before and after the commencement of this litigation; (2) false testimony in discovery and at trial; and (3) improper redaction of evidence. Because Natural Biologics has "unclean hands," the Court concludes that Natural Biologics is not entitled to the equitable defenses of laches, unclean hands, waiver, and estoppel.

**1. Laches**

24. [HN17]"Laches is an equitable doctrine applied to 'prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay.'" *Winters v. Kiffmeyer*, 650 N.W.2d 167, 169 (Minn. 2002) (quoting **[*61]** *Aronovitch v. Levy*, 238 Minn. 237, 56 N.W.2d 570, 574 (Minn. 1953)). "The basic question [in applying laches] is 'whether there has been such unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for.'" *Klapmeier v. Town of Center*, 346 N.W.2d 133, 137 (Minn. 1984) (quoting *Fetsch v. Holm*, 236 Minn. 158, 52 N.W.2d 113, 115 (Minn. 1952)).

25. Although "evidence of prejudice is not always essential to the application of laches, it is a circumstance of importance in determining whether a plaintiff's delay was reasonable." *Klapmeier*, 346 N.W.2d at 137. The prejudice must result from the delay. *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995). If the party asserting laches would not have acted differently with earlier notice, laches does not apply. *See id.* ("Even a considerable investment during a delay period is not a result of the delay if it was 'a deliberate business decision to ignore [a] warning, and to proceed as if nothing had occurred.'") (quoting *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992)). **[*62]**

26. A defendant "whose prejudice is largely self-imposed may not prevail on the affirmative defense of laches." *Hurst v. United States Postal Serv.*, 586 F.2d 1197, 1200 (8th Cir. 1978).

27. Because David Saveraid knew that it would be improper to obtain information about the Brandon Process from a former Wyeth employee, Albers failed to investigate thoroughly how Natural Biologics developed its process, and Natural Biologics spent millions of dollars after Wyeth commenced this action, the Court concludes that any prejudice experienced by Natural Biologics and Albers is self-inflicted.

28. Notwithstanding overwhelming evidence of misappropriation, Albers continues to trust David Saveraid to the same extent as when he initially invested in Natural Biologics. Natural Biologics engaged in extensive efforts, including false testimony and destruction of evidence, to conceal its misappropriation of the Brandon Process. Accordingly, the Court concludes that neither Natural Biologics nor Albers would have acted differently had Wyeth commenced this action earlier.

29. The Court concludes that any prejudice experienced by Natural Biologics and Albers is not a result of Wyeth's **[*63]** delay in bringing this action.

30. The Court concludes that Wyeth neither knew nor should have known of Natural Biologics' misappropriation of the Brandon Process before late 1997. Wyeth brought this action in November 1998. The Court concludes that the delay in bringing this action from late 1997 to November 1998 was not unreasonable.

31. The equitable defense of laches does not apply to Wyeth's claim against Natural Biologics for trade secret misappropriation.

**2. Unclean Hands**

32. [HN18]The defense of unclean hands may deny equitable relief to a plaintiff if the plaintiff has engaged in unconscionable conduct:

> The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.

*Freberg*, 228 N.W. at 160. The plaintiff's conduct must be "egregious" to support a finding of unclean hands. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 450 (Minn. Ct. App. 2001). **[*64]**

33. Unclean hands in a collateral matter is not a defense to equitable relief. *See Berg v. Carlstrom*, 347 N.W.2d 809, 812 (Minn. 1984).

34. According to Natural Biologics, Wyeth engaged in unconscionable conduct so as to preclude injunctive relief in connection with its opposition to the classification of synthetics as generic substitutes for Premarin. In particular, Wyeth asked Natural Biologics to submit comments to the FDA in opposition to the classification of synthetics as generic substitutes for Premarin, called the comments submitted by Natural Biologics to the FDA's attention, and stated to the FDA that Natural Biologics "presents an alternate source of equine-derived, natural conjugated estrogens raw material."

35. When Wyeth asked Natural Biologics to submit comments to the FDA, Wyeth did not know that Natural Biologics had misappropriated the Brandon Process. Wyeth had long opposed the classification as synthetics as generic substitutes for Premarin. As early as 1994, years before Wyeth contacted it, Natural Biologics stated that "the natural content of precisely

the right combination of estrogens cannot be duplicated" by synthetics. Under these circumstances, **[*65]** the Court concludes that Wyeth did not engage in unconscionable conduct.

36. Although the FDA's decision not to approve synthetics as generic substitutes for Premarin benefits Wyeth and harms synthetic manufacturers, the Court concludes that such benefit and harm will not be unconscionable because the FDA contemplates the approval of generic substitutes derived from the same source material--that is, the legitimate development of an estrogen-extraction process that replicates the Brandon Process.

