2003 U.S. Dist. LEXIS 13495

CHARLES MUNAFO, Plaintiff, -against- METROPOLITAN TRANSPORTATION AUTHORITY, et al.,. Defendants.

98 CV-4572 (ERK), 00-CV-0134 (ERK)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 13495

January 22, 2003, Decided

**SUBSEQUENT HISTORY:** Motion denied by, Motion for new trial denied by Munafo v. Metro. Transp. Auth., 277 F. Supp. 2d 163, 2003 U.S. Dist. LEXIS 14534 (E.D.N.Y., Aug. 4, 2003)

**PRIOR HISTORY:** Munafo v. Metro. Transp. Auth., 285 F.3d 201, 2002 U.S. App. LEXIS 4857 (2d Cir. N.Y., 2002)

**DISPOSITION:** **[*1]** Defendants' motion to exclude evidence granted in part and denied in part. Defendants' motion to dismiss plaintiff's claims arising prior to June 6, 1995 granted. Plaintiff's motion to exclude granted in part and denied in part and motion to amend complaint denied.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant former employer and various individual defendants, under 42 U.S.C.S. § 1983, alleging that the employer retaliated against him for exercising his First Amendment right to free speech and freedom of association. Among other matters, both parties moved in limine to exclude evidence at trial.

**OVERVIEW:** The former employee held various positions in the transit operating authority's track department, and sought redress for disciplinary actions. Defendants contended that the disciplinary actions were taken because he was repeatedly disobedient and insubordinate. Regarding defendants' omnibus motion to exclude evidence, although the appellate court had already determined that the bulk of his claimed "speech" was a matter of public concern, the instant court performed a more detailed screening review, taking into account the form, and context of a given statement. It also examined defendants' motion to exclude evidence related to a number of other matters. Next, it determined that claims accruing prior to July 6, 1995 were barred by the three-year statute of limitations for 42 U.S.C.S. § 1983 actions. It then examined the employee's motion to exclude evidence related to numerous matters. Finally, it determined that the employee's motion to amend pursuant to N.Y. Civ. Serv. Law § 75-b should be denied, as that statute allowed an employee to bring suit only where a collective bargaining agreement did not substitute its own grievance procedure for relief encapsulated by the statute.

**OUTCOME:** Defendants' motion to exclude evidence was partially granted and partially denied. The motion to dismiss claims arising prior to June 6, 1995 was granted. The employee's motion to exclude was partially granted and partially denied, and his motion to amend was denied. The damages issue was bifurcated from liability.

**CORE TERMS:** disciplinary, matter of public concern, grievance, retaliation, termination, discipline, workers compensation, depression, suspension, admissible, causation, tire, public concern, corruption, arbitrator, introduce, hearsay, motive, supervisor, matters of public concern, reputation, intends, punitive damages, summary judgment, protest, introduce evidence, diagnosis, threatening, unsafe, collective bargaining agreement

**LexisNexis(TM) Headnotes**

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN1]The determination of whether a public employer has improperly discharged an employee for engaging in speech requires a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. The threshold question in applying this balancing test is whether an employee's speech may be fairly characterized as constituting speech on a matter of public concern. Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN2]If one needed to consult more than common sense, one would need look no farther than the existence of laws such as the Occupational Safety and Health Act of 1970, 29 U.S.C.S. § 651 et. seq., and similar state laws, e.g., N.Y. Lab. Law § 202 et seq. (2001), to recognize that safety in the workplace is a matter of public concern.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN3]In general, an employee's protests about the conditions of his or her own employment situation do not rise to the level of public concern necessary for First Amendment protections to attach. As the U.S. Supreme Court has explained: When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Moreover, making a strictly employment-related complaint on behalf of another does not transform the matter into one of public concern. In contrast, charges of public corruption or illegal misuse of government funds may rise to the level of public concern even if embedded within an otherwise non-public employment dispute.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN4]The mere allusion to corruption or mismanagement does not render a purely personal conflict over employment benefits a matter of concern to the general public. For instance, a district court has found that a government employee's criticism of her employer's training program was not a matter of public concern even though her criticism implied that the program wasted public funds. As the court has explained, adopting the plaintiff's reasoning would convert every public employee's complaint about his or her work conditions into a matter of public concern because all such complaints indirectly charge that the governmental employer is wasting money. Broadly defining misuse of funds or government waste to incorporate nearly any employment practice would eradicate Connick's distinction between speech touching upon employment issues and speech regarding public matters. Thus, courts must also investigate the context and forum of the governmental employee's complaint when contemplating its public import.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN5]The fundamental inquiry for First Amendment protection is whether the individual making the complaints was seeking to vindicate personal interests or to bring to light any matter of political, social, or other concern to the community.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN6]There is no doubt that the public would be concerned with the revelation that an official in a position of public trust had previously breached a similar public trust elsewhere in violation of federal law.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN7]A topic otherwise of public concern does not lose its importance merely because it arises in an employee dispute. To restate the proposition differently, the content of the disputed speech rather than the motive behind its utterance is the greatest single factor in the analysis.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN8]As a general rule, evidence that an employee merely represented other employees in disputes involving genuinely private concerns like workers compensation benefits or disciplinary actions is not protected speech or associational activity.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN9]Activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under Connick.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN10]There is some case law suggesting that the falsity of a public employee's statements is relevant to the Pickering balance between the employer's interest in efficient operation and the employee's First Amendment rights.

***Evidence > Hearsay Rule & Exceptions***

[HN11]While, as a general matter, newspaper articles are inadmissible to prove the truth of their contents, they may be used for other relevant non-hearsay purposes.

***Evidence > Hearsay Rule & Exceptions***

[HN12]See Fed. R. Evid. 801(c) advisory committee's note.

***Evidence > Hearsay Rule & Exceptions***

[HN13]The definition of hearsay excludes the entire category of verbal acts and verbal parts of an act, in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights.

***Evidence > Witnesses > Expert Testimony***

[HN14]Daubert imposes on district court judges a special gatekeeping function to ensure that any and all scientific testimony is not only relevant, but reliable. The objective of Daubert's gatekeeping function is to make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Thus, an expert's opinion is admissible only if: (i) the testimony is based upon sufficient facts or data; (ii) the testimony is the product of reliable principles and methods; and (iii) the witness has applied the principles and methods reliably to the facts of the case. These requirements are not diminished merely because the expert witness is a treating physician rather than an expert retained solely for the purposes of litigation.

***Evidence > Witnesses > Expert Testimony***

[HN15]When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other alternative possible causes.

***Evidence > Witnesses > Expert Testimony***

[HN16]See Fed. R. Evid. 702 advisory committee's note.

***Evidence > Witnesses > Expert Testimony***

[HN17]The district court has the discretion to exclude as unreliable a medical expert's opinion as to the specific source or cause of a plaintiff's medical condition where (1) the physician engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's illness other than the defendant's actions and the physician offered no reasonable explanation as to why he or she still believed that the defendant's actions were a substantial factor in bringing about that illness.

***Evidence > Witnesses > Expert Testimony***

[HN18]While an expert need not rule out every potential cause in order to satisfy Daubert, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant.

