U). Indeed, the reply letter from the Attorney General to SIRTOA indicates that the entire investigation could have been avoided if SIRTOA had simply turned over all of its information when requested by the Department of Labor:After reviewing the Department of Labor's investigation file and findings and conducting further inquiry in this matter, we have decided not to commence a civil action under Labor Law § 27-a(10). While we appreciate your cooperation with our office's request for information and interviews, we note that the documentation you ultimately provided to us was requested by the Department of Labor more than a year ago and its existence was made known to your client at or about the time the Department commenced its investigation in 1994. Had your office provided more timely and complete responses to the Department's requests, unnecessary expenses and delays could have been avoided.(Att. Gen. Letter to SIRTOA, May 16, 1997). Thus, the Department of Labor's initial finding of discrimination was essentially found to be unsupported by the **[*48]** evidence. The Department of Labor's investigation and findings are therefore irrelevant and will be excluded.

*D. Defendants' Motion to Exclude Evidence of Other Employees' Grievances and of Allegedly Dangerous and Unsafe Conditions in the Workplace*

According to Munafo's proposed witness and exhibit lists, he intends to elicit testimony by other SIRTOA employees concerning their own grievances and "safety-related issues in the workplace." (Plaintiff's Proposed Witness List; Plaintiff's Proposed Exhibits # 9-11 (Defendants' Exhibit O); Complaint of Maryanne Laborante (Defendants' Exhibit V)). But this is not a trial about the safety of SIRTOA's operation, the fairness of its grievance and disciplinary procedures, or the equity of its operating policies. Rather, the principle triable issue in this case "is whether defendants' treatment of Munafo was in fact motivated by his safety complaints and union activities, as Munafo contends, or was instead punishment for disobedience and insubordination." *See* Munafo, 285 F.3d at 212. The truth or falsity of Munafo's complaints is simply not relevant to this determination.

While Munafo concedes that evidence of grievances **[*49]** by his co-workers is inadmissible, he argues that the extent of the dangers in the workplace bears directly upon the motive of the defendants. In essence, he claims that SIRTOA would have no reason to retaliate against him if the safety complaints were baseless. Even if Munafo's assumption is valid, defendants do not raise the falsity of Munafo's complaints as a defense. Rather, they argue that Munafo was terminated for wholly independent disciplinary violations. [HN10]There is some case law suggesting that the falsity of a public employee's statements is relevant to the *Pickering* balance between the employer's interest in efficient operation and the employee's First Amendment rights. *See Johnson v. Multnomah County, Oregon*, 48 F.3d 420, 423-24 (9th Cir. 1995) ("the recklessness of the employee and the falseness of the statements should be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the *Pickering* balancing test"). But the *Pickering* analysis is a *legal* question -- one that has already been implicitly resolved in this case by Judge Weinstein's denial of summary judgment. Thus, unless defendants **[*50]** raise questions at trial regarding the truth of Munafo's statements, evidence relating to safety violations by SIRTOA will be excluded as irrelevant, prejudicial, and an undue waste of time on a collateral issue.

*E. Defendants' Motion to Exclude the Staten Island Advance Article*

Pursuant to Fed. R. Evid. 802, defendants move to exclude an article published in the Staten Island Advance on October 30, 1998, which criticizes SIRTOA for quashing employee safety concerns and tampering evidence in workers compensation proceedings. (Defendants' Exhibit W). [HN11]While defendants are correct that as a general matter, newspaper articles are inadmissible to prove the truth of their contents, *see, e.g., In re Columbia Sec. Litig.*, 155 F.R.D. 466, 474-75 (S.D.N.Y. 1994), they may be used for other relevant non-hearsay purposes. *See, e.g., Sanders v. City of New York*, 2001 U.S. Dist. LEXIS 20242, 2001 WL 1568422, *3 (S.D.N.Y. Dec. 5, 2001).

The article referenced by defendants is ostensibly the culmination of an interview Munafo conducted with reporters concerning safety violations and internal corruption at SIRTOA. Such evidence does not fall within the definition of hearsay because **[*51]** it is not being "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). As Munafo articulates, the article is offered to show several required elements of his First Amendment claim: Munafo's exercise of his First Amendment rights, defendants' knowledge of the substance of Munafo's public criticisms, and their motive for retaliating against him. None of these purposes depends on the truth of the article; the mere fact of publication suffices. *See* Advisory Committee Note to Fed. R. Evid. 801(c) [HN12]("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *United States v. Press*, 336 F.2d 1003, 1011 (2d Cir. 1965) ("statements

inadmissible to prove the truth of the matter they assert may be admitted if the fact of the assertion is in itself relevant").

Moreover, the article contains Munafo's speech itself, and is thus a verbal act giving rise to legal consequences (i.e. First Amendment protection). [HN13]The definition of hearsay excludes "the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement **[*52]** itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." *Id.; see also* *United States v. Cardascia*, 951 F.2d 474, 486-87 (2d Cir. 1991) ("Statements not considered hearsay are typically verbal acts that give rise to legal consequences."); *United States v. Kohan*, 806 F.2d 18, 21-22 (2d Cir. 1986) (statements of third party to defendant about source of checks was not hearsay because they were offered not to prove the truth of the statements but rather that defendant believed them and was not aware checks were stolen). Accordingly, defendants' motion to exclude the entire article is denied. To the extent that parts of the article are irrelevant and do not relate to Munafo's First Amendment protected speech, defendants should submit proposed redactions prior to its admission.

*F. Defendants' Motion to Preclude the Expert Testimony of Munafo's Physician*

In support of his claim that he suffered clinical depression as a result of his treatment and termination by defendants, Munafo intends to introduce testimony from Dr. Santapuri Rao, a psychopharmacologist who began treating him on March 27, 1999. Dr. **[*53]** Rao is expected to testify "to the damages Mr. Munafo has suffered as a result of the defendants' treatment of him, including, but not limited to, the treatment he provided Mr. Munafo following his (Mr. Munafo) termination from the defendants." (Munafo Proposed Witness List). Defendants argue that Dr. Rao's testimony, notes, and reports pertaining to his opinion as to the cause of Munafo's depression should be precluded as unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1983), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999). For the reasons set forth below, I am precluding Dr. Rao from testifying as to the cause of Munafo's depression.

