Case 0:01-cv-01605-JNE-JGL Document 324-4 Filed 03/07/2005 Page 1 of 15



# Verschwiegenheitspflicht - Unterlassungsansprüche

*BGB §§ 823 , 826 , 1004 ; HGB §§ 74ff .; UWG §§ 1 , 13 IV , 17 ; ZPO §§ 286 , 301 , 318 , 320 , 554 III Nr. 3 lit. b*

**Nach der Beendigung des Arbeitsverhältnisses darf ein Arbeitnehmer, der nicht durch ein den §§ 74ff. HGB entsprechendes Wettbewerbsverbot gebunden ist, zu seinem Arbeitgeber in Wettbewerb treten. Eine nachvertragliche Verschwiegenheits- sowie eine nachvertragliche Treuepflicht des Arbeitnehmers begründen für den Arbeitgeber regelmäßig gegen den ausgeschiedenen Arbeitnehmer keine Ansprüche auf Unterlassung von Wettbewerbshandlungen (Bestätigung von BAGE 73, 229 = NZA 1994, 502 = AP Nr. 40 zu § 611 BGB Konkurrenzklausel).**

*BAG, Urteil vom 19. 5. 1998 - 9 AZR 394/97 (LAG Thüringen, Teilurt vom 23. 1. 1997 - 4 Sa 1395/94)*

**Zum Sachverhalt:**

Die Kl. nimmt den Bekl. auf Unterlassung, Auskunft und Schadenersatz in Anspruch. Gegenstand des Revisionsverfahrens sind Unterlassungsanträge, mit denen dem Bekl. untersagt werden soll, im geschäftlichen Verkehr betriebliche Daten der Kl. zu Wettbewerbszwecken zu verwenden. Die Kl. ist ein führendes Unternehmen der kunststoffverarbeitenden Industrie. Sie befaßt sich u.a. mit der Herstellung und dem Vertrieb von Kantenbändern und Fassadenprofilen. Der 1933 geborene Bekl. war etwa 32 Jahre bei der Kl. beschäftigt, zuletzt als Entwicklungsleiter. Seit 1988 hatte sich die Kl. mit der Entwicklung eines Produktionsverfahrens befaßt, bei dem eine Breitschlitzdüse zum Einsatz kommen sollte (BS-Verfahren); an diesen Arbeiten, die 1990 eingestellt wurden, war der Bekl. beteiligt. Das Arbeitsverhältnis der Parteien endete auf Veranlassung der Kl. aufgrund eines Aufhebungsvertrags zum 31. 1. 1991 gegen Zahlung einer Abfindung von 200000 DM. In dem Vertrag verpflichtete sich der Bekl. unter Nr. 5, über alle ihm während seiner Dienstzeit bei der Kl. bekannt gewordenen Geschäftsvorgänge, insbesondere technische Verfahrensabläufe, Rezepturen, Werkzeugkonzeptionen, Kunden, Preise und Produkte, bezogen auf die Produktion der Kl. von Kantenbändern, auch nach Beendigung des Arbeitsverhältnisses Stillschweigen zu bewahren. Er garantierte außerdem, weder bei der *R*-Gruppe noch bei der *O*- bzw. deren Tochter- oder Beteiligungsgesellschaften ein abhängiges oder beratendes Tätigkeitsverhältnis einzugehen. In Nr. 6 verpflichtet sich der Bekl., alle geschäftlichen Unterlagen, insbesondere die Rezeptbücher, Produktionsanweisungen, Lieferantenadressen, inclusive davon gefertigter Kopien, die noch in seinem Besitz befindlich sind und er gefertigt hat, an die Kl. herauszugeben. Er sicherte zu, darüber hinaus keinerlei Kopien mehr in seinem Besitz zu haben, und erklärte in Nr. 8 abschließend, daß er bei seinem Ausscheiden keinerlei Material und/oder sonstige Geschäftsunterlagen zurückbehalten werde. Er sicherte zu, auch alle Kopien insoweit der Kl. zurückzugeben. Im Frühjahr 1991 stellte die Bekl. fest, daß ein Teil der zu dem BS-Verfahren erstellten Unterlagen, Erfahrungs- und Entwicklungsberichte fehlten. Der Bekl. gründete mit seinem Bruder am 23. 5. 1991 die *M*-GmbH (im folgenden: *M*) mit Sitz in O. Er ist Mitgesellschafter und alleiniger Geschäftsführer der *M*. Gegenstand der GmbH ist unter anderem die Produktion von Kantenbändern und von Fassadenprofilen. Sie ist damit Wettbewerberin der Kl.. Kantenbänder fertigt die *M* auf einer Anlage mit Breitschlitzdüse, die nach Angabe des Bekl. im Sommer 1991 bestellt worden ist. Zuständig für den Einkauf sämtlicher Roh- und Hilfsstoffe sowie früherer Leiter des Labors der Kl. war *K*, der aufgrund eigener Kündigung das Arbeitsverhältnis mit der Kl. zum Jahresende 1991 beendete. Seit dem 1. 1. 1992 ist er als Angestellter im Vertrieb der *M* tätig. Aufgrund einer im August 1992 erstatteten Strafanzeige der Kl. wurden am 11. 11. 1992 die Büroräume des Bekl. sowie der Keller des Privathauses von *K* in H. durchsucht und Unterlagen sichergestellt. Zu den bei *K* beschlagnahmten Unterlagen aus dem Besitz der Kl. gehörten unter anderem Kundenlisten (ohne Anschriften), Umsatzlisten, Rezepturen, Rezeptauswahl Großbrandversuch, Gutachten zum Brandverhalten einer PVC-Fassade, nach Maß und Kunden sortierte Übersichten von Profilen, Summenbildung auf Maß innerhalb jeder Firma, Fünfjahresplanung, Verträge, Absatzpläne. Im Büro des Bekl. wurden unter anderem Bauzeichnungen für Werkzeug- und Werkzeugteile sichergestellt, deren Verwendung nicht Gegenstand des Rechtsstreits ist, sowie einige Blätter zum BS-Verfahren, deren Zuordnung streitig ist. Im Juni 1993 hat die Kl. den Bekl. und *K* vor dem *ArbG Essen* und die *M* vor dem *LG Erfurt* auf Unterlassung von Wettbewerb, Schadenersatz und Auskunft in Anspruch genommen. Das *ArbG Essen* hat den Rechtsstreit gegen den Bekl. an das *ArbG Gotha* verwiesen. Die Staatsanwaltschaft hat am 30. 3. 1995 Anklage gegen *K* und den Bekl. erhoben. Dem Bekl. wird vorgeworfen, in den Jahren 1990 und 1991 durch zwei selbständige Handlungen gegen § 17 II UWG verstoßen zu haben. Die Kl. hat geltend gemacht, *K* habe in Absprache mit dem Bekl. gehandelt; die beschlagnahmten Unterlagen verkörperten Betriebs- und Geschäftsgeheimnisse. Jedenfalls mache die Art der entwendeten Unterlagen deutlich, daß der Bekl. von dem strafbaren Handeln des *K* gewußt habe, da die *M* durch sie mit allen für das Unternehmen interessanten Daten ausgestattet worden sei und auf der Grundlage der bei ihr gestohlenen Unterlagen zum BS-Verfahren Kantenbänder produziere. Die Kl. hat zuletzt beantragt, den Bekl. zu verurteilen, es zu unterlassen:

**I.**

1.