37. The instant action arises out of Natural Biologics' misappropriation of the Brandon Process. Accordingly, the Court concludes that Natural Biologics' reliance on Wyeth's conduct with regard to the FDA's consideration of synthetics as generic substitutes for Premarin to establish an unclean hands defense is misplaced because that conduct is collateral to Natural Biologics' misappropriation of the Brandon Process.

38. The equitable defense of unclean hands does not apply to Wyeth's claim against Natural Biologics for trade secret misappropriation.

**3. Waiver**

39. [HN19]Waiver is an equitable defense. *Minn. Cent. R.R. v. MCI Telecomms. Corp.*, 595 N.W.2d 533, 539 (Minn. Ct. App. 1999). **[*66]**

40. "Waiver is the intentional relinquishment of a known right; it is the expression of an intention not to insist upon what the law affords; it is consensual in its nature; the intention may be inferred from conduct, and the knowledge may be actual or constructive, but both knowledge and intent are essential elements." *Carlson v. Doran*, 252 Minn. 449, 90 N.W.2d 323, 328 (Minn. 1958).

41. Because Wyeth neither knew nor should have known of Natural Biologics' misappropriation of the Brandon Process when Wyeth represented to the FDA that Natural Biologics "presents an alternate source of equine-derived, natural conjugated estrogens raw material," the Court concludes that Wyeth did not waive its claim against Natural Biologics for trade secret misappropriation.

**4. Estoppel**

42. [HN20]Estoppel is an equitable defense. *Minn. Cent. R.R.*, 595 N.W.2d at 539.

43. "Equitable estoppel is 'the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change **[*67]** his position for the worse.'" *In re Petition of Nelson*, 495 N.W.2d 200, 203 (Minn. 1993) (quoting *In re Beier's Estate*, 205 Minn. 43, 284 N.W. 833, 838 (Minn. 1939)); *see N. Petrochemical Co. v. United States Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979) ("To establish a claim of estoppel, [Natural Biologics] must prove that [Wyeth] made representations or inducements, upon which [Natural Biologics] reasonably relied, and that [Natural Biologics] will be harmed if the claim of estoppel is not allowed.").

44. The Court concludes that Dey's inquiry in 1994 regarding the possibility of purchasing product from Natural Biologics was neither a representation or inducement for Natural Biologics to continues its development efforts. In addition, the Court concludes that Natural Biologics could not reasonable rely on Dey's inquiry because it took place before David Saveraid's communications with Dr. Irvine. Finally, the Court concludes that Dey's inquiry did not lead Natural Biologics or Albers to change their position for the worse because any harm they experienced was self-inflicted.

45. The Court concludes that Wyeth's statement to the FDA **[*68]** in 1996 that Natural Biologics "presents an alternate source of equine-derived, natural conjugated estrogens raw material" was neither a representation nor an inducement for Natural Biologics to continue its development efforts. In addition, the Court concludes that Natural Biologics could not reasonable rely on the statement because Natural Biologics had concealed its misappropriation of the Brandon Process. Finally, the Court concludes that Wyeth's statement did not lead Natural Biologics or Albers to change their position for the worse because any harm they experienced was self-inflicted.

46. The equitable defense of estoppel does not apply to Wyeth's claim against Natural Biologics for trade secret misappropriation.

**III. Injunctive Relief**

47. [HN21]"Actual or threatened misappropriation may be enjoined." Minn. Stat. § 325C.02(a). "Where injunctive relief is explicitly authorized by statute, . . . proper exercise of discretion requires issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." *Wadena Implement Co. v. Deere & Co.*, 480 N.W.2d 383, 389 (Minn. Ct. App. 1992) **[*69]** (citing *United States v. White*, 769 F.2d 511, 515 (8th Cir. 1985)).

48. Wyeth seeks an injunction that would prohibit Natural Biologics, its officers, agents, servants, employees, attorneys, successors and assigns, and all those persons or entities in active concert or participation or privity with Natural Biologics, from:(a) using for their own benefit or the benefit of any other person or entity, or disclosing to any other person or entity in any manner, whether directly or indirectly, any information or knowledge they have obtained at any time(i) about the chemicals, equipment and/or process steps, procedures or methods used by Wyeth at any time, in whole or in part, to remove estrogens from urine and/or produce any material or product consisting in whole or in part of estrogens from urine (collectively, the "Brandon Process");