***Evidence > Witnesses > Expert Testimony***

[HN19]The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions.

***Torts > Damages > Punitive Damages***

[HN20]Punitive damages are not available against public benefit corporations such as the Metropolitan Transit Authority (MTA), the NYCTA, and the Staten Island Rapid Transit Operating Authority (SIRTOA). In a 42 U.S.C.S. § 1983 action against individual defendants, however, punitive damages may be awarded when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

***Civil Procedure > Trials > Separate Trials***

[HN21]Since it often would be prejudicial to a defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages, the preferred method of accommodating the various interests is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all.

***Evidence > Relevance > Character Evidence***

[HN22]Pursuant to Fed. R. Evid. 405(b), in cases where character or traits of character of a person is an essential element of a defense, proof may be made of specific instances of that person's conduct. Thus, courts have found that where a plaintiff claims reputational injury, defendants must be permitted to introduce specific evidence that the plaintiff's reputation has already been compromised.

***Evidence > Witnesses > Impeachment by Opinion & Reputation***

[HN23]See Fed. R. Evid. 608(b).

***Evidence > Witnesses > Impeachment by Opinion & Reputation***

[HN24]To be admissible under Fed. R. Evid. 608(b), specific acts of misconduct must involve some element of deception or fraud that would tend to show the witness' propensity to lie. General acts of violence or threats are simply not probative of an individual's credibility.

***Evidence > Relevance > Confusion, Prejudice & Waste of Time***

[HN25]The charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent.

***Constitutional Law > Fundamental Freedoms > Freedom of Speech > Public Employees' Speech***

[HN26]The decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing has significant probative weight regarding the requisite causal link between an employee's termination and the employer's alleged illegal motive. This its reasoning is equally pertinent to a First Amendment retaliatory discharge claim, which imposes the identical essential element of causation.

***Evidence > Hearsay Rule & Exceptions***

[HN27]Consistent statements of other witnesses may be admissible pursuant to Fed. R. Evid. 801(d)(1)(B) if they are offered to rebut a charge of recent fabrication, or improper influence or motive. As with party admissions, the use of consistent statements under Rule 801(d)(1)(B) does not require that the statements be made under oath.

***Evidence > Hearsay Rule & Exceptions > Residual Exception***

[HN28]The context of formal proceeding and an oath provide firm additional assurances of the reliability of a statement. The catchall hearsay exception should not be used to override this express Congressional judgment. As the legislative history of Fed R. Evid. 803(24) and 804(b)(5) makes clear, these residual hearsay exceptions were designed to facilitate the admission of hearsay in situations unanticipated by the other exceptions, but involving equal guarantees of trustworthiness. Fed. R. Evid. 803(24) advisory committee's note. Indeed, it was intended by Congress that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. Moreover, except where the prior statement is essential to establish a prima facie case, there is little practical difference between admission for impeachment and admission as evidence in chief.

***Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Arbitrator's Authority***

[HN29]See N.Y. Civ. Serv. Law § 75-b.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Action***

***Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration***

[HN30]An employee may bring suit under N.Y. Civ. Serv. Law § 75-b in a court of competent jurisdiction only where a collective bargaining agreement does not substitute its own grievance procedure for the relief encapsulated by the statute.

**COUNSEL:** For Charles Munafo, Plaintiff (1:98-cv-04572-ERK-RLM, 1:00-cv-00134-ERK-RLM): Scott A. Korenbaum, LEAD ATTORNEY, Kreisberg Maitland & Thornhill, LLP, New York, NY.

For Metropolitan Transportation Authority, Defendant (1:98-cv-04572-ERK-RLM): Dorothea W. Regal, LEAD ATTORNEY, Luisa K. Hagemeier, LEAD ATTORNEY, Hoguet Newman & Regal, LLP, New York, NY.

For Metropolitan Transportation Authority, Staten Island Rapid Transit Operating Authority, Alfonse W. Sorrentino, individually and in his official capacity, Peter Argenziano, individually and in his official capacity, Samuel Holmes, individually and in his official capacity, John McCabe, Individually & in his Official Capacity, Owen P. Swords, Individually & in his Official Capacity, David C. Filimon, Individually & in his Official Capacity, Defendants (1:98-cv-04572-ERK-RLM, 1:00-cv-00134-ERK-RLM): Ira J. Lipton, LEAD ATTORNEY, Metropolitan Transportation Authority, New, NY. **[*2]**

For Metropolitan Transportation Authority, Staten Island Rapid Transit Operating Authority, Alfonse W. Sorrentino, individually and in his official capacity, Peter Argenziano, individually and in his official capacity, Defendants (1:98-cv-04572-ERK-RLM): Wendy Rothstein Bocian, LEAD ATTORNEY, Metropolitan Transportation Authority, Legal Department, New York, NY.

For Metropolitan Transportation Authority, Staten Island Rapid Transit Operating Authority, Alfonse W. Sorrentino, individually and in his official capacity, Peter Argenziano, individually and in his official capacity, Samuel Holmes, individually and in his official capacity, Louis Russo, Individually & in his Official Capacity, John McCabe, Individually & in his Official Capacity, Michael Caputo, Individually & in his Official Capacity, Owen P. Swords, Individually & in his Official Capacity, David C. Filimon, Individually & in his Official Capacity, Defendants (1:98-cv-04572-ERK-RLM, 1:00-cv-00134-ERK-RLM): Luisa K. Hagemeier, LEAD ATTORNEY, Hoguet Newman & Regal, LLP, New York, NY.

For New York City Transit Authority, John Does 1-4, Jane Does 1-4, Martin Scheinman, Defendants (1:00-

cv-00134-ERK-RLM): Ira J. [*3] Lipton, LEAD ATTORNEY, Metropolitan Transportation Authority, New, NY.

For New York City Transit Authority, Rosemary Healy aka Rosemary Lake, John Does 1-4, Jane Does 1-4, Martin Scheinman, Defendants (1:00-cv-00134-ERK-RLM): Luisa K. Hagemeier, LEAD ATTORNEY, Hoguet Newman & Regal, LLP, New York, NY.

For Martin Scheinman, Defendant (1:00-cv-00134-ERK-RLM): Linda Gail Bartlett, LEAD ATTORNEY, Bartlett, Bartlett & Ziegler, P.C., New York, NY.

**JUDGES:** Edward R. Korman, United States Chief District Judge.

**OPINIONBY:** Edward R. Korman

**OPINION: MEMORANDUM & ORDER**

Korman, C.J.

Plaintiff Charles Munafo brought this action against his former employer, Metropolitan Transit Authority ("MTA"), and various individual defendants, under 42 U.S.C. § 1983, alleging that MTA retaliated against him for exercising his First Amendment right to free speech and freedom of association. Both parties have moved *in limine* to exclude evidence at trial.