[HN14]*Daubert* imposes on district court judges a special "gatekeeping" function to "ensure that any and all scientific testimony...is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The objective of *Daubert's* gatekeeping function "is to make certain that an expert...employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in **[*54]** the relevant field." *Kumho Tire*, 526 U.S. at 152. Thus, an expert's opinion is admissible only if: (i) the testimony is based upon sufficient facts or data; (ii) the testimony is the product of reliable principles and methods; and (iii) the witness has applied the principles and methods reliably to the facts of the case. *Id.* These requirements are not diminished merely because the expert witness is a "treating physician" rather than an expert retained solely for the purposes of litigation. n1 *See* *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 270 (2d Cir. 2002) (treating physician's proposed testimony is subject to *Daubert* analysis); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000) ("A treating physician's expert opinion on causation is subject to the same [*Daubert*] standards of reliability that govern the expert opinions of physicians hired solely for purposes of litigation.").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Although it is worth pointing out that Munafo did not seek "treatment" from Dr. Rao until eight months after he commenced this lawsuit.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*55]**

To the extent that Dr. Rao's testimony touches upon matters of causation, it will satisfy *Daubert's* prerequisites for reliability only if the doctor conducted a meaningful "differential diagnosis" ruling out other possible contributing factors. [HN15]"When offered for the purpose of proving specific medical causation, a meaningful or reliable differential diagnosis must specifically negate other alternative possible causes." *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp.2d 470, 497 (D.N.J. 2002) (citing *Turbe v. Robert A. Lynch Trucking, Inc.*, 41 V.I. 146, 1999 WL 1087026 (Terr.V.I. Oct. 7, 1999)); *see also* Fed. R. Evid. 702 advisory committee's note [HN16](in assessing an expert's reliability, courts should determine whether the expert "has adequately accounted for obvious alternative explanations.").

[HN17]The district court has the discretion to exclude as "unreliable" a medical expert's opinion as to the specific source or cause of a plaintiff's medical condition where "(1) the [physician] engaged in very few standard diagnosis techniques by which doctors normally rule out alternative causes and (2) the defendant pointed to some likely cause of the plaintiff's **[*56]** illness other than the defendant['s] actions and

[the physician] offered no reasonable explanation as to why he or she still believed that the defendant['s] actions were a substantial factor in bringing about that illness."

*Id.* at 497-98 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 760 (3d Cir. 1994)).

[HN18]While an expert need not rule out *every* potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant. *See, e.g.,* *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp.2d 584, 609 (D.N.J. 2002) ("While an expert is not required to rule out all alternative possible causes of a plaintiff's disease, 'where a defendant points to a plausible alternative cause and the doctor offers no reasonable explanation' for why he still concludes that the chemical was a substantial factor in bringing about the plaintiff's disease, 'that doctor's methodology is unreliable'") (quoting *Paoli*, 35 F.3d at 759-60)); *see also* *Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358 (D.N.J. 1995) **[*57]** (excluding expert medical testimony on issue of specific causation where physician "did little, if anything, to rule out alternative causes" and either "ignored" or offered "no satisfactory reason" for discounting "several alternative possible causes" for plaintiff's asthma identified by defendant).

During his deposition, Dr. Rao candidly admitted that he made no attempt to perform a differential diagnosis as to the cause of Munafo's alleged depression. Despite a number of significant events and emotional traumas in Munafo's recent past, Dr. Rao utterly failed to investigate or even inquire as to how these factors may have contributed to his depression. For instance, Dr. Rao noted that Munafo was divorced after having been married for six years, that he had primary care-taking responsibility for his 12-year-old son who lived with him, that a girlfriend he had been living with moved out approximately eighteen months before "because of problems he was having on job," that he had a 71-year-old father and that his mother had been murdered in 1995. (Rao Dep 34-35). He also noted that Munafo's mother suffered from a "chemical imbalance" and had been an outpatient at the Bailey Seton Psychiatric **[*58]** Outpatient Clinic. (Rao Dep. 37). Notwithstanding this information, Dr. Rao did not ask Munafo a single question about his ex-wife or his relationship with her, his relationship with his son, any current romantic involvements or any of the circumstances surrounding his mother's murder and the emotional effect that traumatic event had on him because "I can't go into every detail." (Rao Dep. 35, 77-78). Indeed, because of his sparse examination, Dr. Rao was not even aware that Munafo's father had recently been diagnosed with cancer. (Rao Dep. 36-37; Munafo Dep. 9/27/02, at 897). Nor did Dr. Rao probe further into the specifics of the chemical imbalance Munafo's mother experienced; he merely speculated that it was depression. (Rao Dep 37).

Dr. Rao's failure to perform a thorough and meaningful differential diagnosis is particularly troubling considering the serious alternative factors raised by the defendants. Dr. Rao could give no satisfactory reason for discounting as contributing causes: his mother's murder; his father's diagnosis of cancer; possible hereditary or genetic mental illness; his divorce and the fact that he faced the stresses of single parenthood; or the fact that his **[*59]** girlfriend recently left him. In lieu of any conscientious attempt to rule out these alternative factors, Dr. Rao's causation determination barely rises above mere speculation and cannot meet the reliability standards of expert testimony under *Daubert*.