a) im geschäftlichen Verkehr zu Wettbewerbszwecken unter Verwendung der Kundenliste der Kl. - beigefügt als Anlagen A und D - an deren Kunden heranzutreten und eigene Produkte, insbesondere das Produkt Kantenband anzubieten;

b) im geschäftlichen Verkehr zu Wettbewerbszwecken an die Kunden der Kl. - laut Anlagen A und D - heranzutreten und deren Preise gezielt zu unterbieten, um zu Lasten der Kl. Wettbewerbsvorteile zu erreichen;

c) im geschäftlichen Verkehr zu Wettbewerbszwecken Rezepturen der Kl. - laut Anlage B - zu verwenden oder auf der Basis dieser Rezepturen Weiterentwicklungen hiervon vorzunehmen und/oder diese zu verwenden;

d) im geschäftlichen Verkehr zu Wettbewerbszwecken die Unterlagen der Kl. über das Brandverhalten von Fassadenprofilen - laut Anlage C, C 1 und C 2 - zu verwenden, insbesondere es an Wettbewerber der Kl. oder an Behörden weiterzugeben;

e) im geschäftlichen Verkehr zu Wettbewerbszwecken die Umsatzstatistiken der Kl. - laut Anlagen D, D 1, D 2, D 3, D 4 und D 5 - zu verwenden, insbesondere sie an Dritte weiterzugeben;

f) im geschäftlichen Verkehr zu Wettbewerbszwecken die von der Firma H für die Kl. erstellten Prüfprotokolle zur Ermittlung der mechanischen Eigenschaften des Fassadenprofils der Kl. zu benutzen - Anlage E -, insbesondere diese an Dritte weiterzugeben;

g) im geschäftlichen Verkehr zu Wettbewerbszwecken die cadmiumfreie Rezeptur der Kl. für Fassadenprofile zu verwenden - Anlage F -;

h) im geschäftlichen Verkehr zu Wettbewerbszwecken die Informationen der Kl. über Produktionskapazitäten und den Umsatz der Kl. - laut Anlage G - an Dritte, insbesondere an Wettbewerber der Kl. weiterzugeben;

i) im geschäftlichen Verkehr zu Wettbewerbszwecken die Vereinbarungen - zwischen der Kl. und der F vom 6. 11. 1990 - Anlage H -, mit der Firma R - Anlage H 2 - und der Firma M - Anlage H 3 - in irgendeiner Weise zu verwenden, insbesondere zugänglich zu machen;

j) im geschäftlichen Verkehr zu Wettbewerbszwecken Informationen der Kl. über Standardqualitäten, nämlich eine Analyse, die alle wesentlichen Rezepturen der Kl. nach



Einsatzzweck, Eigenschaften usw. analysiert, in irgendeiner Weise zu gebrauchen, insbesondere an Dritte weiterzugeben - Anlage I -;

k) das von der Kl. entwickelte Produktionsverfahren der sogenannten Breitschlitzdüse für Kantenbänder - laut Anlage K - zu benutzen und/oder weiterzugeben und/oder die durch solche Art produzierten Kantenbänder an Wettbewerber der Kl. zu verkaufen.

2. über alle Geschäftsvorgänge, insbesondere technische Verfahrensabläufe, Rezepturen, Werkzeugkonzeptionen, Kunden, Preise und Produkte bezogen auf die Produktion der Kl. von Kantenbändern laut Anlage K und insbesondere, soweit diese in den zuvor erwähnten Anlagen und der Anlage K verkörpert sind, Stillschweigen zu bewahren, insbesondere diese nicht an Dritte weiterzugeben; . . .

Der Bekl. hat geltend gemacht, er habe von den bei *K* beschlagnahmten Unterlagen keine Kenntnis gehabt, sie nicht benutzt und kein Interesse, sie künftig zu verwenden. Er könne deshalb nicht auf Unterlassung in Anspruch genommen werden.

Das *ArbG* hat die Klage abgewiesen. Das *LAG* hat die Berufung der Kl. durch das ihr am 20. 6. 1997 zugestellte Teilurteil über die Klageanträge I 1 lit.a-j zurückgewiesen. Hiergegen hat sich die Kl. erfolglos mit der vom *LAG* zugelassenen Revision gewandt.

## Aus den Gründen:

Die Kl. hat gegen den Bekl. keinen Unterlassungsanspruch. Das Urteil des *LAG* beruht auch auf keinem Verfahrensfehler.

A. I. Das Urteil des *LAG* leidet entgegen der Auffassung der Kl. an keinem absoluten Revisionsgrund i.S. von § 551 Nr. 7 ZPO. Es ist mit Entscheidungsgründen versehen. Mängel des Tatbestands führen nur unter den Voraussetzungen des § 554 III Nr. 3 lit. b ZPO zur Aufhebung des Urteils und zur Zurückverweisung des Rechtsstreits (BAG, AP Nr. 1 zu § 320 ZPO; BAGE 4, 81 = NJW 1957, 1165 = AP Nr. 2 zu § 60 ArbGG1953).

II. Das *LAG* war entgegen der Auffassung der Revision nicht aus Rechtsgründen gehindert, über die Unterlassungsanträge durch Teilurteil zu entscheiden. Zwar betreffen die Unterlassungsanträge und der

Case 0:01-cv-01605-JNE-JGL Document 324-4 Filed 03/07/2005 Page 3 of 15

auf die Verpflichtung des Bekl. zum Stillschweigen über die Geschäftsvorfälle „Kantenbänder„ gerichtete weitergehende Klageantrag zu 2 teilweise dieselbe Frage. Denn der Umfang der Verschwiegenheitspflicht des Bekl. ist bereits auch bei der Entscheidung über die Unterlassungsanträge zu beurteilen. Diese Überschneidung begründet aber nicht die Gefahr, daß sich Teil- und Endurteil widersprechen. Dem stehen die Bindung des Gerichts an seine Entscheidung nach § 318 ZPO und die Rechtskraftwirkung nach § 322 ZPO entgegen.

B. Das *LAG* hat die Unterlassungsanträge insgesamt als zulässig beurteilt; sie seien hinreichend bestimmt i.S. von § 253 II Nr. 2 ZPO. Hiergegen bestehen keine Bedenken. Das gilt nach den Darlegungen der Kl. in der Revision auch für den Klageantrag zu I 1 lit. b. Denn die Kl. hat klargestellt, sie wende sich nicht gegen jede Umwerbung ihrer Kunden, sondern gegen eine Umwerbung und gezielte Preisunterbietung unter Benutzung ihrer Kundenlisten.

C. Die Kl. hat keinen Anspruch gegen den Bekl. auf die begehrte Unterlassung, weil nach ihrem Vorbringen weder die Gefahr einer erneuten Verletzung ihrer Betriebsgeheimnisse noch die Gefahr einer erstmaligen Verletzung durch den Bekl. anzunehmen sind. Das hat das *LAG* zu Recht entschieden.