(ii) about the chemicals, equipment and/or process steps, procedures or methods used by defendants at any time, in whole or in part, to remove estrogens from urine and/or produce any material or product consisting in whole or in part of estrogens from urine (collectively, the "Natural Biologics Process"); and/or

(iii) **[*70]** in connection with any research or development of the Brandon Process and/or the Natural Biologics Process.(b) engaging in the research or development of, or engaging in or utilizing in any manner, whether directly or indirectly, any process, procedure or method for the removal of estrogens from urine and/or the production of any material or product consisting in whole or in part of estrogens from urine;

(c) producing, manufacturing, selling, offering for sale, distributing, importing or exporting any material or product consisting in whole or in part of estrogens from urine; and/or

(d) working for, consulting with, and/or providing services, information, materials or other assistance of any kind to any other person or entity who or which is engaged in the research or development of, or who is engaged in or utilizing in any manner, whether directly or indirectly, any process, procedure or method for the removal of estrogens from urine and/or the production of any material or product consisting in whole or in part of estrogens from urine, or who is engaged in manufacturing, selling, offering for sale, distributing, importing or exporting, whether directly or indirectly, **[*71]** any material or product consisting in whole or in part of estrogens from urine.

**A. Wyeth is entitled to injunctive relief**

49. [HN22]Misappropriation of a trade secret constitutes irreparable harm warranting injunctive relief. *See Equus Computer Sys., Inc. v. N. Computer Sys., Inc.*, 2002 U.S. Dist. LEXIS 13539, Civ. No. 01-657, 2002 WL 1634334, at *4 (D. Minn. July 22, 2002). Because Natural Biologics misappropriated the Brandon Process and Wyeth will experience irreparable harm in the form of loss of market share, physician relationships, and control over the trade secret unless an injunction issues against Natural Biologics, the Court concludes that Wyeth has demonstrated the prerequisites for injunctive relief.

50. [HN23]"The protection afforded trade secrets is not intended to reward or promote the development of secret processes (although it does, of course, benefit the enterprising developer), but rather is to protect against breaches of faith and the use of improper methods to obtain information. Trade secret law seeks to maintain standards of loyalty and trust in the business community." *Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 701 (Minn. 1982). The Court **[*72]** concludes that an injunction against Natural Biologics fulfills the purpose of the Minnesota Uniform Trade Secrets Act.

51. Because Wyeth has demonstrated the prerequisites necessary to obtain an injunction and injunctive relief fulfills the legislative purpose of the Minnesota Uniform Trade Secrets Act, the Court concludes that Wyeth is entitled to injunctive relief.

**B. Scope of the injunction**

52. [HN24]"Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed. R. Civ. P. 65(d).

53. [HN25]"The common rationale for imposing a production injunction is that, where the misappropriated trade secrets are 'inextricably connected' to the defendant's manufacture of the product, a use injunction is ineffective because the misappropriator cannot be relied upon to 'unlearn' or abandon the misappropriated technology." *Gen. Elec. Co. v. Sung*, 843 F. Supp. 776, 780 (D. Mass. 1994); *see Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1234 (W.D.N.Y. 1994) **[*73]** ("Past cases have recognized the potential difficulty an enjoined party would face in not using or disclosing secret information as justifying injunctions prohibiting such party from working in the area to which the secrets relate."). Because Natural Biologics would inevitably use information gained from misappropriating the Brandon Process in any research or development related to processes for extracting estrogens from urine, the Court concludes

that the scope of the injunction requested by Wyeth is appropriate.

54. Because Natural Biologics attempted to conceal its misappropriation of the Brandon Process by destroying evidence, giving false testimony, and improperly redacting evidence, the Court concludes that Natural Biologics cannot be trusted to avoid using the misappropriated process and cannot be trusted to obey an Order that permits them to exercise any discretion. Accordingly, the Court concludes that the scope of the injunction requested by Wyeth is appropriate. *See* Monovis, 905 F. Supp. at 1234 (granting injunction prohibiting defendants from competing in market where "there is much to cause this Court to question whether the defendants would in good faith **[*74]** act to avoid using and disclosing information belonging to others").

**C. Duration of the injunction**

55. [HN26]"Normally, the duration of an injunction is designed to preclude defendants' wrongful activities for a period of time reasonably necessary to protect plaintiff's interest; the period of time that would be required for independent development of the protected information is the prevailing standard." Surgidev, 648 F. Supp. at 696. In its decades-long history, nobody has legitimately replicated the Brandon Process despite its value. The Court therefore concludes that a permanent injunction is appropriate.