**BACKGROUND**

Munafo was employed by MTA from 1987 until March 1999 and was assigned to the Staten Island Rapid Transit Operating Authority ("SIRTOA"), where he held various positions in the Maintenance of Way Department [*4] ("Track Department"). During that period, Munafo lodged a series of complaints about what he perceived to be safety problems in Track Department operations. He was also subject to a number of disciplinary actions, culminating in the termination of his employment in 1999. During the pertinent period, most of the individual defendants (hereinafter the "individual defendants") were managerial employees at SIRTOA. Defendant Alfonse W. Sorrentino was a supervisor in the Track Department and was Munafo's supervisor. Defendants Peter Argenziano, John McCabe, Samuel Holmes, and David C. Filimon were SIRTOA officials who presided over various phases of the disciplinary proceedings against Munafo. Defendant Owen P. Swords was SIRTOA's Superintendent or General Superintendent of Operations and approved several of the disciplinary findings and actions taken against Munafo. Defendant Rosemary Healy was a SIRTOA secretary who transcribed the disciplinary hearing that culminated in Munafo's termination.

In the present case, Munafo seeks redress for the disciplinary actions taken against him. He contends that those actions were taken because of his persistent criticisms of unsafe practices and conditions [*5] at SIRTOA and because of his union activities. Defendants contend that the disciplinary actions were taken because Munafo was repeatedly disobedient and insubordinate. The record, taken in the light most favorable to Munafo, may be summarized as follows.

*A. Safety Complaints by Munafo in 1994*

Prior to June 15, 1994, SIRTOA used forms known as "vehicle condition reports" to document the condition of SIRTOA equipment. In an affidavit submitted in opposition to defendants' motions for summary judgment, Munafo stated that at a 1993 training session conducted by NYCTA,I, and other SIRTOA employees, were directed to complete, for the purpose of ensuring the health and safety of employees, "vehicle condition reports" for "anything that has an engine."

...

11. Given the important safety-related implications of these forms, I adhered to [the NYCTA instructor's] directions as strictly as possible, regularly completing vehicle condition reports for vehicles which I operated. 12. The vehicle condition reports revealed numerous safety problems with SIRTOA's vehicles. For example, employees were required to operate some vehicles with hydraulic leaks and without brakes, endangering [*6] their own, and the general public's safety.(Affidavit of Charles J. Munafo dated October 23, 2000 ("Munafo Aff."), PP 10-12, Defendants' Exhibit T).

On or about June 15, 1994, SIRTOA issued a directive instructing employees to make their reports with respect to certain equipment in maintenance log books, and "prohibiting the completion of vehicle condition reports" (*Id.* PP 13). Munafo, however, believed the vehicle condition reports were superior, allowing employees to record more accurately the condition of the vehicles. Although he began making reports in the maintenance log books as instructed by management, he also continued to file vehicle condition reports:14. Concerned with documenting the unsafe conditions of the vehicles, I continued to complete the vehicle condition reports. As instructed by management, I also completed another "form," called the "maintenance log book," in addition to, not in lieu of, the vehicle condition report.

15. Unlike the "vehicle condition reports," the "maintenance log books" did not include space to report crucial pre-trip and post-trip safety problems...

16. Because "maintenance log books" did not include "carbon copies, [*7] " and would frequently go "missing," the reporting employee would have no way to prove that he had reported unsafe conditions. "Vehicle condition reports" included carbon copies, enabling the reporting employee to document the fact that safety issues had been reported.
17. Given SIRTOA management's refusal to acknowledge receipt of "vehicle condition reports," the carbon copies retained by reporting employees served as the only evidence of the unsafe conditions of SIRTOA vehicles.
18. I continued to complete and submit both the "maintenance log books" and the "vehicle condition reports" to SIRTOA management.(*Id.* PP 14-18.) Munafo insisted on filing both types of reports because he "refused to hide or disguise the unsafe conditions of the vehicles." (*Id.* P 20.)

*B. Disciplinary Actions Against Munafo*

One week after SIRTOA ordered that there be no further vehicle condition reports, the first of the disciplinary actions of which Munafo principally complains occurred.

1. The 1994 "Tire Incident"

On June 22, 1994, while Munafo was operating a piece of equipment, he heard a "pop" and believed that a tire on his machine had gone flat. The tire was repaired by **[*8]** SIRTOA mechanics; Munafo filled out a vehicle condition report. That afternoon, Sorrentino instructed Munafo to prepare an "incident report," a document that becomes a potentially adverse part of the employee's personnel file. Sorrentino returned later in the day to collect the incident report but discovered Munafo had not prepared it. The next morning, Sorrentino again instructed Munafo to fill out such a report. Believing that no other employees had been required to file incident reports for flat tires, Munafo accused Sorrentino of trying to punish him for continuing to document and protest against unsafe conditions. Munafo refused to fill out an incident report unless Sorrentino provided a written statement of his reasons for requesting it. On the same day, June 23, Munafo filed a complaint with the MTA Office of Inspector General, protesting that Sorrentino's actions were harassment in retaliation for Munafo's safety-related protests.

On June 24, Sorrentino sent Munafo a written notice, charging him with insubordination for the refusal to comply with Sorrentino's direct orders of June 22 and June 23 to prepare an incident report on the tire, and stating that a hearing would be **[*9]** held on July 1. The hearing, postponed at Munafo's request in order to allow him to obtain counsel, was held on July 14. Argenziano presided; Munafo and Sorrentino, along with several witnesses called by Munafo, testified. Munafo complains that Argenziano refused to call six of the 11 persons on Munafo's proposed witness list. After the hearing, Argenziano issued a written decision upholding the insubordination charge. In deciding on an appropriate sanction, Argenziano reviewed Munafo's record, which included a 10-day suspension in 1991 for insubordination, a five-day suspension in 1991 for threatening a co-worker, and a 30-day suspension in 1992 for leaving his work site without permission and falsely stating that permission had been given. Argenziano ruled that, with respect to the 1994 tire incident, Munafo should be suspended for 30 days, demoted, and permanently barred from operating any vehicle requiring a commercial driver's license.

For nearly four years thereafter, Munafo's union, the United Transportation Union ("UTU"), unsuccessfully appealed Argenziano's decision through administrative channels. The ruling by Argenziano was upheld by SIRTOA's General Superintendent McCabe; **[*10]** McCabe's decision was upheld by SIRTOA's Acting General Manager Holmes. The UTU unsuccessfully sought review by the National Railroad Adjustment Board. The disciplinary decisions were eventually upheld by the Standing Board on Arbitration ("SBA"), a joint union-employer body, in March 1998. In July 1998, Munafo commenced the present action, complaining principally that the discipline imposed on him in connection with the 1994 tire incident was retaliation for his union activities and his complaints about safety-related issues.

2. Additional Safety Complaints by Munafo

In the meantime, in December 1994, Munafo was elected vice-chairman of the UTU, a position he had held previously. In that capacity, he represented employees at meetings with management and "apprised them, among other things, of their right to a safe work environment." (Munafo Aft. P 45.). Munafo also continued to lodge complaints about various employment matters, including SIRTOA's safety practices. For example, in January 1995, he complained that employees assigned to perform welding were being required to work without the appropriate respiratory equipment. In June 1995, he protested the fact that SIRTOA employees **[*11]** were being required to work in unsafe proximity to the "live" third rail, in violation of state and federal law requiring them to be at least three feet away from 600 volt electricity unless the power lines are shut off or the workers are protected by rubber matting. (*Id.* P 66.).