In addition to the lack of a meaningful differential diagnosis, Dr. Rao's causation analysis simply does not exhibit the rigorous application of scientific principles required by *Daubert*. Dr. Rao testified at his deposition that he is a psychopharmocologist, which is a psychiatrist whose practice focuses on "medication management" and not psychotherapy. (Rao Dep. 11-12, Defendants' Exhibit X). From his own testimony it is clear that, as a psychopharmocologist, Dr. Rao was concerning primarily with identifying and treating Munafo's condition, not determining its underlying cause. As he explained, since his practice concerned only diagnosis and treatment, he completely ignored factors that would be critical to an analysis of causation:

See, what happens with this kind -- my practice, when I'm doing an evaluation, focusing on pharmocology treatment, if they need one -- if the same person goes to a social worker, a psychologist, **[*60]** they concentrate on those kinds of things in detail, relationship issues, family issues, you know. In my practice that's not common because that doesn't help me in any way in my evaluation treatment, pharmocology.

(Rao Dep. 78-79). [HN19]"The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions." *Wynacht v. Beckman Instruments, Inc.*, 113 F. Supp.2d 1205, 1208-09 (E.D. Tenn. 2000).

Moreover, Dr. Rao's diagnosis appears to be based entirely on Munafo's own description of symptomology and the causal relationship between his anxiety and work-related difficulties -- statements the defendant made during the pendency of this lawsuit. For instance, although Dr. Rao based his causation determination on Munafo's description of "flashbacks of his work situation," (Rao Dep. 30), and symptoms he suffered as a result of job-related stress, (*Id.* at 28-29), Dr. Rao did not probe the substance of any of Munafo's descriptions: "I just took what he [Munafo] said. I didn't explore that part, you know, I just took what he mentioned. **[*61]** " (*Id.* at 29). Indeed, the essence of Dr. Rao's entire testimony involved his reading transcriptions of treatment notes that merely recorded verbatim what Munafo told the doctor n2:Q. These notes, when you wrote these notes are you transcribing what he said to you?

A. Exactly. Some of them are verbatim notes.
Q. It's not that you're drawing conclusions or things like that from what he's saying?
A. No.

Q. You're just writing down what he tells you?
A. That's right.(Rao Dep. 74). Dr. Rao did not attempt to verify any of the information Munafo provided him nor did he attempt to contact Munafo's other physicians. (*Id.* 32). He also failed to perform any physiological tests, such as a blood test, to ascertain whether Munafo suffered from a chemical imbalance. (*Id.* at 33). Finally, Dr. Rao admitted that he inferred the cause of Munafo's depression primarily because Munafo did not mention any other source:A. I think really because of he has no past history of depression and he's talking to me about what happened at the job, which is kind of traumatic for him, I can only make causal relationship between what happened to him and then his onset of **[*62]** depression.
Q. But you didn't ask him about things other than the job; is that correct?
A. I didn't.

(Rao Dep. 79). Given the lack of scientific rigor, and Dr. Rao's admission that he made no attempt whatsoever to make a differential diagnosis and rule out other potential causes of Munafo's depression, his testimony on causation is inherently unreliable and must be excluded under *Daubert.*

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Dr. Rao's deposition testimony relied exclusively on his reading of contemporaneous notes, and not on any independent recollection of his sessions with Munafo. (Rao Dep. 10, 28).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

This determination of Dr. Rao's reliability with respect to causation does not preclude his testimony on other aspects relevant to Munafo's claim for damages. As an experienced, board certified psychiatrist who ostensibly employed the criteria set forth in the DSM-IV for the evaluation of mental defects, Dr. Rao's testimony is admissible as to his *diagnosis and treatment* of Munafo. *See* S.M. v. J.K., 262 F.3d 914, 920-22 (9th Cir. 2001) **[*63]** (board certified psychiatrist could testify regarding diagnosis even though he did not rely upon DSM-IV); *Mancuso v. Consolidated Edison Co. of N.Y., Inc.*, 967 F. Supp. 1437, 1456 (S.D.N.Y. 1997) ("[Defendant] has cited no cases in which a qualified psychiatrist was excluded from testifying because she did not follow the DSM-IV"). Defendants have made no showing that Dr. Rao's dianosis was unreliable or based on techniques or evidence not traditionaly relied upon by experts in the field of psychopharmocology. Thus, although Dr. Rao is precluded from submitting evidence of causation, he will be permitted to testify as to the facts of treatment, including "why Mr. Munafo sought help, what medications, if any, he prescribed, and what diagnoses, if any, he made." (Plaintiff's Witness List); *see* *Annis v. County of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) (plaintiff's testimony that she needed counseling as a result of emotional distress caused by her employer's discrimination would only be sufficient to warrant an award of compensatory damages if it was corroborated).

*G. Defendants' Motion to Exclude Evidence of Munafo's Alleged Depression After* **[*64]** *His Clinical Depression Was Resolved*

According to his treating physician, Dr. Rao, Munafo was "not depressed clinically" as of December 1999. (Rao Dep. at 80-81; Rao Notes 12/30/99, Defendants' Exhibit X). Due to this diagnosis, defendants maintain that Munafo cannot claim legally cognizable damages in the form of depression any time after December of 1999. They move to exclude any evidence of Munafo's mental or emotional state thereafter as irrelevant. Although conceding that Dr. Rao may not testify as to his depression after December 1999, Munafo states that he should be allowed to present evidence about his own mental condition because the fact that he was no longer clinically depressed within the meaning of the DSM IV does not mean that he was not still suffering emotionally. While Dr. Rao's opinion that Munafo's depression was resolved as of a certain date undeniably renders Munafo's claims of subsequent injuries suspect, it does not preclude him from testifying as to

such alleged damages. Dr. Rao's conclusion does not make Munafo's other evidence irrelevant; it merely goes to the weight of that evidence.

*H. Defendants' Motion to Preclude Testimony From Witnesses That Were* **[*65]** *Not Identified Pursuant to F.R.C.P. 26(a)(1)(A) and 26 (e)(1)*

Defendants move to preclude the testimony of Joseph Munafo and Doreen Shannon because Munafo failed to identify these individuals as persons with knowledge pursuant to Fed. R. Civ. Pro. 26. Munafo does not oppose this aspect of defendants' motion and will not call these witnesses.