I. Ein vertraglicher Anspruch der Kl. ist nicht bereits deshalb gegeben, weil der Bekl. ohnehin zur Verschwiegenheit verpflichtet und ihm damit auch vertraglich verboten ist, die bei *K* beschlagnahmten Unterlagen zu verwenden. Mit dem Ende des Arbeitsverhältnisses endet gleichzeitig die Pflicht des Arbeitnehmers zur Wettbewerbsenthaltung. Der Arbeitgeber kann sich vor einer nachvertraglichen konkurrierenden Tätigkeit des Arbeitnehmers nur durch die Vereinbarung eines bezahlten und auf höchstens zwei Jahre befristeten Wettbewerbsverbots nach §§ 74ff. HGB schützen. Fehlt es an einer rechtswirksamen Wettbewerbsabrede, kann der Arbeitnehmer wie jeder Dritte zu seinem ehemaligen Arbeitgeber in Wettbewerb treten. Hierbei kann er sein im Arbeitsverhältnis erworbenes Erfahrungswissen einschließlich der Kenntnis von Betriebs- oder Geschäftsgeheimnissen einsetzen und in den Kundenkreis des Arbeitgebers eindringen (BAGE 73, 229 = NZA 1994, 502 = AP Nr. 40 zu § 611 BGB Konkurrenzklausel). Eine nachvertragliche Verschwiegenheitspflicht sowie eine allgemeine nachvertragliche Treuepflicht begründen deshalb für den Arbeitgeber regelmäßig keinen Anspruch gegen den ehemaligen Arbeitnehmer auf Unterlassung von Wettbewerb. Ein solcher Anspruch ergibt sich wegen der dem Arbeitnehmer gesetzlich gewährleisteten Wettbewerbsfreiheit - vom Fall des wirksamen Wettbewerbsverbots abgesehen - nur nach den allgemeinen gesetzlichen Bestimmungen zum Schutz vor unlauterem Wettbewerb, § 1 UWG, §§ 823 , 826 BGB.

Die von der Revision angezogene Entscheidung des *BAG* (BAGE 57, 159 = NZA 1988, 502 = AP Nr. 5 zu § 611 BGB Betriebsgeheimnis) besagt entgegen ihrer Auffassung nichts anderes. Danach kann es dem Arbeitnehmer untersagt werden, rechtswidrig beschaffte oder beim Ausscheiden zurückgehaltene Listen oder sonstige Informationsträger zu verwenden, in denen Betriebsgeheimnisse des Arbeitgebers verkörpert sind. Die Revision übersieht jedoch, daß das *BAG* auch in dieser Entscheidung den Nachweis für erforderlich gehalten hat, daß der Arbeitnehmer die Unterlagen tatsächlich benutzt hat. Verfassungsrechtliche Bedenken bestehen hiergegen nicht (BVerfG, AP Nr. 5a zu § 611 BGB Betriebsgeheimnis).

Etwas anderes folgt nicht aus der vom Bekl. in Nr. 5 der Aufhebungsvereinbarung eingegangenen Verpflichtung, über den Geschäftsbereich „Kantenbänder„ Stillschweigen zu bewahren. Zwar können die Arbeitsvertragsparteien im Einzelfall vereinbaren, daß der Arbeitnehmer nach Beendigung des Arbeitsverhältnisses ein bestimmtes Betriebsgeheimnis des Arbeitgebers auf Dauer nicht für eine eigene berufliche Tätigkeit nutzt (BAGE 41, 21 = NJW 1983, 134 = AP Nr. 1 zu § 611 BGB Betriebsgeheimnis). Die dem Bekl. auferlegte nachvertragliche Schweigepflicht betrifft aber nicht ein oder mehrere konkret festgelegte Betriebsgeheimnisse, sondern sie bezieht sich unterschiedslos auf alle Geschäftsvorgänge. Dem Bekl. wird damit jede berufliche Verwertung seiner in diesem Geschäftsbereich erworbenen Kenntnisse verwehrt. Damit wird die Grenze zum entschädigungspflichtigen und zeitlich auf höchstens zwei Jahre beschränkten Wettbewerbsverbot überschritten.

II. Ein Unterlassungsanspruch ergibt sich nicht aus den gesetzlichen Vorschriften zum Schutz von Betriebs- und Geschäftsgeheimnissen, §§ 823 I , II , 830 , 1004 BGB i.V. mit § 17 I und II UWG, § 1 UWG i.V. mit § 826 BGB noch aus § 13 IV UWG i.V. mit § 1 UWG.

1. Ein vom Verschulden des Bekl. unabhängiger Unterlassungsanspruch läßt sich nicht aus §§ 1 , 13 IV UWG herleiten. Nach dieser Vorschrift hat der Inhaber eines Betriebs für das nach § 1 UWG wettbewerbswidrige Handeln von Angestellten einzustehen und kann allein wegen seiner Inhaberschaft auf Unterlassung in Anspruch genommen werden. Inhaber i.S. von § 13 IV UWG ist derjenige, in dessen Namen und für dessen Rechnung der Betrieb geführt wird. Inhaber des Betriebs, für den *K* gehandelt hat, ist die *M*, nicht der Bekl. als deren Geschäftsführer und Mitgesellschafter. Das hat das *LAG* zutreffend ausgeführt; auch die Revision greift die Entscheidung insoweit nicht an.

2. Ein Anspruch der Kl. ergibt sich nicht wegen vorsätzlicher unerlaubter Handlung des Bekl.

a) Das *LAG* hat nicht festgestellt, daß der Bekl. an dem nach seiner Auffassung „zweifellos wettbewerbswidrigen„



Verhalten des *K* beteiligt war oder von den bei *K* beschlagnahmten Unterlagen Kenntnis hatte. Die von der Kl. angebotenen Beweismittel, Sachverständigengutachten und Beiziehung der Ermittlungsakte, seien hierfür ebenso ungeeignet wie die nunmehr vorliegende Anklageschrift. Gegen diese Beurteilung wendet sich die Revision ohne Erfolg.

(1) Das *LAG* ist zu Recht davon ausgegangen, daß die Kl. für die Tatsachen, aus denen sich der Unterlassungsanspruch ergeben soll, in vollem Umfang darlegungs- und beweisbelastet ist. Das gilt auch für die Tatsachen, die eine Wiederholungsgefahr begründen. Die Grundsätze des Anscheinsbeweises sind entgegen der Auffassung der Kl. nicht anzuwenden.

Der Anscheinsbeweis erleichtert den Beweis nur bei typischen Geschehensabläufen. Nach der allgemeinen Lebenserfahrung muß ein bestimmter feststehender Sachverhalt auf eine bestimmte Ursache oder auf einen bestimmten Ablauf als maßgeblich für den Eintritt eines bestimmten Erfolgs hinweisen (BGH, NJW 1997, 2757). Bloße Wahrscheinlichkeiten genügen nicht. Der behauptete Vorgang muß vielmehr schon auf den ersten Blick als Muster erkennbar sein, also regelmäßig, üblich und häufig vorkommen und den Schluß auf die behauptete Tatsache rechtfertigen (vgl. *Zöller/Greger*, ZPO, 20. Aufl., Vorb. § 284 Rdnr. 29).