**ORDER**

Based on the evidence received at trial, the Confidential Findings of Fact, and the Confidential Conclusions of Law, IT IS ORDERED THAT:1. Natural Biologics, its officers, agents, servants, employees, attorneys, successors, and assigns, and all those persons or entities in active concert or participation with Natural Biologics who receive actual notice of this Order by personal service or otherwise, are PERMANENTLY ENJOINED from:(a) using for their own benefit or the benefit of any other person or entity, or disclosing to any **[*75]** other person or entity in any manner, whether directly or indirectly, any information or knowledge they have obtained at any time:

(i) about the chemicals, equipment and/or process steps, procedures or methods used by Wyeth at any time, in whole or in part, to remove estrogens from urine and/or produce any material or product consisting in whole or in part of estrogens from urine (collectively, the "Brandon Process");

(ii) about the chemicals, equipment and/or process steps, procedures or methods used by Natural Biologics at any time, in whole or in part, to remove estrogens from urine and/or produce any material or product consisting in whole or in part of estrogens from urine (collectively, the "Natural Biologics Process"); and/or

(iii) in connection with any research or development of the Brandon Process and/or the Natural Biologics Process.

(b) engaging in the research or development of, or engaging in or utilizing in any manner, whether directly or indirectly, any process, procedure or method for the removal of estrogens from urine and/or the production of any material or product consisting in whole or in part of estrogens from urine;

(c) producing, manufacturing, **[*76]** selling, offering for sale, distributing, importing or exporting any material or product consisting in whole or in part of estrogens from urine; and/or

(d) working for, consulting with, and/or providing services, information, materials or other assistance of any kind to any other person or entity who or which is engaged in the research or development of, or who is engaged in or utilizing in any manner, whether directly or indirectly, any process, procedure or method for the removal of estrogens from urine and/or the production of any material or product consisting in whole or in part of estrogens from urine, or who is engaged in manufacturing, selling, offering for sale, distributing, importing or exporting, whether directly or indirectly, any material or product consisting in whole or in part of estrogens from urine.2. Natural Biologics shall, within 60 days of the date of this Order, file with the Court, under seal, and serve on counsel for Wyeth a list identifying each person and/or entity (together with each such person's and entity's current address and telephone number and, in the case of each entity, the name of the chief executive officer or managing agent of **[*77]** such entity) to whom Natural Biologics has at any time disclosed or provided information and/or documents that describe, in whole or in part, any portion of the Brandon Process and/or the Natural Biologics Process and/or to whom Natural Biologics has at any time, directly or indirectly, sold, distributed, furnished or otherwise provided any material or product consisting in whole or in part of estrogens from urine resulting from the Brandon Process.

3. Natural Biologics shall, within 60 days of the date of this Order, withdraw from the U.S. Food and Drug Administration ("FDA") any Drug Master File and file with the Court and serve on counsel for Wyeth proof of such withdrawal. Natural Biologics shall not permit

any person or entity to use or rely on any information contained in its Drug Master File in connection with any submission, filing or application to the FDA.

4. Natural Biologics shall, within 120 days of the date of this Order, gather, shred, and destroy all documents or other materials in its possession, custody or control, and use its best efforts to retrieve and to gather, shred, and destroy any documents or other materials from any other person or entity (other **[*78]** than Wyeth) identified in the list required under paragraph 2 above, that contain information about or describe any portion of or analyze (a) the Brandon Process and/or the Natural Biologics Process and/or (b) any material or product consisting in whole or in part of estrogens from urine resulting from any Natural Biologics Process.

5. Natural Biologics shall, within 120 days of the date of this Order, gather and destroy any conjugated estrogen material or product in its possession, custody or control, and use its best efforts to retrieve and to gather and destroy any conjugated estrogen material or product furnished by Natural Biologics, directly or indirectly, to any other person or entity.

6. Natural Biologics shall, within 130 days of the date of this Order, certify to the Court in writing, under oath, through an officer of Natural Biologics, and serve a copy of such certification upon counsel for Wyeth, that Natural Biologics has complied with all of the requirements of this Order or, if Natural Biologics has not done so, state in such certification the reasons why Natural Biologics has not complied with all of the requirements of this Order.

7. The Second Amended **[*79]** Protective Order Regarding Confidential Information under Fed. R. Civ. P. 26(c) and the Uniform Trade Secrets Act dated September 19, 2002 ("Protective Order") previously entered in this case shall continue to apply to this case and to any information and/or documents produced in this case according to the terms of such Protective Order. The Court's Confidential Findings of Fact and Confidential Conclusions of Law set forth above shall be treated as Super Sensitive Confidential Information under the terms of this Protective Order.Dated: October 2, 2003

JOAN N. ERICKSEN

United States District Judge