However, Mr. Munafo' s behavior as an advocate was characterized as "disrespectful, hostile, and

threatening," and was determined to be detrimental to the employees he represented. *See* Letter from Local 1440 Grievance Committee (Defendants' Exhibit H). Indeed, after an incident in which Munafo threatened an administrative law judge and had to be escorted by security from the courthouse, he was banned from representing any person before the New York Public Employment Relations Board. *See* Report of Sidney Asch Concerning Alleged Misconduct of Charles Munafo Before the PERB (Plaintiff's Exhibit A). Despite being informed in writing by both international and local union officials that he was no longer authorized to represent employees at grievance hearings, Munafo continued to act as a "knight-errant out to fight what he may perceive as injustice" (*Id.*, at 6), and ignored the union's instructions **[*12]** to cease participating in employee grievance actions. This prompted the Union to send a letter to all of its members apprising them of Munafo's unauthorized status and informing them that because of his disruptive behavior, Munafo was no longer deemed fit to represent employees in grievance proceedings. (Defendants' Exhibit H).

3. The 1998 "Caputo Incident"

On October 19, 1998, Munafo learned that Sorrentino had summoned trackworker Michael Caputo to a meeting to discuss an accident report pertaining to a work- related injury Caputo had sustained. Although repeatedly chastised by the union for engaging in unauthorized representation, Mr. Munafo determined that his presence was required at Mr. Caputo's side during this meeting. Upon hearing that Munafo intended to accompany Caputo to the meeting, Sorrentino informed the foreman of Munafo's crew that the meeting was to be merely a safety interview and not a disciplinary proceeding and that Munafo should not attend. Accordingly, Munafo was advised that if he left his work assignment to attend the meeting he would not be paid.

Munafo nonetheless attempted to accompany Caputo to the meeting, planning to serve as Caputo's union representative **[*13]** and to be a witness. When he and Caputo arrived at the offices where the meeting was to be held, Sorrentino informed Munafo that he was not invited and instructed him to return to his work site. Munafo refused and was insistent on attending the meeting, or at least on making telephone calls to explore the nature of the meeting. Sorrentino repeatedly ordered Munafo to return to work, would not allow him to use the office telephones, and insisted that Caputo accompany Sorrentino to meet with the safety officer.

The exchange between Munafo and Sorrentino lasted some 15 minutes. Sorrentino finally left for the meeting; Caputo remained behind with Munafo. Munafo then made a series of telephone calls to various members of SIRTOA management; he had another conversation with Sorrentino, who again directed him to return to work; and he finally was assured by the safety officer that the purpose of the meeting was simply to discuss details of the accident. The safety officer directed Munafo to return to his work site. Munafo then instructed Caputo to go to the meeting; Munafo returned to work, having been absent from his work site for more than two hours.

That evening Sorrentino telephoned **[*14]** Munafo and informed him that he was being suspended for insubordination; on the following day Sorrentino served him with notice that the hearing would be held on October 28, 1998. The notice charged thaton the morning and afternoon of October 19, 1998, between 11:50 AM and 2:00 PM, you provided false information to your foreman, absented yourself from your job site without permission, refused to comply with a repeated direct order to return to your job site and acted in a rebellious, insubordinate and threatening manner when directed repeatedly to return to your work site.(Letter from Sorrentino to Munafo dated October 20, 1998).

After an adjournment requested by Munafo, the hearing was begun on November 5, 1998; the hearing officer was Filimon, who was then SIRTOA's Deputy Superintendent of Transportation. Munafo attended, represented by counsel, but did not testify. The witnesses included Sorrentino and Caputo; the latter testified that he had told Munafo of the scheduled meeting with Sorrentino and the safety officer about his accident report, but that he had not asked Munafo to accompany him. Munafo's counsel made a closing statement in which he argued that Munafo **[*15]** was entitled to conduct himself as he had.

In March 1999, Filimon upheld the charges against Munafo. His decision stated, *inter alia*, that "on October 19, 1998 you refused to comply with a directive to return to your duties, ... absenting yourself from your job site without permission and acted in a rebellious and insubordinate manner to your supervisor...." (Letter from Filimon to Munafo dated March 12, 1999, at 1, attached as Plaintiff's Exhibit E). Filimon stated that in "deciding what discipline to assess ... the serious nature of the substantiated charges, your service record, and the fact that even when given an opportunity at the Hearing to present a reasonable explanation for your actions, you elected not to provide any testimony, were all taken into consideration." (*Id.* at 2.). Filimon concluded that the "only appropriate action is DISMISSAL from the

employ of the Staten Island Railway, effective immediately." (*Id.* at 3) (emphasis in original).

Munafo appealed Filimon's decision to Argenziano but sought to argue the appeal only by telephone rather than in a face-to-face conference. Argenziano responded that this would be contrary to SIRTOA policy. He rescheduled **[*16]** the conference once, stating that if Munafo did not appear, Argenziano would regard the matter closed. Munafo did not appear, and Argenziano left Filimon's decision undisturbed. Munafo next appealed Argenziano's decision to McCabe; but again he did not appear at the meeting scheduled to discuss his appeal. McCabe therefore left Argenziano's decision undisturbed. In addition, the UTU pursued appeals on Munafo's behalf, but again Munafo refused to attend the scheduled hearings. Eventually, the SBA upheld the SIRTOA decisions, concluding that the dismissal was an appropriate disciplinary action. *See* Arbitration Board Decision (Plaintiff's Exhibit D).

4. Articles in Local Staten Island Newspapers

As a component of his First Amendment claims, Munafo also contends that his dismissal was directly related to statements he made to local Staten Island newspapers which resulted in two highly inflammatory articles criticizing SIRTOA for its corrupt employee discipline and workers compensation policies. The first article appeared in the *Staten Island Advance* on October 30, 1998, shortly before the grievance hearing resulting in Munafo's dismissal. (Advance Article 10/30/98, Defendants' **[*17]** Exhibit W). The article interviewed Munafo and several other SIRTOA employees and detailed their complaints regarding SIRTOA's alleged practice of tampering with evidence and otherwise obstructing employees from obtaining workers compensation benefits. The article also described the workers compensation hearing of Thomas Poggi, during which an administrative law judge found that SIRTOA officers had deliberately altered documents and submitted a perjured accident report. (*Id.*). The second article was published in the *Staten Island Register* on February 15, 2000, almost two years after Munafo's dismissal. (Register Article 2/15/00, Defendants' Exhibit R). The article addresses Munafo's allegations of unfairness and improper behavior during his grievance hearing and accuses numerous SIRTOA officers with illegal evidence tampering. (*Id.*).

*C. Procedural History*

Munafo commenced the present action in 1998, shortly after the conclusion of the administrative appeals of his suspension in connection with the 1994 tire incident. He alleged principally that the suspension constituted retaliation in violation of his rights under the First Amendment and that he had been denied due **[*18]** process. After the termination of his employment in 1999, Munafo amended his complaint to add claims that the termination was in retaliation for his continuing criticisms of SIRTOA's safety practices and his actions as a union officer. In addition, in January 2000, Munafo commenced a new and overlapping action, which was consolidated with his original action.