*I. Defendants' Motion to Exclude Evidence of Loans Munafo Received From His Father as a Result of This Litigation*

Munafo apparently intends to introduce evidence of loans he received from his father subsequent to his discharge from SIRTOA. He claims that such evidence is relevant to his emotional distress because he had to turn to his father for financial assistance as a direct result of defendants' termination of his employment. However, the facts belie Munafo's professed purpose for offering evidence of the loans and defendants' motion to exclude should be granted.

Munafo testified that his father loaned him $ 21,107.74 in the year 2000, $ 6,425 in the year 2002, and "out of pocket" cash loans in 2001. (Munafo Dep. Sept. 7, 2002, at 911-17, Defendants' Exhibit Y). Munafo alleges that he needed the loans to pay his "expenses" because **[*66]** he had just lost his job. But his federal tax returns prove that Munafo earned a considerably higher salary *after* his dismissal than he ever did while employed at SIRTOA. (Defendants' Exhibit Z (1997 Federal Tax Return, showing $ 41,712 adjusted gross income; 1998 Federal Tax Return, showing $ 40,708 adjusted gross income; 1999 Federal Tax Return, showing $ 46,379 adjusted gross income; 2000 Federal Tax Return, showing $ 58,531 adjusted gross income; 2001 Federal Tax Return, showing $ 64,381 adjusted gross income). Moreover, Munafo's deposition suggests that his need for the loans actually stemmed from expenses incurred in prosecuting this litigation. For instance, he testified that the "majority of the money has gone for attorney fees to fight [the defendants]," that "my money is consumed on litigation," and "you know what attorneys fees cost to fight a case like this." (Munafo Dep. 9/7/02 at 911, 915). These facts indicate that the true purpose of such evidence is to portray Munafo as a "long- and hard-suffering victim" forced to spend all of his money litigating this case. (Def. Mem. at 39). Munafo does not dispute this purpose and indeed, argues that "this conclusion in and **[*67]** of itself militates in favor of its admission." (Munafo Mem. at 12). However, Munafo's expenses in connection with this case are completely irrelevant to the issues of liability or damages, as are any alleged emotional damages as a result of the stress and financial anxiety resulting from the cost of litigation. These are improper subjects for the jury to consider; the sole issue is what legally cognizable damages Munafo suffered as a result of his *termination*. In sum, a litigant who commences a protracted and expensive lawsuit (a majority of which has already been dismissed as frivolous) may not then claim as an element of damages that he suffered emotional and financial anxiety because the lawsuit cost too much.

*J. Defendants' Motion to Exclude Evidence Related to Punitive Damages*

Both parties acknowledge that [HN20]punitive damages are not available against public benefit corporations such as the MTA, the NYCTA and SIRTOA. *See* *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 655-56, 516 N.E.2d 190 (1987); *Karoon v. NYCTA*, 241 A.D.2d 323, 659 N.Y.S.2d 27, 28 (1st Dept. 1997); *Sewell v. NYCTA*, 1992 U.S. Dist. LEXIS 2160, 1992 WL 202418, **[*68]** *3 (E.D.N.Y. Feb. 10, 1992); *Majer v. MTA*, 1992 U.S. Dist. LEXIS 6239, 1992 WL 110995, *3 (S.D.N.Y.). In a § 1983 action against individual defendants, however, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983). Defendants argue that Munafo "has not put forward facts from which a jury could properly make a punitive award against [the individual defendants]" (Def. Mem. at 40), but ruling on such a motion to exclude would be premature at this point.

Because of the danger of unfair prejudice, the issue of punitive damages will be bifurcated from liability. Munafo is precluded from submitting any evidence relevant solely to punitive damages until and unless the jury returns a verdict on liability. *See* *Vasbinder v. Ambach*, 926 F.2d 1333, 1343-44 (2d Cir. 1991) ("We have no difficulty in theory with a bifurcation of the punitive damages issue, postponing the jury's consideration of the amount of such an award until a later stage in **[*69]** the trial. Punitive damages are to be tailored to the defendant's ability to pay, and normally that class of evidence is not admitted or desirable during the liability and compensatory damages phase of the case."); *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 373-74 (2d Cir. 1988) [HN21]("Since it often would be prejudicial to a

defendant to attempt to litigate its financial condition during the trial on the issues of liability and compensatory damages, the preferred method of accommodating the various interests is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all.").

*K. Defendants' Motion to Dismiss Claims Accruing Prior to July 6, 1995 as Time-Barred on Statute of Limitations Grounds.*

Defendants argue that Munafo is barred from pressing any claims arising prior to July 6, 1995 because of the three-year statute of limitations for actions under 42 U.S.C. § 1983. Thus, defendants move to dismiss Munafo's allegation that his First Amendment **[*70]** rights were violated by his suspension and demotion on July 21, 1994 in connection with the tire incident. Both the incident itself and the resulting discipline ocurred more than three years prior to the filing of Munafo's Complaint on July 6, 1998. Munafo does not oppose this motion but contends that evidence concerning these claims may still be relevant for other purposes. Defendants motion to dismiss the allegations in the Complaint regarding incidents prior to July 6, 1995 is therefore granted, but resolution of evidentiary objections on this issue will have to await a more detailed offer of proof at trial.

**II. Plaintiff's Motion to Exclude Evidence and Amend Complaint**

*A. Plaintiff's Motion to Exclude a Report of Retired Justice Asch Accusing Munafo of Misconduct and Banning Him From Representing Employees in PERB Actions*

During his representation of a fellow employee, Anthony Imbriale, at a PERB administrative hearing, allegations of misconduct and assault were leveled against Munafo by ALJ Elena Cacavas. Retired New York Supreme Court Justice Sydney Asch prepared an Investigative Report on January 22, 1998, substantiating these charges and recommending that **[*71]** Munafo be suspended from representing employees in PERB matters for six months. Specifically, the report concluded that ALJ "Cacavas had bonafide reason to, and did, fear for her physical safety when Mr. Munafo appeared before her, lost control and physically followed and confronted her." (Asch Report, Plaintiff's Exhibit A). Munafo moves to exclude this report as irrelevant under Rule 401, and improper impeachment material under Rule 608(b).