Diese Voraussetzungen liegen nicht vor. Die Darlegungen der Kl. zum Wert der bei *K* beschlagnahmten Unterlagen für einen Wettbewerber wie die *M* sind zwar durchaus stimmig und nachvollziehbar. Es mag deshalb naheliegen, aus der Zusammensetzung des Materials „nach allgemeiner Lebenserfahrung„, wie die Kl. formuliert, zu schließen, daß *K* die Unterlagen seinem neuen Arbeitgeber und damit deren Alleingeschäftsführer, dem Bekl., auch weitergegeben oder ihn jedenfalls darüber informiert hat, daß er über diese wertvollen Unterlagen verfügt. Eine allgemeine Lebenserfahrung ist aber mit dem für einen Anscheinsbeweis erforderlichen Erfahrungssatz nicht gleichzusetzen. Die Tatsache, daß sich *K* dadurch unbefugt Betriebsgeheimnisse der Kl. beschafft hat, besagt weder regelmäßig etwas über eine Verwendung der Unterlagen durch ihn noch über deren Weitergabe an den Bekl. Damit wird allenfalls belegt, daß *K* aufgrund seiner Beschäftigung bei der Kl. den Wert der Unterlagen ebenso einschätzte wie sie. Rückschlüsse auf eine Beteiligung oder Kenntnis des Bekl. lassen sich daraus ohne näheren Vortrag über die Begleitumstände des Handelns von *K* aber nicht ziehen.

Deshalb rügt die Revision auch ohne Erfolg, das *LAG* habe verkannt, daß der Bekl. sich nicht substantiiert auf ihre Behauptungen eingelassen habe; er hätte nicht nur seine Kenntnis vom Vorhandensein der bei *K* beschlagnahmten Unterlagen bestreiten dürfen. Dem Grundsatz, daß der Umfang der Darlegungslast sich nach der Einlassung des Gegners richtet, liegt nicht der Gedanke zugrunde, eine Partei sei zur Förderung der Wahrheitsermittlung und zur Beschleunigung des Prozesses allgemein zur Aufklärung verpflichtet. Die Zivilprozeßordnung kennt keine allgemeine

Aufklärungspflicht der nicht darlegungs- und beweispflichtigen Partei (vgl. BGH, NJW 1990, 3151; *BGH*, NJW 1991, 2707).

(2) Ob das *LAG* den von der Kl. vorgetragenen Indiztatsachen hätte nachgehen müssen, ist aufgrund des Vorbringens der Revision nicht zu entscheiden. Die Rüge mangelnder Sachaufklärung i.S. von § 286 ZPO ist als Verfahrensrüge nach § 554 III Nr. 3 lit.b ZPO nach der ständigen Rechtsprechung des *BAG* (BAGE 71, 56 = NZA 1993, 181 = AP Nr. 32 zu § 1 TVG Tarifverträge: Einzelhandel m.w.Nachw.) nur beachtlich, wenn in der Revision im einzelnen die Tatsachen angeführt werden, die den Verfahrensmangel ergeben sollen. Die anzuführenden Tatsachen sind nicht die Tatsachen, die den Gegenstand des fehlerhaften Verfahrens bildeten, sondern diejenigen Vorgänge im Prozeß, in denen sich der Mangel vollzog (vgl. *Grunsky*, in: *Stein/Jonas*, ZPO, 20. Aufl., § 554 Rdnr. 12). Anzugeben sind deshalb der konkrete Schriftsatz einschließlich der Seitenzahl, in dem sich der vermeintlich übergangene Parteivortrag, das Beweisthema und die Beweismittel finden lassen. Anzugeben ist ferner das Ergebnis, das sich aus der zu Unrecht unterlassenen Beweisaufnahme ergeben hätte. Geht es um Indiztatsachen, ist auch anzugeben, was sich aus der Hilfstatsache für die zu beweisende Haupttatsache ergibt.

Dem wird die Revision nicht gerecht. Die Kl. rügt, das *LAG* habe den im Schriftsatz vom 10. 9. 1996 unter Nr. 11 angebotenen Sachverständigenbeweis zur Rezeptur der von der *M* produzierten Fassadenprofile nicht erhoben (Klageantrag zu I. 1. d). Diesem Beweisantrag ist das *LAG* mit der Begründung nicht nachgegangen, es sei nicht ersichtlich, inwieweit die B 1 Zulassung nur durch eine Rezeptur erreicht werden könne, die mit der bei der Kl. verwandten Rezeptur im wesentlichen übereinstimme. Die Kl. hätte näher darlegen müssen, daß die Zulassung mit anderen als bei ihr verwandten Verfahren nicht erreicht werden könne. Diese vom *LAG* vermißte Darlegung enthält jedoch auch die Revision nicht. Sie macht nicht deutlich, worin der gedankliche Fehler des *LAG* liegen soll.

Soweit die Kl. in der Revision hierzu und zum Klageantrag zu I 1e) ihren Sachvortrag zum Komplex „Normtex„ wiederholt, die *M* sei an ihre Kundin herangetreten und habe diese zum Vertragsbruch verleitet, fehlt es an einem auf den Bekl. bezogenen Vortrag, insbesondere zur Kenntnis des Bekl. der von der Kl. behaupteten Ausschließlichkeitsbindung. Das gilt auch für die dem Geschäftsführer der Normtex zugeschriebene Äußerung, er wisse, daß die Kl. kein Interesse an der Produktion von Fassadenprofilen habe, kenne „von den Mitarbeitern der Kl.„ die internen Zahlen und könne das mit internen Unterlagen der Kl. beweisen. Dieser Vortrag betrifft damit pauschal Mitarbeiter der Kl., nicht aber den Bekl. oder *K*. Die Preisunterschiede, die nach Auffassung der Kl. zwingend den Schluß zulassen, daß die *M* ihre Rezepturen genutzt und damit Zeit und Kosten erspart habe, werden pauschal nur als „derart erheblich„ angegeben, daß die Normtex deshalb vertragsbrüchig geworden sei.

Soweit die Revision auf ihren Sachvortrag zur Preisunterbietung verweist, entspricht auch dies nicht § 554 III Nr. 3b ZPO. Er ist im übrigen aber auch ohne Aussagewert. Preise der *M* in den Jahren 1993 und 1994, die unter denen der Kl. liegen und nach ihrem eigenen Vorbringen auch ein neues Produkt betreffen, können dem Rechtsstreit schon zeitlich nicht zugeordnet werden. Daß *K* im Frühjahr 1992 den beiden von der Kl. in der Revision „beispielhaft„ genannten Kunden Preise angeboten hat, die um 34,6% und um 11% unter ihren lagen, ist ohne nähere Erläuterung der üblichen Preiskalkulation im Kunststoffmarkt ebenso ohne Indizwirkung wie die Tatsache, daß sich *K* als früherer Mitarbeiter der Kl. gerierte. Das gilt ebenfalls für den Hinweis der Revision, die Staatsanwaltschaft habe die Unterlagen nicht in den privaten Wohnräumen von *K* aufgefunden, sondern in dem im Keller des Privathauses von der *M* unterhaltenen „Vertriebsbüro West„. Er bestätigt das wettbewerbswidrige Verhalten des *K*, nicht aber eine Kenntnis des Bekl. von den dort aufgefundenen Schriftstücken.

Auch aus dem Komplex „BS-Verfahren„ ergeben sich in diesem Verfahren keine beachtlichen Hinweise auf ein wettbewerbswidriges Verhalten des Bekl. hinsichtlich der Unterlassungsanträge. Denn der Bekl. hat nicht bestritten, daß die *M* nach dem BS-Verfahren produziert. Er hält sich lediglich für berechtigt, seine im Arbeitsverhältnis erworbenen Kenntnisse insoweit auch für die *M* zu verwerten. Für ihre Behauptung, die *M* habe die Produktionsanlage

über einen Strohmann bestellt, hat die Kl. keinen Beweis angetreten.