All defendants moved for summary judgment, arguing principally that Munafo could not prevail on his First Amendment claims because: (a) he was disciplined for insubordinate conduct, and (b) his speech was not protected by the First Amendment because it did not deal with matters of public concern. They argued that his due process claims should be dismissed because Munafo had been accorded all the process he was due under the collective bargaining agreement that governed union disciplinary proceedings. The individual defendants also asserted that they were entitled to summary judgment on the basis of qualified immunity.

Munafo responded by submitting affidavits and documents, including his own affidavit recounting his safety complaints and union activities and reiterating his view that he had been singled out for special treatment **[*19]** and discipline in retaliation for those complaints and activities. Munafo charged that SIRTOA management had sought to silence his complaints in order to enhance SIRTOA's safety record and to avoid the expense of providing safe equipment and a safe working environment.

Although defendants' motion for summary judgment was initially denied by Judge Weinstein, the Second Circuit partially reversed his decision on appeal, and dismissed the due process claims against the individual defendants on qualified immunity grounds. *See* *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 214 (2d Cir. 2002). On remand, Judge Weinstein subsequently dismissed Munafo's claims against most of the individual defendants, and all of the remaining due process claims. *See* Order dated June 25, 2002 and Transcript of Proceedings on June 10, 2002 (Plaintiff's Exhibit B). By stipulation dated November 18, 2002, (so ordered November 20, 2002), Munafo has voluntarily withdrawn and stipulated to the dismissal with prejudice of all of his state-law claims (Defendants' Exhibit D). Thus, the sole remaining claim is a First Amendment retaliation claim under 42 U.S.C. § 1983 **[*20]** against the MTA and several individual defendants.

**DISCUSSION**

**I. Defendants' Omnibus Motion to Exclude Evidence**

*A. Defendants' Motion to Exclude Evidence of Speech and Union Activity That Did Not Involve a "Matter of Public Concern"*

Munafo asserts First Amendment claims based on both free speech and freedom of association. Defendants argue that Munafo seeks to introduce a myriad of evidence concerning speech and associational activity that is not protected by the First Amendment because it did not involve a "matter of public concern." Because all of the speech is critical of the defendants, insinuating corruption, malfeasance and mistreatment of employees, defendants argue that they will be prejudiced if such evidence is admitted at trial. Defendants also argue that permitting Munafo to introduce evidence that is unrelated and irrelevant to the claims at issue would unduly prolong the trial as they would be forced to elicit testimony rebutting Munafo's complaints.

[HN1]The determination of whether a public employer has improperly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting **[*21]** upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968). The threshold question in applying this balancing test is whether Munafo's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 140, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (citing *Connick*, 461 U.S. at 147-48).

Both Judge Weinstein and the Second Circuit have already determined that the bulk of Mr. Munafo's claimed "speech" was a matter of public concern. Indeed, the Second Circuit found defendants' argument bordering on the frivolous:Defendants contend that [the First Amendment's prohibition against punishing employees **[*22]** in retaliation for the content of their speech on matters of public importance] is inapplicable here as a matter of law because Munafo's complaints were no more than internal personnel grievances relating to matters of his own personal interest. Given the requirements that we accept the allegations of the complaint as true and take the record in the light most favorable to Munafo as the party against whom summary judgment is sought, defendants' premise borders on the frivolous. The complaint and Munafo's affidavit assert that Munafo was speaking out--both in filing complaints and in dealing with members of his union--on matters of safety. He complained of, *inter alia*, trackworkers' being forced to operate in unlawful proximity to live rails without protective gear, welders' being forced to work without respirators, and drivers' being assigned vehicles with faulty brakes. [HN2]If one needed to consult more than common sense, one would need look no farther than the existence of laws such as the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et. seq.* (1994), and similar state laws, *see, e.g.*, N.Y. Lab. Law § 202 *et seq.* (McKinney Supp. **[*23]** 2001), to recognize that safety in the workplace is a matter of public concern.

*Munafo*, 285 F.3d at 211-12. However, because both Judge Weinstein and the Second Circuit made only broad conclusions about the evidence as a whole, I will perform a more detailed review of specific evidence to screen out instances of Munafo's speech and/or conduct which do not relate to matters of public concern.

1. Munafo's Practice of Filling Out Vehicle Condition Reports

Munafo contends that he filled out and submitted Vehicle Condition Reports ("VCR's") for heavy-equipment in order to document and protest against safety concerns he had with the equipment. Defendants argue that this purported basis is contradicted by Munafo's deposition testimony, in which he admits that he filled out these forms in addition to the proper documents for the heavy-duty equipment (Inspection Maintenance Logs), because the VCR's had carbons and thus enabled him to take a copy and maintain a record with which to "defend [himself]" if "something should happen." (Munafo Dep. 271, 166-67, 323-24, Defendants' Exhibit F). Defendants contend that because the VCR's contain identical information to **[*24]** the Inspection Maintenance Logs, which MTA required Munafo to fill out, his use of VCR's was merely to protect his own interests and not anyone's safety.

Contrary to defendants' suggestions, however, this is precisely the type of evidence the Second Circuit found to be a clear matter of public concern. Munafo described his conduct in filling out VCR's as necessary to ensure that his complaints were documented. He maintains that the Inspection Maintenance Logs were prone to be tampered with or simply vanish. (*Id.* at 324). He claims that accident reports were often "fudged" (*Id.* at 334-35). And he stated that SIRTOA

opposed his use of the VCR's because they documented equipment defects "that could affect the safety of other employees." (*Id.* at 271). Assuming Munafo's allegations are true, his use of VCR's to record what he perceived to be safety violations is unquestionably a matter of public concern even if his complaints were partially motivated by personal interests. *Szoke v. Carter*, 974 F. Supp. 360 (S.D.N.Y. 1997) (County employee's complaints to county officials regarding operation and safety of private laboratory in which she worked for county addressed **[*25]** matter of public concern even though employee's complaints were at least partially motivated by her belief that her own health was being jeopardized).

2. Munafo's Complaints About General Conditions of Employment

Defendants seek to exclude any testimony and documentary evidence concerning "miscellaneous conditions of employment," including Munafo's protests over SIRTOA's alleged failure to compensate employees for emergency "snow duty," and its improper alteration of time cards, because "the question of whether overtime or extra pay was miscalculated is an issue between the employees and the employer that has no significance to the citizenry at large." (Def. Mem. at 15). Munafo responds by characterizing his complaints as a charge of public corruption or misuse of public funds.