A closer examination of Munafo's remaining causes of action illustrate the relevance of evidence surrounding his assault of ALJ Cacavas and subsequent suspension from handling PERB matters. Since the Complaint alleges that Munafo was engaging in union activity, and that he was terminated as a result of that activity, Munafo's authority to act on behalf of the union and engage in union-related activities is a key issue in the case. Justice Asch's report and other evidence about the PERB incident is relevant to Munafo's relationship with his union and defendants' claim that he lacked the authority to act as a union representative. Munafo's union identified this incident and Munafo's "threatening manner," and "disruptive and abusive ways" as key **[*72]** factors in their revocation of his authority to handle "any matter pertaining to union business" even though he was a vice chairman. (June 5, 1997 Letter from Local Chairman Russo to union members, Exhibit A attached to Hagmeier Reply Decl. dated December 4, 2002).

Despite its collateral relevance, however, the report itself should not be admitted for this purpose. Because it details specific acts of a violent and threatening nature, the report is likely to be unfairly prejudicial to Munafo. In addition, it has only modest probative value since the principal issue is whether Munafo was engaging in union activity, not the justification for the union's revocation of his authority. Finally, the report itself and any extrinsic evidence of the incident would be unecessary and cumulative; a succinct description of the relevant material is already available within the union letter terminating Munafo's authorization as union rep. (*Id.*). Consequently, Rule 403 precludes defendants' admission of the Asch Report or any extrinsic evidence pertaining to the PERB incident outside of the aforementioned description contained within the union letter, at least for the purpose of illustrating Munafo's **[*73]** lack of union authority.

Defendants also claim relevance because Munafo has put his own character, reputation, and mental and emotional states in issue. Indeed, the Complaint seeks damages for "humiliation, embarrassment, mental anguish, emotional distress, loss of self-esteem and harm to his personal and professional reputation." (First Amended Cmplt. PP 155, 159, 163). [HN22]Pursuant to Fed. R. Evid. 405(b), in cases where "character or traits of character of a person is an essential element of a...defense, proof may...be made of specific instances of that person's conduct." Thus, courts have found that where a plaintiff claims reputational injury, defendants must be permitted to introduce specific evidence that the plaintiff's reputation has already been compromised. *See Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072 (3d Cir. 1985) (evidence of tarnished reputation

arising out of broad range of criminal activity, deemed relevant to mitigating damage to reputation for purported libelous statement about specific criminal act); Bularz v. Prudential Ins. Co., 93 F.3d 372, 378-79 (7th Cir. 1996) (evidence of general reputation in business dealings **[*74]** deemed "relevant to determining whether [plaintiff's] reputation was already compromised at the time that [defendant] allegedly defamed him, and thus to the jury's computation of damages."); *Weber v. Multimedia Entertainment, Inc.*, 1997 U.S. Dist. LEXIS 18592, 1997 WL 729039, *2 ("If plaintiff's reputation was disreputable before the purported defamatory statements were uttered, because she had been known for having casual sex with strangers, in exchange for money, drugs or otherwise, this information is clearly relevant to mitigation of damages.").

The Asch report and subsequent PERB suspension obviously disparages Munafo's professional reputation with respect to his activities as union vice chairmen. It also calls into question his mental and emotional state, another essential element of his damages claim. As discussed above, however, the prejudicial impact is likely to be substantial. If defendants are permitted to introduce evidence of Munafo's violence towards ALJ Cacavas during the liability phase of the trial, the jury may decide that Munafo does not deserve compensation regardless of the merit of his claim. While the danger of unfair prejudice stemming from the report does not outweigh **[*75]** its probative value, it does suggest an additional reason why bifurcation of the damage issues is appropriate. Thus, to the extent that the Asch report is relevant to mitigate damages, it will be admissible only at the damages phase of the trial.

Finally, defendants suggest that the Asch report is relevant for impeachment purposes under Rule 608(b). In pertinent part, Fed. R. Evid. 608(b) provides that:[HN23]Specific instances of the conduct of a witness, for the purpose of attacking...the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Thus, as an initial matter, neither the report nor any other extrinsic evidence relating to the Cacavas incident may be admitted under rule 608(b). In addition, the substantive nature of the report **[*76]** and the incident it documents does not support an inference regarding Munafo's capacity for truthfulness. [HN24]To be admissible under rule 608(b), specific acts of misconduct must involve some element of deception or fraud that would tend to show the witness' propensity to lie. *See, e.g.,* *United States v. Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978); *United States v. Nosov*, 221 F. Supp.2d 445, 449 (S.D.N.Y. 2002); *Davidson Pipe Co. v. Laventhol and Horwath*, 120 F.R.D. 455, 462 (S.D.N.Y. 1988). General acts of violence or threats are simply not probative of an individual's credibility. *See,* e.g., *United States v. Meserve*, 271 F.3d 314 (1st Cir. 2001) (convictions of disorderly conduct and assault did not involve element of deceit, untruthfulness, or falsification so as to be admissible for impeachment purposes). The fact that Munafo assaulted a judge does not alter this conclusion -- the incident still sheds little insight on Munafo's capacity for truthfulness. Accordingly, neither the Asch report nor the Cacavas incident are admissible as impeachment evidence to impinge Munafo's general credibility. This analysis does **[*77]** not necessarily preclude all use of the incident as impeachment evidence if, for instance, a witness testifies contrary to evidence in the report. Such a determination necessarily must await presentation of the evidence.