Eine andere Beurteilung ist nicht wegen des von der Revision in Bezug genommenen Vorbringens der Klageschrift zu den Werbeaussagen der *M* angezeigt. Danach soll die *M* die Kunden der Kl. mit der falschen Werbeaussage konfrontiert haben, sie - die *M* - verfüge über mehr als zwanzig Jahre Erfahrung in der Kunststoff-Extrusion von Kantenbändern und über ein Herstellungsverfahren, das extrem enge Toleranzen ermögliche. Auf Abmahnung der Kl. habe der Bekl. für die *M* im August 1992 eine wettbewerbliche Unterlassungsverpflichtung abgegeben. Die Kl. übersieht jedoch, daß die vom Bekl. abgegebene Verpflichtungserklärung sich lediglich auf das Unterlassen irreführender Werbung der *M* bezieht. Sie enthält kein Anerkenntnis, die Kl. habe das Produktionsverfahren entwickelt. Im übrigen trifft die Behauptung der Revision, bereits in der Klageschrift habe sie vorgetragen, die *M* habe das Werbeschreiben allen Kunden übermittelt, so nicht zu. Dort wird zwar das Schreiben „an die Kunden„ der Kl. genannt. Das war aber im Hinblick auf die wenigen namentlich genannten Kunden nicht zwingend im Sinne „alle Kunden„ zu verstehen, zumal die Kl. stets betont hat, auch in der Revision, daß die Kunden mit einem hohen Umsatz von Unikaten für die *M* wegen des BS-Verfahrens interessant seien. Überdies weisen die im Rechtsstreit überreichten Unterlagen keine Kundenanschriften aus.

3. Der Bekl. kann entgegen der Auffassung der Kl. nicht wegen fahrlässiger Unkenntnis auf Unterlassung in Anspruch genommen werden. Die Tatbestände der §§ 1 , 17 UWG in Verbindung mit den Vorschriften über die unerlaubte Handlung setzen vorsätzliches Handeln des vermeintlichen Mittäters voraus.

4. Ein Unterlassungsanspruch der Kl. ergibt sich auch nicht aus dem Gesichtspunkt der sogenannten Erstbegehungsgefahr. Das *LAG* hat die Erstbegehungsgefahr mit der Überlegung verneint, spätestens seit ihrer Beschlagnahme habe der Bekl. keinen Zugriff auf die Unterlagen. Damit hat es erkennbar dem Umstand keine Bedeutung beigemessen, daß die Kl. die in den beschiedenen Klageanträgen bezeichneten Anlagen, in denen ihre Betriebsgeheimnisse verkörpert sind, dem Bekl. im Rechtsstreit zugeleitet hat. Das ist aus Rechtsgründen nicht zu beanstanden. Denn der Bekl. hat die Unterlagen redlich erworben. Aus einem redlichen Besitzerwerb kann regelmäßig nicht auf die Gefahr künftiger Störung geschlossen werden. Deshalb ist die Rüge der Revision, der Tatbestand des Urteils des *LAG* sei unvollständig, weil sich aus ihm nicht die Tatsache ergebe, daß sie dem Bekl. die Unterlagen auf Weisung des Gerichts im Rechtsstreit überreicht habe, unbegründet. Hierauf beruht die Entscheidung des *LAG* nicht.

Die Behauptung der Kl., sie habe nur „auf Druck„ des Gerichts gehandelt, trifft im übrigen nicht zu. Im Protokoll der Sitzung vom 7. 3. 1996 ist lediglich der Hinweis des *LAG* festgehalten, gegen die Bestimmtheit der Klageanträge I 1c), 1.g) 1k) und 2. bestünden Bedenken. Dem mußte die Kl. Rechnung tragen. Wenn sie sich dafür entschied, die Klageanträge mit Hilfe der Unterlagen selbst zu konkretisieren, waren die Unterlagen dem Bekl. zur ordnungsgemäßen Rechtsverteidigung zur Verfügung zu stellen. Die Kl. hätte auch die Möglichkeit gehabt, ihr Anliegen zu umschreiben, ohne gleichzeitig die Betriebs- und Geschäftsgeheimnisse zu offenbaren.

**Anm. d. Schriftltg.:**

Zum Wahlrecht des Arbeitnehmers aus einer unverbindlichen Wettbewerbsabrede vgl. *ArbG Suhl*, NZA-RR 1999, 18. Zum Wettbewerbsverbot allgemein vgl. *LAG Düsseldorf*, NZA-RR 1998, 58 und zum Verzicht auf ein nachvertragliches Wettbewerbsverbot s. *ArbG Stuttgart*, NZA-RR 1996, 165.

TRANSLATION

German Federal Labor Court (*Bundesarbeitsgericht*): Duty of confidentiality – Claims for injunctive relief

NZA1999 Issue 4 200

## Duty of confidentiality – Claims for injunctive relief

*German Civil Code [Bürgerliches Gesetzbuch, BGB] §§ 823, 826, 1004; German Commercial Code [Handelsgesetzbuch, HGB] §§ 74 et seq.; German Act on Unfair Competition [Gesetz gegen den unlauteren Wettbewerb, UWG] §§ 1, 13 IV, 17; German Code of Civil Procedure [Zivilprozessordnung, ZPO] §§ 286, 301, 318, 320, 554 III No. 3 point b*

**After an employment relationship has been terminated, an employee, who is not bound by a prohibition to compete pursuant to §§ 74 et seq. of the German Commercial Code, may compete with his employer. A past employee's post-contractual duty of confidentiality as well as a past employee's post-contractual duty of loyalty do not entitle the past employer to injunctive relief to prohibit acts of competition on the part of the past employee (confirmation of Federal Labor Court Decisions [*Bundesarbeitsgerichtsentscheidungen*] 73, 229 = NZA 1994, 502 = AP No. 40 of § 611 of the German Civil Code, non-compete clause).**

*Federal Labor Court, Judgment dated 19 May 1998 - 9 AZR 394/97 (Regional Labor Court [Landesarbeitsgericht] of Thuringia, Part judgment dated 23 January 1997 - 4 Sa 1395/94)*

### Facts:

The Plaintiff is seeking an order to prohibit the Defendant from acts of competition as well as an order that he supply information and pay damages. The subject of the appeal proceeding are applications to have the Defendant prohibited from using the Plaintiff's business data in business transactions for the purpose of competition. The Plaintiff is a leading company in the plastic processing industry. Among other things, it is active in the manufacture and distribution of edge strips [*Kantenbänder*] and facade profiles. The Defendant, who was born in 1933, was employed by the Plaintiff for about 32 years. He last held the position of head of development. The Plaintiff was active in the development of a production process that involves the use of a sheet die (sheet die process) from 1988; the Defendant was involved in this work which was discontinued in 1990. On the basis of a Severance Agreement, the parties' employment relationship was terminated by the Plaintiff effective 31 January 1991. The Defendant's severance pay was DM 200,000. In clause 5 of the Severance Agreement, the Defendant agreed to keep confidential all of the business transactions, in particular information regarding technical production processes, recipes, tool designs, customers, prices and products related to the Plaintiff's production of edge strips to which he had become privy during his period of employment, even after the employment relationship was terminated. He further warranted that he would not enter into an employment or consulting relationship with the *R-Group* or with *O, its subsidiaries or affiliated* companies. In clause 6 of the Severance Agreement, the Defendant agreed to return to the Plaintiff all business documents, in