[HN3]In general, an employee's protests about the conditions of his or her own employment situation do not rise to the level of public concern necessary for First Amendment protections to attach. *See Bogart v. New York City Law Dep't*, 2001 U.S. Dist. LEXIS 21919, 2001 WL 1631986, *6 (S.D.N.Y. Dec. 20, 2001) (complaint about discrimination by supervisor not a matter of public concern); *Saraceno v. City of Utica*, 733 F. Supp. 538, 542 (N.D.N.Y. 1990) **[*26]** (public employee's complaint of dissatisfaction with treatment not public concern). As the Supreme Court explained:

when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147. Moreover, making a strictly employment-related complaint on behalf of another does not transform the matter into one of public concern. *Nonnenmann v. City of New York*, 174 F. Supp. 2d 121, 136 (S.D.N.Y. 2001).

In contrast, charges of public corruption or illegal misuse of government funds may rise to the level of public concern even if embedded within an otherwise non-public employment dispute. *See Gorman-Bakos v. Cornell Coperative Extension of Schenectady County*, 252 F.3d 545, 553 n.4 (2d Cir 2001) ("Plaintiff's claims related to the administration of the [agency] and the allocation of funds were based on alleged mismanagement **[*27]** of government funds and violations of its by-laws, which are clearly matters of public concern."); *Vasbinder v. Scott*, 976 F.2d 118, 119-20 (2d Cir. 1992) (complaint of financial mismanagement of government funds was protected speech); *Keyser v. Sacramento City Unified Sch. Dist.*, 238 F.3d 1132, 1137 (9th Cir. 2001) (complaint about supervisor's alleged misuse of federal funds was protected speech); *Johnson v. Multnomah County, Oregon*, 48 F.3d 420, 425 (9th Cir. 1995) ("We have stated that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern.").

Yet [HN4]the mere allusion to corruption or mismanagement does not render a purely personal conflict over employment benefits a matter of concern to the general public. In *Harris v. Beedle*, 845 F. Supp. 1030 (S.D.N.Y. 1994), for instance, the district court found that a government employee's criticism of her employer's training program was not a matter of public concern even though her criticism implied that the program wasted public funds. As the court explained, adopting the plaintiff's reasoning **[*28]** would convert "every public employee's complaint about his or her work conditions" into a matter of public concern because all such complaints "indirectly charge that the governmental employer is wasting money." *Id.* at 1034. Broadly defining misuse of funds or government waste to incorporate nearly any employment practice "would eradicate *Connick's* distinction between speech touching upon employment issues and speech regarding public matters." *Id.* Thus, courts must also investigate the context and forum of the governmental employee's complaint when contemplating its public import. *See, e.g., Schaeffer v. City of New York*, 889 F. Supp. 97, 101 (S.D.N.Y. 1995) (plaintiff's complaint relating to the procedures for disciplining employees was not a matter of public concern because "when plaintiff made his complaint, he did so in the context of a personal dispute he was having with his superiors").

Although the issue is close, Munafo's complaints appear to implicate larger issues than a mere employer-employee dispute. For instance, his July 20, 1998 letter

to Governor George Pataki suggests that SIRTOA's systematic underpaying of wages for emergency **[*29]** work might be the result of "manipulation of state or city funds" or "fraud." (Munafo Letter to Pataki, Exhibit L). Munafo expressly requests that the Governor investigate SIRTOA's books to reveal any improprieties with respect to the agency's accounting practices. (*Id.*). Munafo also wrote to the acting chief officer of the MTA, John H. McCabe, demanding that the MTA adhere to its collective bargaining agreement concerning overtime pay for emergency work. (Munafo Letter to McCabe, Exhibit L). He even identified specific provisions of the agreement which the MTA was allegedly in violation of. (*Id.*). These allegations are quite distinct from the vague, indirect implications at issue in *Harris*. Munafo also impugned a systematic agency policy and appealed to the highest levels of government for redress, unlike the plaintiff in *Schaeffer*. As in *Gorman-Bakos*, Munafo's complaints were based on an agency's "alleged mismanagement of government funds and violations of its by-laws" (or in this case, its contract with its employees). *Gorman-Bakos*, 252 F.3d at 553. Consequently, the evidence he seeks to introduce relates to matters of public concern and cannot **[*30]** be excluded.

In contrast to Munafo's letter to Governor Pataki, however, his letter to Mayor Guliani does not involve a matter of public concern. (Munafo Letter to Guliani dated July 23, 1994, attached as Defendant's Exhibit I). Munafo apparently wrote this letter while serving a suspension as a result of the tire incident, and it is clear from its content that his sole purpose in sending the letter was to solicit the Mayor's aid in obtaining reinstatement:I hope this matter, with your help, can be resolved and my position reinstated in a diplomatic way with no public exposure because my intent is surely not to hurt anyone on either a worker or management's level but to have the operation of this system improved.(*Id.* at 2). Such a purely personal matter does not rise to the level of public concern necessary for First Amendment protection.

3. Munafo's Failure to Receive Promotions and Benefits

Munafo apparently intends to introduce evidence of protests he made when unfairly denied a promotional opportunity, bereavement pay, and perks he was entitled to by seniority. (Munafo Dep. 356; First Amended Complaint PP 28, 51-53, Defendants' Exhibit E; Munafo Letter **[*31]** to Inspector General and related correspondence, Defendants' Exhibit M). Defendants' contend that these issues were of purely personal concern to Munafo and thus cannot sustain a First Amendment retaliation claim. As the Second Circuit articulated in *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), [HN5]the fundamental inquiry for First Amendment protection is whether the individual making the complaints was seeking to vindicate personal interests or to bring to light "'any matter of political, social, or other concern to the community.'" (quoting *Connick*, 461 U.S. at 146). Munafo has not made any attempt to demonstrate how protests over his own employment situation are a matter of public concern. As such, this evidence must be excluded as irrelevant to his First Amendment claims.

4. Workers' Compensation Complaints

Defendants move to exclude evidence of complaints Munafo made regarding SIRTOA's workers' compensation practices because workers compensation is not a matter of public concern. *See* *Santiago v. Temple Univ.*, 739 F. Supp. 974, 981 (E.D. Pa. 1990) (workers' compensation not public concern but rather "a matter between an **[*32]** individual and his employer"). Specifically, defendants request that the court exclude all evidence relating to the 1996 worker's compensation hearing of Thomas Poggi and a March 29, 1995 informal meeting from which Munafo was forcibly removed. Munafo argues in response that a significant component of his First Amendment claim is the fact that he spoke to his fellow employees about the defendants' practice of altering worker's compensation reports to make them appear as if the employee was at fault. According to Munafo, the evidence he seeks to introduce pertains to this "corruption" not general workers compensation policies.