*B. Plaintiff's Motion to Exclude Evidence of an Unsuccessful Small Claims Action Munafo Brought Against His Union*

In 1997, Munafo commenced a small claims action against the United Transportation Union alleging that he was given improper information concerning the grievance process and consequently expended money unecessarily to attend two hearings in Chicago. (Index No. S.C.R. 898/97, Civil Court, Richmond County). After a one-day trial on July 12, 1997, Judge Philip S. Straniere entered judgment for the union and dismissed Munafo's claims as "unbelievable" and "not credible." (Decision of Judge Straniere dated August 25, 1997, Plaintiff's Exhibit C). Judge Strainiere also questioned Munafo's motive for bringing the lawsuit, intimating that the suit stemmed from a dispute over internal union politics and was brought "to harass, embarrass, and cause additional expenses to the union." (*Id.*).

Munafo contends that this evidence is irrelevant and seeks only **[*78]** to portray him as a litigious person. Defendants respond that the evidence has relevance to Munafo's relationship to his union and his lack of authority to handle union business. However, it is unclear how this small claims lawsuit has any bearing on the principle issue regarding Munafo's retaliation claim premised on union status: was he engaging in actual union activities for which he was terminated?

As already discussed, the union's *motive* for terminating Munafo's authority is irrelevant; only the fact of his lack of authorization is of consequence. Even if such evidence has some small collateral relevance, the prejudicial impact of a charge of litigiousness is considerable, and in this case, unjustifiable. *See* Outley v. New York, 837 F.2d 587, 592 (2d Cir. 1988) [HN25]("The charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent.") (internal citations omitted). Accordingly, evidence relating to the small claims action should be excluded.

*C. Plaintiff's Motion to Exclude the Arbitration Decision Affirming Munafo's Discharge* **[*79]**

As a result of the June 22, 1994 "Tire Incident," Munafo received a suspension of 30 days, seven hours and forty-five minutes. The union appealed the decision to the Special Board of Adjustment (the "Arbitration Board"), which upheld defendants' determination on March 26, 1998. Munafo was ultimately terminated as a result of disciplinary charges filed on October 19, 1998. Once again, the union appealed these charges and the Arbitration Board affirmed Munafo's termination in a decision dated March 22, 2000. (Plaintiff's Exhibit D). Munafo moves to preclude defendants from introducing either of these decisions because of extraordinary prejudice.

In support of his contention, Munafo cites a Tenth Circuit case holding that a district court did not abuse its discretion by excluding a state agency's report dismissing the plaintiff's complaint of discrimination because "the only purpose to be served by admitting [the report] into evidence...would be to suggest to the jury that it should reach the same conclusion." *Hall v. Western Prod. Co.*, 988 F.2d 1050, 1058 (10th Cir. 1993). But this very reasoning has been explicitly rejected by the Second Circuit, which has found **[*80]** that [HN26]the "decision of an independent and unbiased arbitrator based on substantial evidence after a fair hearing" has significant probative weight regarding the requisite "causal link between an employee's termination and the employer's [alleged] illegal motive." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). Indeed, the Court of Appeals granted summary judgment on the basis of such a decision by an independent arbitration panel. *Id.* Although *Collins* involved discrimination and retaliatory termination charges under Title VII, its reasoning is equally pertinent to a First Amendment retaliatory discharge claim, which imposes the identical essential element of causation.

Moreoever, the arbitration decisions Munafo seeks to exclude are official determinations of discipline rendered by the system of neutral arbitration provided for in the applicable union-negotiated collective bargaining agreement. They establish the final disciplinary penalties imposed on Munafo and set forth the reasons why those penalties were found warranted. It would be impossible to fully explore the pivotal factual issues surrounding whether defendants' decision **[*81]** to terminate Munafo was proper or retaliatory without permitting defendants to introduce the final determinations of discipline and the justifications thereof. Accordingly, Munafo's motion to exclude the arbitration decisions is denied.

*D. Plaintiff's Motion to Exclude Evidence of Munafo's Prior Discipline for Threatening an Employee With Physical Violence*

Approximately seven years prior to Munafo's termination, he was involved in a workplace incident involving violent and threatening conduct. He was charged and found guilty of using "quarrelsome, vulgar and profane language" and "threatening another employee with physical violence," resulting in a five-day suspension. (Letter from Filimon to Munafo dated March 12, 1999, Defendants' Exhibit C). Munafo argues that any evidence concerning this incident or the discipline he received would be unfairly prejudicial, especially because the October 19, 1998 disciplinary charges for which he was ultimately dismissed, charged Munafo with "acting in a rebellious, insubordinate and threatening manner when directed repreatedly to return to [his] work site." (Munafo Mem. at 9).

As shown from David Filimon's letter outlining the reasons **[*82]** for SIRTOA's decision of termination, Munafo's past disciplinary penalties are highly probative to the issue of defendants' motivation and the jury's evaluation of whether discharge was warranted or retaliatory. SIRTOA uses a system of "progressive discipline," under which discipline becomes progressively severe depending on the number, types and degrees of disciplinary infractions that have preceded the present information. The defendants expressly relied on Munafo's past transgressions when deciding to impose the ultimate penalty of termination in connection with his August 19, 1998 disciplinary violation:When deciding what discipline to assess, if any, the serious nature of the substantiated charges, your service record, ...were all taken into consideration. A review of your service record reveals the following related substantiated charges and discipline assessed:

| Incident Date | Discipline Assessed | Substantiated Charges |
|---|---|---|
| August 1, 1991 | 5 Days Suspension | Quarrelsome, vulgar, and profane language, threatened another employee with physical violence. |
| August 6, 1991 | 2 Days Suspension | Behaved in an insubordinate manner. |
| April 13, 1992 | 30 Days Suspension | Absent without permission. Made false statements. |
| June 24, 1994 | 30 Days Suspension & Permanent Barring from Machine Operator Status | Insubordination. |

**[*83]**

It is clear that based on the repeated substantiated incidents aforementioned, that the only appropriate action is DISMISSAL from the employ of the Staten Island Railway, effective immediately.