particular recipe books, production instructions and addresses of suppliers, including all copies, which were still in his possession and which he had made. Moreover, he warranted that he had no further copies in his possession; in clause 8 he stated that when he left the company he was no longer in possession of any of the company's materials and/or business documents. He warranted that to the extent that he had any copies, he had also returned all copies to the Plaintiff. In spring of 1991, the Defendant determined that part of the documents, reports and progress reports related to the sheet die process were missing. Together with his brother, the Defendant founded *M GmbH* on 23 May 1991 (hereinafter referred to as *M)* with its registered office in *O*. He is a shareholder and sole director of *M*. The object of the *GmbH* is, among other things, the production of edge strips and facade profiles. The company is thus a competitor of the Plaintiff. *M* uses a unit with sheet dies, which according to the Defendant was ordered in the summer of 1991, to manufacture the edge strips. Mr. *K* was responsible for the purchase of all raw materials and process materials and he was also previously head of the laboratory. He terminated his employment relationship with the Plaintiff with effect at the end of 1991. Since 1 January 1992, he has been employed in sales at *M*. In August 1992, the Plaintiff brought criminal charges against Mr. *K*. On this basis, the Defendant's offices and the basement in Mr. *K*'s premises in *H*. were searched and documents were secured on 11 November 1992. Among the Plaintiff's documents seized at Mr. *K's* premises were customer lists (without addresses), sales lists, recipes, conflagration trial recipe selection, expert opinions regarding the fire behavior of a PVC facade, overviews of profiles sorted by dimension and customer, summing within each company, five-year plans, contracts and sales projections. In the Defendant's offices, the authorities seized, among others things, construction plans for tools and tool parts (the use of which is not a subject of this legal dispute) as well as a few pages regarding the sheet die process. The ownership of the latter is disputed. In June 1993 the Plaintiff sued the Defendant and Mr. *K* before the *Labor Court [Arbeitsgericht] of Essen* and *M* before the *Regional Court [Landgericht] of Erfurt* to have them prohibited from competing and to have them ordered to provide information and pay damages. The *Labor Court of Essen* referred the case against the Defendant to the *Labor Court of Gotha*. On 30 March 1995 the public prosecutor's office brought charges against Mr. *K* and the Defendant. The Defendant was accused of having violated § 17 II of the German Act on Unfair Competition in two separate instances in 1990 and 1991. The Plaintiff asserted that Mr. *K* had acted in agreement with the Defendant; the seized documents were the embodiment of trade and business secrets. In any case, the Plaintiff believes that the type of documents stolen make it clear that the Defendant knew of Mr. *K's* criminal actions, since *M* was thus equipped with all of the information that was of interest to the company and could with the information contained in the stolen documents begin the production of edge strips using the sheet die process. The Plaintiff applied to have the Defendant prohibited from:

I.

a) using the Plaintiff's customer lists – attached as Enclosures A and D – in business transactions for competitive purposes to approach the Plaintiff's customers and offer its own products, in particular, the edge strip product;

b) using the Plaintiff's customer lists – attached as Enclosures A and D – in business transactions for competitive purposes to approach the Plaintiff's customers and offer prices that are deliberately lower and to thus achieve a competitive advantage at the expense of the Plaintiff;

c) using in business transactions for competitive purposes the Plaintiff's recipes – attached as Enclosure B – and/or making further developments on the basis of these;

d) using the Plaintiff's documents about the fire behavior of facade profiles – as seen in Enclosures C, C 1 and C 2 – in business transactions for competitive purposes in particular as a competitor of the Plaintiff or passing these on to the authorities;

e) using the Plaintiff's sales statistics – as seen in Enclosures D, D 1, D 2, D 3, D 4 and D 5 – for competitive purposes in particular passing them on to third parties;

f) using the test reports prepared for the Plaintiff by the company ***H*** to determine the mechanical characteristics of the Plaintiff's facade profiles – Enclosure E – in business transactions for competitive purposes in particular passing these on to third parties;

g) using the Plaintiff's cadmium-free recipe for facade profiles in business transactions for competitive purposes – Enclosure F –;

h) passing the Plaintiff's information regarding its production capacity and sales – as seen in Enclosure G – to third parties in business transaction for competitive purposes in particular to competitors of the Plaintiff;

i) using in any manner the agreements – between the Plaintiff and the *F* dated 6 November 1990 – Enclosure H – with the *company R* – Enclosure H 2 – and the *company M* – Enclosure H 3 – in business transactions for competitive purposes in particular making them accessible;

j) using in any manner the Plaintiff's information regarding standard qualities, that is an analysis which examines the Plaintiff's most important recipes by application purpose, properties etc. in business transactions for competitive purposes in particular passing it on to third parties – Enclosure I –;

k) using and/or passing on the production procedures developed by the Plaintiff – the so-called sheet dies for edge strips – see Enclosure K – and/or selling edge strips manufactured in this manner to the Plaintiff's competitors.

2. [The Plaintiff also applied to have the Defendant ordered] to keep confidential all – and not pass on to third parties any – information related to business transactions in particular information regarding technical production processes, recipes, tool designs, customers, prices and products related to the Plaintiff's production of edge strips in accordance with Enclosure K and in particular such information as is found in the enclosures mentioned above and in Enclosure K; . . .

The Defendant asserted that he did not know of the documents seized at Mr. *K*'s premises and that he had not made use of them and was also not interested in using them in the future. Therefore, a claim for injunctive relief could not be asserted against him.

The Labor Court dismissed the Statement of Claim. The Regional Labor Court dismissed the Plaintiff's appeal in its part judgment regarding applications I 1 points a-j in the Statement of Claim. The part judgment was served on the Plaintiff on 20 June 1997. The *Regional Labor Court* allowed the Plaintiff to appeal, but its appeal was unsuccessful.

**Reasons:**

The Plaintiff has no claim for injunctive relief against the Defendant. The Regional Labor Court's judgment is not based on a procedural error.

A. I. Contrary to the Plaintiff's view, the judgment of the *Regional Labor Court* does not contain an absolute ground for appeal as defined in § 551 No. 7 of the German Code of Civil Procedure. It includes reasons for the decision. Only under the prerequisites of § 554 III No. 3 point b of the German Code of Civil Procedure, do inaccuracies in the statement of facts lead to a judgment being overturned and the case being referred back (German Federal Labor Court, AP No. 1 on § 320 of the German Code of Civil Procedure; Federal Labor Court Decisions 4, 81 = NJW 1957, 1165 = AP No. 2 on § 60 of the Labor Court Act

[*Arbeitsgerichtsgesetz, ArbGG* 1953]).

II. Contrary to the opinion expressed in the appeal, there were no legal grounds preventing the Regional Labor Court from deciding the claim for injunctive relief in a part judgment. It is true that the claims for injunctive relief and the more far-reaching application (2) in the Statement of Claim related to the Defendant's duty of confidentiality regarding the edge strip do in part deal with the same question. This is because the scope of the Defendant's duty of confidentiality has to already be decided when the court is making its decision on the claim for injunctive relief. This overlap does not, however, lead to a risk of contradiction between the part judgment and the final judgment. This is precluded by the fact that the court is bound by its decision pursuant to § 318 of the German Code of Civil Procedure and its decision is final according to § 322 of the German Code of Civil Procedure.

B. The Regional Labor Court decided that the claims for injunctive relief were admissible; they were sufficiently specific as defined in § 253 II No. 2 of the German Code of Civil Procedure. There are no doubts about this. According to the Plaintiff in the appeal, this also applies to application (I) 1 point b in the Statement of Claim, since the Plaintiff made it clear, it was not appealing against each solicitation of its customers, but rather against the Defendant's use of its customer lists to solicit the Plaintiff's customers and deliberately undercut its prices.