The record bears out Munafo's contention. The two specific incidents defendants attempt to exclude pertain quite vividly to allegations of SIRTOA corruption and misconduct. Although defendants correctly point out that Thomas Poggi's workers compensation hearing did not involve any speech activity by Munafo, their argument misses the mark. The events underlying Thomas Poggi's workers compensation hearing form the basis for Munafo's complaints of corruption -- complaints he voiced to coworkers and reported to the Staten Island Advance in 1998. Munafo intends to **[*33]** show that defendant Alfonse Sorrentino and Albert Santore (another SIRTOA supervisor) fraudulently altered an "accident report" in order to make it appear as though Mr. Poggi's injuries were caused by his own negligence. At Mr. Poggi's compensation hearing, Judge Finkelstein uncovered this fraud by comparing two "versions" of the accident report and found that the "supervisor report was really and truly altered. Something was added to guild the lily for the purposes of this trial. This is tainted, perjured evidence." (Transcript of Poggi Hearing pp. 42-43, Defendants' Exhibit O). To

the extent that Munafo's speech recounted the incident at Poggi's hearing and accused SIRTOA of deliberately falsifying evidence, it unquestionably involves a matter of public concern. *See, e.g., Vasbinder v. Ambach*, 926 F.2d 1333, 1341 (2d Cir. 1991) (Department of Education employee's report to FBI of fraudulent overbilling in a federally funded program satisfied "public concern" test); *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46-47 (2d Cir. 1983) (Allegation by director of nursing of corrupt and wasteful practices at large municipal hospital, made to city official **[*34]** empowered to investigate such charges, was constitutionally protected).

Defendants' reliance on *Santiago*, 739 F. Supp. at 981, and *O'Malley v. New York City Trans. Auth.*, 829 F. Supp. 50, 53 (E.D.N.Y. 1993), is misplaced. In each of these cases, the speech at issue was simply the plaintiff's act in bringing a workers compensation claim. In *O'Malley*, for instance, the plaintiff's First Amendment cause of action essentially claimed that he was discharged in retaliation for prosecuting a workers compensation case against the city. The court found that the compensation case itself was not a matter of public concern because the plaintiff brought his claim merely to regain his job and there was no evidence that the relevant facts of the case affected the citizenry at large. *Id.* at 53. This differs notably from Munafo's speech, which addressed efforts by public officials to corrupt the administrative process and inhibit employees from availing themselves of their rights and remedies under the worker's compensation laws.

In fact, the reasoning of *O'Malley* actually supports Munafo's position. Although dismissing the plaintiff's First **[*35]** Amendment claims based on his worker's compensation case, Judge Bartels reached the opposite result with respect to the plaintiff's disclosure of his supervisor's criminal activity, finding that [HN6]"there is no doubt that the public would be concerned with the revelation that an official in a position of public trust had previously breached a similar public trust elsewhere in violation of federal law." *O'Malley*, 829 F. Supp. at 53. As in this case, the defendants in *O'Malley* argued that because the plaintiff's complaints arose directly from an employment dispute they could not be a matter of public concern. In rejecting this argument, Judge Bartels noted that [HN7]"'a topic otherwise of public concern ... [does not] ... *lose* its importance merely because it arises in an employee dispute.'" *Id.* at 54 (quoting *Hall v. Ford*, 272 U.S. App. D.C. 301, 856 F.2d 255, 260 (D.C. Cir. 1988)). "To restate the proposition differently, the content of the disputed speech rather than the motive behind its utterance is the 'greatest single factor' in the analysis." *Id.* at 54 (quoting *Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir. 1988). **[*36]** Thus, the matters of public concern raised by Munafo's disclosure about Sorrentino and other SIRTOA supervisors "cannot be negated by the possibility that they originated out of an employee dispute." *Id.* at 54.

Nevertheless, while Munafo's *speech* concerning what happened at Poggi's hearing is relevant to his First Amendment claims (i.e. exactly what he said about evidence tampering and who he made these comments to), the actual events of the hearing are not. The truth of Munafo's allegations are not relevant to his retaliation claim. Munafo does not need to prove that his complaints were accurate in order to sustain his claim for wrongful termination; retaliation in response to his speech is prohibited by the First Amendment regardless of its truth. Thus, while Munafo is permitted to testify concerning his statements, neither he or Mr. Poggi will be permitted to testify as to the underlying facts of the hearing itself.

The same analysis applies with equal force to evidence concerning the March 29, 1995 meeting during which Munafo addressed a group of employees to caution them about SIRTOA's tactics of altering accident reports and falsifying evidence in workers compensation **[*37]** cases. Munafo intends to show that when defendant Sorrentino became aware that Munafo was discussing the falsification of accident reports, he had Munafo escorted off the property by SIRTOA police. (Munafo Dep. 334-35). A subsequent decision by the PERB found that SIRTOA's actions in expelling Munafo off the property were improper. (PERB Decision, 2-4, Defendants' Exhibit Q).

Defendants argue that all of this evidence is irrelevant because the subject of the meeting was neither a matter of public concern nor even a union-related matter. They point to Munafo's own characterization of the meeting as "not a union meeting" but "a voluntary informal discussion basically on my future absence and any individual matters." (Improper Practice Charge Form, dated March 29, 1995, Defendants' Exhibit P). According to the defendants, "the fact that [they] removed [Munafo] from the property in the belief that he was conducting an unauthorized union meeting, and then were found to have done so improperly, is irrelevant to the First Amendment claim, because the action was not taken in response to First Amendment speech or activity." (Def. Mem. at 20-21). However, Munafo maintains that the subject **[*38]** of his comments at the meeting centered around SIRTOA's practice of altering documents in workers compensation cases. Munafo also claims that Sorrentino knew of his purpose in conducting the meeting. If these assertions are true, evidence of the meeting and SIRTOA's response not only relates to a matter of public concern (corruption), it also provides

direct evidence of defendants' hostility to the content of Munafo's speech. At this point, defendants have not sufficiently demonstrated that the evidence Munafo seeks to introduce would not be relevant for these purposes.

5. Munafo's Representation of Other Workers

Defendants' move to exclude any evidence concerning Munafo's representation of coworkers in employment disputes as irrelevant. Munafo argues that such evidence is relevant to his freedom of association claim (he alleges that defendants discharged him in retaliation for activities he performed on behalf of a minority union faction). Without a more detailed account of the actual testimony sought to be presented, it would be premature to rule on admissibility. But [HN8]as a general rule, evidence that Munafo merely represented other employees in disputes involving genuinely **[*39]** private concerns like workers compensation benefits or disciplinary actions is not protected speech or associational activity. *See* Nonnemann v. City of New York, 174 F. Supp.2d 121, 136 (S.D.N.Y. 2001). Defendants should challenge objectionable testimony as it arises during the course of the trial.

*B. Defendants' Motion to Exclude Evidence Relating to Munfo's Now Dismissed Due Process Claims*

Munafo's due process claim has been dismissed, and previously-named defendants Martin Scheinman, Louis Russo and Rosemary Healy were removed from the case. *See* *Munafo*, 285 F.3d at 214. Nevertheless, Munafo's Witness and Exhibit lists suggest that he intends to introduce evidence concerning the fairness and propriety of defendants' grievance and disciplinary processes. For instance, Munafo expects to call Nikki Joseph to give testimony about "improprieties in the defendants' disciplinary process, including the alteration of hearing transcripts by the defendants." (Plaintiff's Proposed Witness List, Defendants' Exhibit A; First Amended Complaint PP 99-106, Defendants' Exhibit E). Defendants contend that such evidence would only serve to confuse the jury, prejudice **[*40]** the defendants, and divert the jury's focus from the real issue in the case. Munafo concedes that he cannot submit evidence relating to his dismissed due process claims, but maintains that a core component of his speech and association claims involve his leadership of the minority faction of the Union and his criticisms of the Union's relationship with management as it concerned employee discipline. *See* Korenbaum Decl. P 8.