(Letter from Filimon to Munafo dated March 12, 1999). Accordingly, the fact that Munafo was disciplined in 1991 for threatening a coworker is both highly relevant and admissible.

Nevertheless, allowing defendants to probe *underlying facts and circumstances* of the 1991 charge, requires a more diligent application of rule 403's balancing test. If defendants relied upon *specific* materials pertaining to the 1991 incident when administering appropriate punishment to Munafo for his 1998 transgression, such materials would be extremely probative and most likely admissible despite any contingent prejudice. However, in the absence of testimony or evidence specifically connecting defendants' determination of appropriate punishment with extrinsic material regarding the underlying facts and circumstances of the incident, the inflammatory nature of the incident coupled with its relative age and staleness counsels against blanket admission under rule 403. It strikes me as the most appropriate **[*84]** balance to permit introduction of the incident and concomitant penalty exactly as they appear in the Filimon letter detailing the justification for Munafo's discharge. Any further inquiry into the underlying facts of the incident shall be precluded absent testimony concretely demonstrating a connection between the termination decision and particular pieces of evidence relating to the incident.

*E. Plaintiff's Motion to Exclude Evidence of Statements Made by Employees at Disciplinary Hearings*

Munafo moves to exclude the transcipts of any testimony offered by employees or other witnesses (including Munafo) at SIRTOA disciplinary hearings because such statements were not given under oath and thus fall within rule 801(c)'s definition of hearsay. As defendants suggest, however, an order precluding all such testimony would be erroneous for several reasons. Munafo's own statements, notwithstanding that fact that they are unsworn, are clearly admissible as "admissions by a party-opponent" pursuant to rule 801(d)(2). In addition, [HN27]consistent statements of other witnesses may be admissible pursuant to rule 801(d)(1)(B) if they are offered to rebut a charge of recent fabrication, or improper **[*85]** influence or motive. As with party admissions, the use of consistent statements under rule 801(d)(1)(B) does not require that the statements be made under oath.

Finally, the statements are relevant for an additional purpose unrelated to the truth of their contents. Specifically, they document the body of facts upon which the defendants based their decision to terminate Munafo. As such, they are relevant, regardless of truth, for the purpose of disputing Munafo's charge of improper retaliatory motive. Munafo's complaint alleges, for instance, that "despite the overwhelming evidence exonerating plaintiff of the charges brought against him on or about October 19, 1998, plaintiff was terminated." (First Amended Cmplt. P 96). Consequently, defendants' motivation for issuing a decision of discharge is the *sine qua non* of this dispute. The hearing transcripts constitute the only direct record of evidence before the hearing officers and will thus be indispensible to the jury in determining defendants' motivation. Whether these statements are true is immaterial; they are the relevant universe of facts from which defendants made their

decision and are therefore admissible evidence at trial. **[*86]**

Defendants also claim that statements of witnesses at the disciplinary hearings that are inconsistent with their trial testimony may be admitted as evidence pursuant to the catch-all provision of Rule 807 because their testimony has the "equivalent circumstantial guarantees of trustworthiness" of statements covered by Rules 803 and 804. Although Rule 801(d)(1)(A) explicitly requires that prior inconsistent testimony be under oath, defendants point out that Munafo was represented by an attorney at the hearings and could cross-examine these witnesses, their testimony was recorded by a secretary and transcribed, and the witnesses signed each page on which their testimony appears. While all of these considerations address some of the concerns underlying limitations on the admissibility of prior statements, the issue of whether the administration of the oath should be one of the predicates for admission of prior statements was the subject of intense debate and legislative consideration. *See* Louisell & Mueller, *Federal Evidence* § 410 at 25-46; *see particularly* House Judicial Subcommittee Note to Rule 801, appearing in the Committee Prints of H.R. 5463 dated June 28, 1973, and **[*87]** October 10, 1973, *House Hearings (Supp)* 145, 170-171, and 357, 383 [HN28]("the context of formal proceeding and an oath provide firm additional assurances of the reliability of the statement"). The catchall hearsay exception should not be used to override this express Congressional judgment. As the legislative history of Fed R. Evid. 803(24) and 804(b)(5) makes clear, these residual hearsay exceptions were designed to facilitate the admission of hearsay "in situations unanticipated by the other exceptions, but involving equal guarantees of trustworthiness." Weissenberger, *The Admissibility of Grand Jury Transcripts: Avoiding the Constitutional Issue*, 59 Tul.L.Rev. 335, 340 (1984); *see also* Fed. R. Evid. 803(24) Advisory Committee Note. Indeed, it was intended by Congress "that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." S.Rep. No. 93-1277, 93d Cong., 2d Sess. 18-20 (1974); *see also* *Parsons v. Honeywell*, 929 F.2d 901, 907 (2d Cir. 1991); *United States v. Mejia-Velez*, 855 F. Supp. 607, 618 (E.D.N.Y. 1994). Moreover, except where the prior statement is essential to establish a **[*88]** *prima facie* case, there is little practical difference between admission for impeachment and admission as evidence in chief. *See* *United States v. De Sisto*, 329 F.2d 929, 933 (2d Cir. 1964) ("The rule limiting the use of prior statements by a witness subject to cross-examination to their effect on his credibility has been described by eminent scholars and judges as 'pious fraud,' 'artificial,' 'basically misguided,' [and] 'mere verbal ritual.'")