C. The Plaintiff's claim for injunctive relief against the Defendant fails because its submissions do not show a risk of a renewed violation of its business secrets nor reason to expect that the Defendant will violate them for the first time. The Regional Labor Court correctly decided that this was so.

I. The Plaintiff does not have a contractual claim against the Defendant because the latter anyway has a duty of confidentiality and is thus also contractually forbidden to use the documents seized at Mr. *K's* premises. The employee's duty not to compete ends simultaneously with the termination of the employment relationship. The only way that an employer can protect itself against competitive acts on the part of a previous employee is by concluding a suitable non-compete agreement pursuant to §§ 74 et seq. of the German Commercial Code. The term of this agreement may not exceed two years and the employee must be paid for agreeing to its provisions. If no legally valid non-compete agreement is signed, the employee shall be entitled like any other party to enter into competition with his previous employer. In competing with his previous employer, the ex-employee may use all of the experience and knowledge gained during his employment relationship, including knowledge of trade and business secrets and may solicit his previous employer's customers (Federal Labor Court Decisions 73, 229 = NZA 1994, 502 = AP No. 40 on § 611 of the German Civil Code, non-compete clause). Therefore, a post-contractual duty of confidentiality as well as a general duty of loyalty do not as a rule establish a right on the part of the employer to demand that its former employee refrain from competing with it. Due to the employee's freedom to compete which is guaranteed by law, the employer can – except in a case where there is an effective non-compete agreement – only rely on protection from unfair

competition pursuant to the general statutory provisions, § 1 of the German Act on Unfair Competition and §§ 823, 826 of the German Civil Code.

Contrary to the Plaintiff's opinion, the decision of the *Federal Labor Court* (Federal Labor Court Decisions 57, 159 = NZA 1988, 502 = AP No. 5 on § 611 of the German Civil Code – trade secrets) upon which it relies in its appeal, states the same. According to this decision, an employee can be prohibited from using the employer's trade secrets which are contained in illegally acquired lists or other information carriers that were kept by the employee when he left the company. The appeal, however, overlooks the fact that in this decision the Federal Labor Court also found that proof must be supplied that the ex-employee actually used the documents. There are no doubts about the constitutionality of this decision (German Federal Constitutional Court [*Bundesverfassungsgericht*], AP No. 5a of § 611 of the German Civil Code – trade secrets).

No other conclusions can be drawn from the Defendant's duty of confidentiality regarding the edge strips business area as agreed in clause 5 of the Severance Agreement. It is true that the parties to the employment contract can in individual cases agree that, after the employment relationship is terminated, the employee will never use a specific trade secret in his professional activities (Federal Labor Court Decisions 41, 21 = NJW 1983, 134 = AP No. 1 on § 611 of the German Civil Code – trade secrets). The post-contractual duty of confidentiality imposed on the Defendant, however, does not cover one or more specific trade secrets, rather it covers without distinction all business transactions. The Defendant is thus prevented from making any professional use of the knowledge he gained in this business area. This exceeds the bounds of a non-compete agreement which is limited to a maximum of two years and for which the ex-employee must receive consideration.

II. There is no basis for a claim for injunctive relief pursuant to the statutory provisions for the protection of business and trade secrets, §§ 823 I, II, 830, 1004 of the German Civil Code in conjunction with § 17 I and II of the German Act on Unfair Competition, § 1 of the German Act on Unfair Competition in conjunction with § 826 of the German Civil Code or pursuant to § 13 IV of the German Act on Unfair Competition in conjunction with § 1 of the German Act on Unfair Competition.

1. A claim for injunctive relief without fault on the part of the Defendant cannot be derived from §§ 1, 13 IV of the German Act on Unfair Competition. Pursuant to this provision, the owner of a company must answer for the acts of his employees that are contrary to fair competition pursuant to § 1 of the German Act on Unfair Competition and a claim for injunctive relief may be brought against him on the basis of his proprietorship alone. The "proprietor" as defined in § 13 IV of the German Act on Unfair Competition is the person in whose name and for whose account the company is operated. The proprietor of the company – for whom Mr. *K* acted – is *M* and not the Defendant, who is a director and a shareholder. This was correctly pointed out by the Regional Labor Court; this aspect of the decision is also not disputed in the appeal.

2. The Plaintiff does not have a claim against the Defendant based on intentional tort.

a) The Regional Labor Court did not determine that the Defendant participated in the actions of Mr. *K*, which in his view represented "without a doubt unfair competition" or that he had knowledge of the documents seized at Mr. *K*'s premises. It found that the evidence, expert opinions and investigation records submitted by the Plaintiff were as unsuitable for this purpose as the indictment. The appeal against this decision is unsuccessful.

(1) The Regional Labor Court correctly assumed that the Plaintiff must bear the entire burden of proof and must provide all the evidence in support of the facts upon which its claim for injunctive relief is based. This also applies to those facts which give cause to expect that repeated infringement is likely. Contrary to the Plaintiff's opinion, the principles of evidence that allow prima facie evidence to be used under certain circumstances do not apply here.

Prima facie evidence only relaxes the burden of proof where there is a typical sequence of events. Recourse can be made to common experience where specific circumstances show that a certain cause or a certain sequence of events is decisive for the occurrence of a certain result (German Federal Supreme Court [*Bundesgerichtshof*], NJW 1997, 2757). Mere likelihood does not suffice. Instead the alleged [sequence of] events must be immediately recognizable as forming a pattern, in other words recurrent, customary and frequent and must provide justification for the alleged facts (cf. *Zöller/Greger*, ZPO, 20th edition, preliminary comment § 284 marginal no. 29).

These requirements have not been satisfied. The Plaintiff's statements regarding the value of the documents seized at Mr. *K*'s premises to a competitor like *M* are indeed consistent and understandable. Therefore, "according to common experience", to use the words of the Plaintiff, from the selection of documents, it seems an obvious conclusion that Mr. *K* would either supply these documents to his new employer and thereby its sole director, the Defendant, or at least inform him that he had these valuable documents. However, common experience cannot be equated with common knowledge which is necessary if the Plaintiff alleges that there is a prima facie case. The fact that Mr. *K* acquired trade secrets of the Plaintiff without authorization, does not tell us that he used the documents nor that they were passed on to the Defendant. At most it proves that, due to his employment with the Plaintiff, he, like the Plaintiff, judged the documents to be valuable. Without further submissions concerning the circumstances surrounding Mr. *K*'s actions, no conclusions can be reached regarding the involvement or knowledge of the Defendant.Thus the Plaintiff's assertion in the appeal that the Regional Labor Court had failed to fully appreciate that the Defendant did not substantiate his rebuttal to its allegations is also unsuccessful; according to the Plaintiff, the Defendant was not entitled to simply dispute that he had been aware of the fact that Mr. *K* was in possession of the seized documents. The principle that the scope of the onus of presentation depends on the submissions of the opposing party is not based on the idea that only one party is obliged to assist in ascertaining the facts and in expediting the proceedings by providing information. Pursuant to the German Code of Civil Procedure, the

party which is not obliged to present facts and proof does not have general duty to inform (cf. German Federal Supreme Court, NJW 1990, 3151; German Federal Supreme Court, NJW 1991, 2707).