1. Allegations of Impropriety in SIRTOA's Disciplinary Process

As defendants properly aver, allegations of impropriety pertaining to Munafo's own grievance hearing and administrative appeals is irrelevant to the claims remaining for trial. Since Munafo's complaints regarding such improprieties did not surface until after his dismissal, they cannot form the basis for a retaliation claim. These allegations relate soley to Munafo's dismissed cause of action for due process violations and any evidence supporting them must therefore be excluded. *See, e.g.,* *Levine v. Goldin*, 1993 U.S. Dist. LEXIS 5766, 1993 WL 147552, *3 (S.D.N.Y. Apr. 30, 1993) (excluding all evidence relating to defendants' intent to defraud or pattern of deceit where RICO fraud claims had been dismissed **[*41]** and only breach of contract cause of action remained).

In opposing the introduction of any allegations regarding former defendant Martin Scheinman, defendants assert that his sole involvement in the relevant events was as the impartial arbitrator presiding over Munafo's grievance. The record indicates that in April 2000, Mr. Scheinman, acting as chairman of a three-person arbitration panel, upheld SIRTOA's dismissal of Munafo for insubordination and workplace disturbances. (Arbitration Decision, Plaintiff's Exhibit D). Subsequent to the arbitration proceeding, Munafo filed an amended complaint in this action, naming Scheinman as a defendant and charging him in connection with the violation of Munafo's due process rights. As Judge Weinstein noted, no factual allegations support a conspiracy or corrupt relationship charge, and Munafo's complaint against Scheinman was properly dismissed because it sued an arbitrator simply for acting as an arbitrator. (Transcript of proceedings June 10, 2002, 12-14, Defendant's Exhibit G). Consequently, the evidence Munafo seeks to introduce relating to Mr. Scheinman (including the allegation that he acted in concert with other defendants to purposely **[*42]** prolong the resolution of Munafo's grievance) is irrelevant to his remaining First Amendment claims.

Munafo also contends that hearing officers at his various grievance proceedings refused to elicit testimony from employees he requested as witnesses. Similar to Munafo's allegations regarding Mr. Scheinman, such evidence is unrelated to his First Amendment claims and should be excluded. As should Munafo's claims that he was denied the right to retain the services of independent stenographers or tape recording devices at his hearings. (First Amended Cmplt. PP 42, 98). These allegations also relate solely to Munafo's now defunct due process claims, and any evidence supporting them must be excluded, including all evidence relating to former defendant Healey a/k/a Lake, whose sole connection to the relevant events was

her position as stenographer at Munafo's disciplinary grievance hearing. Munafo's complaints regarding these improprieties did not arise until after his dismissal and cannot therefore be the subject of a retaliatory discharge claim. For this reason, the February 15, 2000 *Staten Island Register* article detailing Munafo's due process complaints is similarly irrelevant. **[*43]** (Exhibit R).

In addition to evidence of specific improprieties in his own grievance proceeding, Munafo also intends to introduce evidence surrounding his allegations that SIRTOA has enacted general policies prohibiting hearing officers from rendering independent decisions in disciplinary matters, does not train its hearing officers or provide them with guidelines for discipline, and prevents employees from obtaining an accurate transcript of disciplinary proceedings. (First Amended Cmplt. PP 79-80; 111-12; 119; 121; 123). Resolution of whether these issues relate to First Amendment concerns or merely the dismissed due process complaint must await a more detailed offer of proof during trial.

2. Minority Union Activities and Criticism of Union Leaders

Finally, Munafo argues that core components of his speech and associational claims involve his leadership of the minority faction of the Union and his criticism of the Union's relationship with management as it concerned employee discipline. Specifically, Munafo contends that Union officials conspired with SIRTOA management to preclude employees from seeking workers compensation benefits. To the extent that the evidence he seeks **[*44]** to introduce supports Munafo's claim that he was retaliated against for his work on behalf of the union minority, such evidence is relevant to his First Amendment claim and should be admitted. *See Clue v. Johnson*, 179 F.3d 57, 60-61 (2d Cir. 1991) (holding that the leaders of a minority union faction could state a claim for First Amendment retaliation on the basis of their criticism that "union leaders were in bed with management and supported management policies that redounded to the disadvantage of workers"). In rejecting the defendants' argument that the plaintiffs' statements and activity involved merely an internal union dispute, the Second Circuit reasoned that [HN9]"activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under *Connick*." *Id.* at 61. As in *Clue*, Munafo's alleged activities and speech on behalf of a minority union faction severely disparaged both SIRTOA and union officials. Consequently, these allegations state a valid basis for Munafo's First Amendment claim and Munafo should be permitted to introduce evidence of his criticisms of union management **[*45]** and any union-related activities that he claims are ostensibly the reason for his termination.

*C. Defendants' Motion to Exclude Evidence of Munafo's August 1994 Complaint to the New York State Department of Labor*

In August 1994, Munafo protested his discipline in connection with the tire incident to the New York State Department of Labor. (NYS Dept. of Labor PESH Discrimination Complaint, Defendants' Exhibit S). By letter dated June 28, 1996, the Department of Labor notified SIRTOA that it had forwarded the investigative file to the Attorney General's Office for "approprate action" on the opinion that SIRTOA had "discriminated" against Munafo in violation of § 27-A of the Labor Law:

In August, 1994, a complaint was filed with the New York State Department of Labor by Charles Munafo, a Trackman/Machine Operator for the Maintenance of Way Track Department of the Staten Island Rapid Transit Operating Authority. Mr. Munafo claimed that he was disciplined in response to his safety and health related activities, particularly his practice of reporting equipment safety defects.

An Investigation into Mr. Munafo's complaint was conducted by the Division of Safety and Health, and **[*46]** their findings have been reviewed by this office. It is the opinion of the Department of Labor that the Transit Authority/SIRTOA discriminated against Mr. Munafo in violation of Section 27-a(10) of the Labor Law by harassing him and imposing disciplinary penalties on him.

(Dept. of Labor Letter to Transit Auth. June 28, 1996, Defendants' Exhibit S). Based on this letter, Munafo alleges in his affidavit that the Department of Labor "found that SIRTOA's decision to discipline [him] in 1994 amounted to illegal retaliation for [his] protests about health and safety-related issues." (Munafo Aff. at P 72, Defendants' Exhibit T).

Although conceding that Munafo's complaint to the Department of Labor is relevant, defendants assert that the aforementioned letter to the Transit Authority is irrelevant and serves no purpose but to unfairly prejudice them. They note that the Attorney General's Office declined to file a civil charge against SIRTOA under the Labor Law. (Att. Gen. Letter to SIRTOA, May 16, 1997, Defendants' Exhibit U). Defense Counsel also states that the entire interaction with the Labor Department is a nullity because their finding of discrimination was due to SIRTOA's **[*47]** inadvertant default rather than any substantive investigation. (Reply Decl. Ira J. Lipton PP 4-6, Defendants' Exhibit