*F. Plaintiff's Motion to Exclude Judge Weinstein's Opinion of the Merits of This Action and His Decision to Impose Sanctions on Munafo*

During the course of oral argument on defendants' motion for summary judgment, Judge Weinstein expressed his view about the merits of Munafo's claims. As recounted by the Court of Appeals for the Second Circuit, Judge Weinstein stated:I'm going to allow your suit to go forward, because there are issues of fact. I'm telling you now, based on the papers I have seen, the case seems to me to be wholly frivolous and an abuse of the federal process. As far as I can see from these papers, we have a disaffected and sullen employee who is ordered on a variety of occasions to do things **[*89]** and he refuses to do them, insisting that he will decide what he's going to do. There is an element of free speech. The jury may decide you are right, in which case we'll go forward with a judgment... I have hardly ever in my work as a judge in this court, seen a case that appears on its face to have less merit and is so abusive of the system and the defendants. I don't understand, really, how counsel can bring it. But it's open, and you'll get a trial, if you want it.

*Munafo*, 285 F.3d at 209. In addition, Judge Weinstein granted summary judgment against Munafo and imposed sanctions for including as defendants in this case several wholly inappropriate parties including: Martin Scheinman, a member of the Arbitration Board; and Louis Russo, a union official. Munafo moves to exclude all mention of Judge Weinstein's opinion on the merits of the case and his decision to impose sanctions as irrelevant and highly prejudicial.

As an initial matter, defendants do not oppose exclusion of Judge Weinstein's opinion on the merits -- evidence which is entirely improper material for a jury to consider and should be precluded. With respect to Judge Weinstein's decision to **[*90]** impose sanctions, however, defendants argue that "plaintiff was sanctioned for a reason, and that reason is that he brought utterly frivolous claims against utterly inapprorpiate parties merely for the purpose of harassment and intmidation." (Hagemeier Reply Decl. dated December 6, 2002, P 6). There is simply no reason for the jury to hear why these defendants were dismissed from the case or Judge Weinstein's reasons for imposing sanctions on Munafo. The only purpose for such evidence would be to improperly cast Munafo as an overly-litigious individual. This is precisely the type of evidence precluded as unfairly prejudicial by the Second Circuit's opinion in *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988)(see discussion, *supra*).

*G. Plaintiff's Motion to Amend His Complaint to Assert Claims Against the Public Authority Defendants Pursuant to New York Civil Service Law § 75-b*

Pursuant to Fed. R. Civ. Pro. 15(a), Munafo moves to amend the Complaint in order to assert new claims against the public authority defendants under New York Civil Service Law § 75-b. Putting aside the issues of timeliness and prejudice raised by Munafo's attempt to assert **[*91]** a new cause of action on the eve of trial, on which I relied in my oral ruling, his motion must be denied as a matter of law. New York Civil Service Law § 75-b provides in relevant part:[HN29]3. (a) Where an employee is subject to dismissal or other disciplinary action under a final and binding arbitration provision, or other disciplinary procedure contained in a collectively negotiated agreement, or under section seventy-five of this title or any other provision of state or local law and the employee reasonably believes dismissal or other disciplinary action would not have been taken but for the conduct protected under subdivision two of this section, he or she may assert such as a defense before the designated arbitrator or hearing officer. The merits of such defense shall be considered and determined as part of the arbitration award or hearing officer decision of the matter. If there is a finding that the dismissal or other disciplinary action is based solely on a violation by the employer of such subdivision, the arbitrator or hearing officer shall dismiss or recommend dismissal of the disciplinary proceeding, as appropriate, and, if appropriate, reinstate the employee with **[*92]** back pay, and, in the case of an arbitration procedure, may take other appropriate action as is permitted in the collectively negotiated agreement.

(b) Where an employee is subject to a collectively negotiated agreement which contains provisions preventing an employer from taking adverse personnel actions and which contains a final and binding arbitration provision to resolve alleged violations of such provisions of the agreement and the employee reasonably believes that such personnel action would not have been taken but for the conduct protected under subdivision two of this section, he or she may assert such as a claim before the arbitrator. The arbitrator shall consider such claim and determine its merits and shall, if a determination is made that such adverse personnel action is based on a violation by the employer of such subdivision, take such action to remedy the violation as is permitted by the collectively negotiated agreement.

(c) Where an employee **is not subject to any of the provisions of paragraph (a) or (b)** of this subdivision, the employee may commence an action in a court of competent jurisdiction under the same terms and conditions as set forth in article **[*93]** twenty-C of the labor law.(emphasis added).

[HN30]An employee may bring suit under § 75-b in a court of competent jurisdiction only where a collective bargaining agreement does not substitute its own grievance procedure for the relief encapsulated by the statute. *See* *Obot v. New York State Dept. of Correctional Services*, 256 A.D.2d 1089, 682 N.Y.S.2d 767, 769-70 (4th Dep't 1998) (employee's cause of action under § 75-b was barred by arbitrator's final decision because "where, as here, an employee is subject to dismissal under a final and binding arbitration provision contained in a collectively negotiated agreement, the employee must assert the protections afforded by section 75-b(2) as a defense before the arbitrator"); *Mottironi v. Axelrod*, 133 A.D.2d 948, 520 N.Y.S.2d 663, 663-64 (3d Dep't 1987) ("To the extent that petitioner seeks relief pursuant to [§ 75-b], the provisions of that statute were made inapplicable by the collective bargaining agreement which substituted its own grievance procedure."). Munafo is therefore precluded from seeking relief under § 75-b, as the collective bargaining agreement between SIRTOA and the United Transport **[*94]** Union prevents the employer from taking adverse personnel actions and provides for final and binding arbitration to resolve allegations that the employer violated such prohibitions. Accordingly, Munafo's motion to amend the complaint to assert a claim under N.Y. Civ. Serv. L. § 75-b must be denied.

**CONCLUSION**

For the reasons set forth above, defendants' motion to exclude evidence is granted in part and denied in part, and the motion to dismiss Munafo's claims arising prior to June 6, 1995 is granted. Plaintiff's motion to exclude is granted in part and denied in part, and the motion to amend the complaint is denied. In addition, the issue of damages will be bifurcated from liability for purposes of trial.

**SO ORDERED:**

January 22, 2003

Edward R. Korman

United States Chief District Judge