(2) On the basis of the submissions made by the Plaintiff in this appeal, no decision has to be made as to whether the Regional Labor Court should have investigated the evidentiary facts presented. The submission that there was insufficient clarification of the facts within the meaning of § 286 of the German Code of Civil Procedure is only significant as a procedural objection pursuant to § 554 III No. 3 point b of the German Code of Civil Procedure according to the established case law of the *Federal Labor Court* (Decisions of the Federal Labor Court 71, 56 = NZA 1993, 181 = AP No. 32 on § 1 of the Collective Agreements Act [*Tarifvertraggesetz*], collective agreements: retailers with further references), if the facts which are supposed to show the error in the proceedings are separately presented in the appeal. The facts that have to be presented are not those which formed the subject matter of the flawed proceedings, but rather the events in the proceedings in which the error occurred (cf. *Grunsky*, in: *Stein/Jonas, ZPO*, 20th edition, § 554 marginal number 12). Therefore, what must be presented is the specific statement of claim (including page number) in which the allegedly ignored pleading, the facts in issue and the evidence can be found. The plea must also specify the finding that would have resulted if the ignored evidence had been considered. If the matter involves evidentiary facts, the plea must also state what consequences the accessory fact has for the leading fact which must be proven.

The appeal did not satisfy these requirements. The Plaintiff submits that the Regional Labor Court did not examine the expert opinion regarding the recipe of the facade profiles produced by *M*, which was offered in the Statement of Claim dated 10 September 1996 under No. 11 (application I. 1. d in the Statement of Claim). The Regional Labor Court denied this motion to admit evidence with the reasoning that it was not obvious to what extent the B 1 certification could only be achieved using a recipe that is in largest part similar to that used by the Plaintiff. Therefore, the Plaintiff should have shown that the certification could not be achieved by using any process other than the one it used. This presentation, which the Regional Labor Court considered lacking, is still not to be found in the appeal. It does not make clear where the Regional Labor Court's error in reasoning is supposed to be found.

To the extent that the Plaintiff repeats its statement of facts regarding the "Normtex" complex in the appeal and in application I 1e) in the Statement of Claim in which it alleges that *M* approached its customers and enticed them to violate their contracts, both the claim and the appeal lack a submission related to the Defendant and in particular one regarding the Defendant's knowledge of the exclusive dealing requirement alleged by the Plaintiff. This also applies for the statement attributed to the director of Normtex that he knew that the Plaintiff had no interest in the production of facade profiles and further that he knew (from employees of the Plaintiff) the company's internal figures and could prove this with internal documents from the Plaintiff. This submission is thus a blanket statement that covers the employees of the Plaintiff, not however the Defendant or Mr. *K*. The price differences, which in the opinion of the Plaintiff offer a compelling reason to believe that *M*

used its recipes and thus saved both time and cost, are simply described as "so substantial" that Normtex could not turn the offer down and therefore violated its contract.

To the extent that the appeal refers to the price cutting in its statement of facts, the reference also does not comply with § 554 III No. 3b of the German Code of Civil Procedure. It is also otherwise lacking in value as evidence. The prices of *M* in 1993 and 1994, which were less than those of the Plaintiff and which according to its own submissions also involved a new product, can not even be connected time-wise with the legal dispute. Without a more detailed description of the usual price calculations in the plastics market, the fact that Mr. *K* offered two customers prices that were in one case ca. 34.6% and in another case ca. 11% less than those of the Plaintiff in 1992 (the Plaintiff mentions these as "examples" in its appeal), does not represent circumstantial evidence. The same is true of the fact that Mr. *K* was previously an employee of the Plaintiff. This also applies for the statement in the appeal that the public prosecutor did not find the documents in the private residential premises of Mr. *K*, but rather in the basement of the house rented by *M* as "Sales Office – West". This confirms that the behavior of Mr. *K* was contrary to fair competition, but it does not prove that the Defendant knew of the documents found there.

In these proceedings, the sheet die process complex also provides no significant indication of behavior contrary to fair competition on the part of the Defendant with regard to the claims for injunctive relief. After all, the Defendant did not dispute that *M* used the sheet die process in its production. He simply considers himself entitled to also use the knowledge that he gained in the course of his employment relationship for *M*. The Plaintiff submitted no evidence to support its allegation that *M* bought the production equipment through a front man.

The reference in the appeal to the submission in the Statement of Claim regarding the advertising statements of *M* does not constitute a reason for a different decision. According to that submission, *M* supposedly confronted the Plaintiff's customers with the false advertising statement that it – *M* – had more than twenty years of experience in the extrusion of plastic edge strips and a manufacturing method that allowed extremely tight tolerances to be achieved. After a warning from the Plaintiff, the Defendant signed a statement in August 1992 that *M* would refrain from making further statements of this kind in its advertising. However, the Plaintiff overlooks that the Defendant's signed statement only states that *M* will refrain from making further misleading advertising statements. It does not contain an admission that the Plaintiff developed the production process. In addition, the allegation in the appeal, which was already made in the Statement of Claim, that *M* sent the sales letter to all customers is false. The letter is addressed to the "customers" of the Plaintiff. In view of the few customers named, one was not compelled to understand this in the sense of "all customers", particularly since the Plaintiff always emphasized – also in the appeal – that the customers with a high volume of one-off items were of special interest for *M* due to the use of the sheet die process. In any case, the documents submitted in the legal dispute do not include customer addresses.

3. Contrary to the Plaintiff's opinion, negligent ignorance on the part of the Defendant does not suffice for a claim for injunctive relief. The requirements in §§ 1 and 17 of the German Act on Unfair Competition in conjunction with the provisions regarding the tort presuppose intentional action on the part of the putative accomplice.

4. The Plaintiff is also not entitled to a claim for injunctive relief from the viewpoint of what is known as the "*Erstbegehungsgefahr*" (risk that the defendant will perform an impermissible act in a blameworthy way for the first time). The Regional Labor Court dismissed this latter risk since the Defendant had no access to the documents – at least after their seizure. With this decision, it is clear that the court did not attribute any significance to the fact that the Plaintiff had forwarded the enclosures referred to in the various applications in the Statement of Claim, which embodied the Plaintiff's trade secrets, to the Defendant in the legal dispute. There are no legal reasons to object to this. After all, the Defendant had acquired the documents honestly. As a rule, the risk of a future "disturbance" (*Störung*) can not be expected after an honest acquisition. Therefore, the submission in the appeal that the statement of facts in the Regional Labor Court's decision is incomplete, since it does not mention the fact that at the instruction of the court the Plaintiff gave documents to the Defendant during the legal dispute, is unfounded. The decision of the Regional Labor Court is not based on this.

In addition, the allegation of the Plaintiff, that it only handed over the documents "under pressure" from the court, is also not correct. In the minutes of the hearing on 7 March 1996, one simply finds that the Regional Labor Court's mentions its doubts about the uncertainty of applications I 1c), 1.g) 1k) and 2 in the Statement of Claim. The Plaintiff had to take this into account. If it decided to make the applications in the Statement of Claim more specific with the aid of the documents, the documents would have to have been made available to the Defendant to allow it to prepare a proper defense. The Plaintiff would also have had the chance to formulate its requests in a manner which did not simultaneously reveal company and trade secrets.

I, Dr. Donna Goessler, LL.M., of Im Vogelsang 12, 53179 Bonn, Germany, confirm that this English translation is a true and correct translation of the original German judgment.