UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Valspar Corporation,<br>Valspar Sourcing, Inc., and<br>Valspar Industries GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>Spraylat Corporation and Spraylat GmbH,<br><br>Defendants. | Civil Action No. 01CV1605 JNE/JGL<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS IN LIMINE**

David M. Zensky, Esq. (DZ 5913)
Mitchell P. Hurley, Esq. (MH 0740)
Blossom Kan, Esq. (BK 6617)
AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue, 42nd Floor
New York, New York 10022-4616
(212) 872-1000

Kenneth A. Liebman
John Connelly
Michelle Paninopoulos
FAEGRE & BENSON L.L.P
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-8800

# TABLE OF CONTENTS

**Page**


I. PLAINTIFFS' MOTION TO PRECLUDE REFERENCES TO THE COURT'S SUMMARY JUDGMENT DECISION SHOULD BE DENIED ....................................1

A. Information Determined To Be Generally Known Or Readily Ascertainable Is Irrelevant And Inadmissible ....................................8

1. The Plain Language of the Contracts Protect Only Secret Information, Not Information that is Generally Known or Readily Ascertainable....................................9

2. Disclosure of "Generally Known or Readily Ascertainable" Information Cannot Constitute Breach of a Confidentiality Agreement as a Matter of Law....................................10

B. If Evidence Concerning the Business Information and Additives is Admitted, Spraylat Must Be Permitted to Reference the Summary Judgment Decision....................................17

II. PLAINTIFFS' MOTION TO PRECLUDE REFERENCES TO THE LACK OF NON-COMPETE CLAUSES IN VALSPAR'S AGREEMENTS WITH EX-EMPLOYEES SHOULD BE DENIED....................................21

A. The Absence of Non-Competition Agreements Is Relevant....................................24

B. The Absence of Non-Competes is Not Unduly Prejudicial ....................................27

III. PLAINTIFFS' MOTION TO PRECLUDE REFERENCE TO TESTIMONY, EVIDENCE, OR ARGUMENT CONCERNING FACTS FORMING THE BASIS PLAINTIFFS' DISMISSED CLAIM FOR CONVERSION....................................28

IV. RESPONSE TO PLAINTIFFS' MOTION IN LIMINE CONCERNING GERMAN CRIMINAL INVESTIGATION....................................31

V. RESPONSE TO PLAINTIFFS' MOTION TO PRECLUDE QUESTIONS THAT WOULD LEAD TO INVOCATION OF PRIVILEGE BY WITNESSES ....................................33

# TABLE OF AUTHORITIES

## CASES

Ackerman v. Kimball Int'l, Inc., 652 N.E.2d 507 (Ind. 1995) .......... 13

Auto Channel, Inc. v. Speedvision Network, LLC, 144 F. Supp. 2d 784 (W.D. Ky. 2001) .......... 15

Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943 (W.D. Mich. 2003) .......... 15, 17

Burbank Grease Services, LLC v. Sokolowski, 693 N.W.2d 89 (Wis. Ct. App. 2005) .......... 15

Cambridge Filter Corp. v. Int'l Filter Co., 548 F. Supp. 1301 (D. Nev. 1982) .......... 14

Cherne Indus., Inc. v. Grounds & Assocs., Inc., 278 N.W.2d 81 (Minn. 1979) .......... 11, 12

Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263 (7th Cir. 1992) .......... 14

Donahue v. Permacel Tape Corp., 234 Ind. 398, 127 N.E.2d 235 (1955) .......... 13

Dynamics Research Corp v. Analytic Scis. Corp., 400 N.E.2d 1274 (Mass. App. Ct. 1980) .......... 15

E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969) .......... 25, 26

Eaton Corp. v. Giere, 971 F.2d 136 (8th Cir. 1992) .......... 15, 16

Ecolab Inc. v. Paolo, 753 F. Supp. 1100 (E.D.N.Y. 1991) .......... 16

Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890 (Minn. 1983) .......... 26

Franke v. Honeywell, Inc., 516 N.E.2d 1090 (Ind. Ct. App. 1987) .......... 13

Frantz v. Johnson, 116 Nev. 455, 999 P.2d 351 (2000) .......... 15

Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis. 2d 202 (1978) .......... 15

Harvey Barnett, Inc. v. Shidler, 143 F. Supp. 2d 1247 (D. Colo. 2001) .......... 14

Heyer-Jordan & Assocs., Inc. v. Jordan, 801 S.W.2d 814 (Tenn. Ct. App. 1990) .......... 14

Hickory Specialties, Inc. v. Forest Flavors Int'l,
26 F. Supp. 2d 1029 (M.D. Tenn. 1998) ........ 14

Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324 (9th Cir. 1980) ........ 15

Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609 (1988) ........ 14

Jostens, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691 (Minn. 1982) ........ 12

Labor Ready, Inc. v. Labor,
Nos. 3264, 121759, 2001 WL. 1807932, at *1 (Pa. Com. Pl. Jan. 25, 2001) ........ 14

Lasermaster Corp. v. Sentinel Imaging, 931 F. Supp. 628 (D. Minn. 1996) ........ 5, 6

Lies v Farrell Lines, Inc., 641 F.2d 765 (9th Cir. 1981) ........ 19

NewLeaf Designs, LLC v. BestBins Corp., 168 F. Supp. 2d 1039 (D. Minn. 2001) ........ 4, 5

North Pac. Lumber Co. v. Moore, 275 Or. 359, 551 P.2d 431 (1976) ........ 15

Nutri-Metics Int'l, Inc. v. Carrington Labs., Inc.,
No. 89-56253, 1992 WL. 389246, at *1 (9th Cir. Dec. 22, 1992) ........ 18

Roll Sys., Inc. v. Shupe,
No. CIV. A. 97-12689-GAO, 1998 WL. 1785455, at *1
(D. Mass. Jan. 22, 1998) ........ 14

Savor, Inc. v. FMR Corp., 812 A.2d 894 (Del. 2002) ........ 15

Signergy Sign Group, Inc. v. Adam,
Nos. A04-70, A04-147, 2004 WL. 2711312, at *1
(Minn. Ct. App. Nov. 30, 2004) ........ 9, 11, 12

Standard Register Co. v. Cleaver, 30 F. Supp. 2d 1084 (N.D. Ind. 1998) ........ 14

Structural Dynamics Research Corp v. Eng'g Mechs. Research Corp.,
401 F. Supp. 1102 (E.D. Mich. 1975) ........ 16

Surgidev Corp. v. Eye Tech., Inc., 648 F. Supp. 661 (D. Minn. 1986) ........ 11, 12

Thomas v. Best Mfg. Corp., 234 Ga. 787 (1975) ........ 15

Unisource Worldwide, Inc. v. Carrara, 244 F. Supp. 2d 977 (C.D. Ill. 2003) ........ 14

Vigoro Indus., Inc. v. Crisp, 82 F.3d 785 (8th Cir. 1996) ........ 6, 12, 26

Wright Med. Tech., Inc. v. Grisoni, 135 S.W.3d 561 (Tenn. Ct. App. 2002) .................14

**STATUTES**

Fed. R. Civ. P. 56 .....................................................................................18

Fed. R. Evid. 403.......................................................................................27

Fed. R. Evid. 104.......................................................................................33

Minn. Stat. Ann. § 325C.01 ..............................................................................4

Minn. Stat. Ann. § 549.20...............................................................................33

Minn. Stat. Ann. § 325C.03(b)..........................................................................33

**DEFENDANTS' CONSOLIDATED OPPOSITION TO PLAINTIFFS' MOTIONS IN LIMINE**

Defendants Spraylat Corporation and Spraylat GmbH (collectively "Spraylat" or "Defendants") respectfully submit this consolidated memorandum of law in opposition to five of Plaintiffs' six motions.[1] Plaintiffs' motions seek to preclude:

(1) references to the Court's summary judgment order;

(2) references to the lack of non-compete clauses in Valspar's employment contracts with former employees;

(3) references to Plaintiffs' dismissed claim of conversion;

(4) references to the German prosecutor's decision to proceed (or not) with criminal prosecution against Plaintiffs' former employees;

(5) questions that would lead Plaintiffs' witnesses to invoke the privilege in front of the jury.

## I. PLAINTIFFS' MOTION TO PRECLUDE REFERENCES TO THE COURT'S SUMMARY JUDGMENT DECISION SHOULD BE DENIED

Plaintiffs seek to ignore the significance of the Court's March 31, 2004 order (the "Order") granting partial summary judgment to Spraylat by attempting to offer evidence and arguments rendered irrelevant and inadmissible in light of the Court's decision. By their motion, Plaintiffs go even farther, arguing not only that they should be permitted to present voluminous evidence concerning information that the Court has determined to be "generally known or readily ascertainable," but also that the Court's order granting summary judgment to Spraylat with respect to that information should be concealed from the jury. The relief sought by

[1] Plaintiffs' sixth motion in limine seeks to preclude references to patents and other publications which were published after July 26, 2001. Because Spraylat's opposition to that motion contains information designated "attorneys' eyes only" pursuant to the protective order, it is filed separately and under seal.

Plaintiffs would undermine Judge Ericksen's Order, severely prejudice Spraylat and result in jury confusion, and should be denied.

## INTRODUCTION

Plaintiffs originally asserted a very broad claim for misappropriation, identifying three types of information that they claimed as their trade secrets: (i) business information, including customer identities and information concerning Plaintiffs' sales volume, market share, margins, pricing and costs (the "Business Information"), (ii) certain chemical additives, and the respective uses of those additives in mirror solutions formulas (collectively, the "Additives"), and (iii) Plaintiffs' "overall" solutions formulas (the "Formulas").

By its Order, the District Court dramatically narrowed Plaintiffs' case, holding as a matter of law that the (i) Business Information and (ii) Additives (and the Additives' respective uses in mirror solutions) are not trade secrets because they are generally known and/or readily ascertainable. Plaintiffs nevertheless argue in their motion that this information, although "generally known," somehow is "confidential" within the meaning of the two confidentiality agreements at issue in this case, and that Plaintiffs should be permitted to present evidence concerning the Business Information and Additives to the jury in support of their tortious interference with contract claim against Spraylat. Further, Plaintiffs seek to preclude Spraylat from referencing Judge Ericksen's determination that the Business Information and Additives are not trade secrets.

Plaintiffs are wrong on both counts. Alleged disclosure or use of "generally known or readily ascertainable" information does not and cannot constitute a breach of either confidentiality agreement at issue in this case, and Spraylat therefore is not liable for intentional interference with contract based on alleged disclosure of the Business Information or Additives.

Evidence concerning the Business Information is not relevant to any claim remaining in the case, would at least double the length of the trial, and should not be admitted.

However, in the event Plaintiffs are allowed to offer evidence and argument concerning this information to the jury, Spraylat must be permitted to reference the Court's summary judgment Order. The very purpose of Judge Ericksen's Order is to narrow the issues to be determined at trial and streamline the proof put before the jury. That purpose will be defeated unless Spraylat is able to direct the jury's attention to the Order in response to the many days' worth of testimony and other evidence Plaintiffs undoubtedly will seek to offer concerning the Business Information and Additives. Barring use of the Order, Spraylat will be forced to present its own extensive evidence demonstrating that all such information is in fact generally known or readily ascertainable, and thus not subject to trade secret protection, a time-consuming exercise that could be avoided simply by reference to the Judge's order.

Moreover, use of the Order is necessary to avoid juror confusion. Plaintiffs' MUTSA and tortious interference claims, though requiring proof of different elements, will appear confusingly similar to the jury, and the jurors easily could conflate proof relevant to one claim with proof relevant to the other. To avoid this confusion, Spraylat should be permitted to rely on the Court's clear ruling that the Business Information and Additives are generally known or readily ascertainable, and do not and cannot support a claim for misappropriation of trade secrets. Plaintiffs claim that they will be unfairly prejudiced if the jury is allowed to know about Judge Ericksen's Order. According to Plaintiffs, the jury might be swayed if it knew that the Court "believes" that the Additives and Business Information are not trade secrets. The Court does not have a "belief" as to whether or not this information can be considered trade secrets; *the Court has ruled as a matter of law that it cannot*. There is no question of "swaying" the jury; the

issue already has been decided, and the jury must know that in order to avoid being confused about exactly what it is being asked to decide.

Plaintiffs' desire to ignore Judge Ericksen's summary judgment decision, and conceal it from the jury, is understandable, since that order decimated their case. To grant Plaintiffs' motion, however, would undermine the Order's purpose of limiting and streamlining issues for consideration at trial, and would result in misleading the jury concerning the significance of the Business Information and Additives during the presentation of evidence in an already complex and fact-intensive trial. Plaintiffs' motion therefore should be denied.

**Judge Ericksen's Decision**

Plaintiffs originally claimed in this case that the Business Information, including the identities of Plaintiffs' customers that manufacture Christmas ornaments, and Plaintiffs' sales volume, pricing, market share, margins and costs relating to both mirror and Christmas ornament customers, constituted protectable trade secrets. Plaintiffs also claimed that four specific chemical Additives contained in their mirror solutions products and their particular uses in mirror solutions were Plaintiffs' exclusive trade secrets. Order at 9-12. By its Order, the Court granted Spraylat's motion for summary judgment in part, holding that the Business Information, the Additives, and particular uses made of the Additives by Plaintiffs in their mirror solutions formulas are generally known or readily ascertainable. Id. 5-12. Plaintiffs then sought permission to file a motion for reconsideration, which was denied by the Court on June 1, 2004.

To establish that information is a "trade secret," it must be shown that (1) the information is not generally known or readily ascertainable; (2) the information derives independent economic value from secrecy; and (3) the party asserting misappropriation has made reasonable efforts to maintain the secrecy of the item. Minn. Stat. Ann. § 325C.01; NewLeaf Designs, LLC

v. BestBins Corp., 168 F. Supp. 2d 1039, 1043 (D. Minn. 2001); Lasermaster Corp. v. Sentinel Imaging, 931 F. Supp. 628, 635 (D. Minn. 1996). As discussed below, the Court determined as a matter of law that the Business Information and Additives do not qualify as trade secrets under Minnesota law.

**Business Information Rulings**

With respect to the ornament customers, the Court held that "there are approximately 40 ornament manufacturers, 80% of those manufacturers are located within 60 miles of one city in Germany, . . . some manufacturers advertise in business directories and on the internet [and] a former vice president of Valspar Corporation testified that the identities of the ornament manufacturers are not a secret." Order at 5. On this basis, the Court found that the identities of the ornament customers are "generally known or readily ascertainable." Id. The Court also held that Plaintiffs themselves did not treat the identities of these customers as confidential, having disclosed a list of their ornament customers to at least one third-party distributor without "marking the list 'confidential,' entering into a confidentiality agreement with the distributor, or instructing the distributor to maintain the list's confidentiality." Id. at 6. Thus, there was no "reason to know that Plaintiffs intended or expected the secrecy of the ornament manufacturers to be maintained." Id. Despite this unambiguous ruling, Plaintiffs still wish to argue that Spraylat intentionally interfered with the confidentiality agreements of DeBlandre and Reipa by allegedly inducing them to provide Spraylat with this "generally known" information.[2]

[2] Inexplicably, Plaintiffs suggest that four confidentiality agreements are at stake in this case. Pls. Br. at 2. In fact, Plaintiffs' claim relates only to the alleged confidentiality agreements of two of its former employees, Alain DeBlandre and Guenther Reipa. See Second Amended Complaint ¶¶ 23-35. In summary judgment papers submitted in July, 2003, Spraylat reminded Plaintiffs that they had never alleged claims with respect to the putative agreements of Kotschenreuther and Reipa, and, in the twenty months that have elapsed since, Plaintiffs have not sought to amend their Complaint to include any such claims.

Similarly, the Court rejected Plaintiffs' claim to secrecy over information relating to Plaintiffs' sales, volume, pricing and costs, finding that such information is readily ascertainable in the industry. "[C]ompanies in the European coatings market routinely gather information about their competitors by proper means. Purchasers of coatings products disclose information about pricing and sales volume to suppliers such as Plaintiffs and Defendants. The information claimed by Plaintiffs to be trade secrets is readily ascertainable by proper means." Id. at 8. The Court went on to observe that:

> A different conclusion is not warranted simply because Defendants obtained information based on [ex-Valspar employees'] employment experience: "*Absent an enforceable covenant not to compete*, a former employer may not prevent a former employee from exploiting sales experience and knowledge of customers with a new employer. The former employer should not be permitted to achieve this anticompetitive objective indirectly through an overly-expansive definition of customer trade secrets."

Id. at 8 (quoting Vigoro Indus. v. Crisp, 82 F.3d 785, 790 (8th Cir. 1996) (emphasis added)). Despite this ruling, and in the absence of any "enforceable covenants not to compete," Plaintiffs seek to achieve the very same "anti-competitive objective" by arguing that their ex-employees are prohibited from exploiting their industry knowledge and experience based on the putative confidentiality agreements, and that Spraylat is liable in tort for hiring them.

**Rulings on Additives**

The Court also rejected Plaintiffs' claims that the Additives, and the particular uses made of the Additives by Plaintiffs in their mirror solutions, are anyone's "secret." The Court specifically cited each of the Additives identified by Plaintiffs, described the particular uses made by Plaintiffs of those Additives in their mirror solutions, and held that those Additives and their respective uses in mirror solutions formulas are generally known or readily ascertainable. Id. at 11-12. Nevertheless, Plaintiffs still contend that any use or disclosure by their ex-

employees of these generally known Additives would constitute a breach of their confidentiality agreements.

**Claims Remaining in Case**

The Court's decision eliminated Plaintiffs' claim for tortious interference with contracts entirely, with one narrow exception related to DeBlandre, and one narrow exception related to Reipa. With respect to DeBlandre, the Court cited his alleged disclosure to Spraylat of "information relating to Plaintiffs' perceived strategic weaknesses" as a potential breach of confidentiality. Order at 17. Since Plaintiffs never specifically identified this information as their trade secrets, the parties did not brief, and the Court did not determine, whether such information is "generally known or readily ascertainable."

With respect to Reipa, the Court allowed that proof of disclosure of the overall Formulas – not mere disclosure of any of the generally known or readily ascertainable Additives – could constitute a breach of confidentiality and support Plaintiffs' claim against Spraylat for tortious interference with contract.

As noted elsewhere, the sole misappropriation claim remaining in the case is based on Plaintiffs' argument that the combinations of known elements embodied in their Formulas constitute trade secrets, and that Spraylat misappropriated those "overall" Formulas.[3]

---

[3] Plaintiffs confuse this issue in their brief by claiming that the "Court found that Valspar's mirror solutions formulae – and in particular, Valspar's novel combinations of additives – were protectible 'trade secrets.'" Pls. Br. at 3. The Court found no such thing. Indeed, Plaintiffs moved for summary judgment on this precise issue, *and their motion was denied,* based on the Court's inability to determine "as a matter of law either that the formulas are generally known or that the formulas are not generally known." Order at 14. Thus, it is for the jury to determine whether the combinations of known elements embodied in Plaintiffs' formulas are "novel" and otherwise satisfy the definition of a trade secret.

**Plaintiffs' Motion**

Despite the Court's ruling, Plaintiffs seek to try claims that the Additives, and *all* of the Business Information, including the historical financial information that the Court specifically ruled to be "generally known," is nevertheless "confidential." Further, Plaintiffs seek to prevent Spraylat from advising the jury that the Business Information and Additives are not trade secrets as a matter of law because they are generally known or readily ascertainable. As discussed below, neither argument is tenable: (i) the generally known or readily ascertainable Business Information and Additives cannot support a claim for breach of the DeBlandre and Reipa confidentiality agreements, and therefore are irrelevant and inadmissible; (ii) in the alternative, if evidence concerning generally known or readily ascertainable Business Information and Additives could somehow be deemed admissible with respect to Plaintiffs' tortious interference claim, Spraylat must be permitted to advise the jury of the Court's ruling, *viz.*, that disclosure of such information *cannot* support Plaintiffs' related claim of misappropriation of trade secrets.

**A. Information Determined To Be Generally Known Or <u>Readily Ascertainable Is Irrelevant And Inadmissible</u>**

Plaintiffs spend much of their brief attempting to establish that the Business Information and Additives, already determined to be "generally known or readily ascertainable" as a matter of law, are nevertheless relevant to Plaintiffs' claims for tortious interference with contracts, and therefore admissible at trial. Plaintiffs are wrong, based both on the plain language of the relevant contracts, and clear legal precedent holding that alleged disclosure of generally known or readily ascertainable information cannot support a claim for breach of a confidentiality agreement.

### 1. The Plain Language of the Contracts Protect Only Secret Information, Not Information that is Generally Known or Readily Ascertainable

Alleged disclosure by DeBlandre and Reipa of the generally known or readily ascertainable Business Information and Additives, even if true, would not constitute a breach of their respective confidentiality agreements. The non-disclosure provision in DeBlandre's agreement – which Plaintiffs neglect to provide in their brief – expressly *excludes* information that is or becomes publicly known:

> The Executive shall hold in a fiduciary capacity . . . all secret or confidential information, knowledge or data relating to the Company or the Affiliated Companies, and their respective businesses, which information, knowledge or data shall have been obtained by the Executive during the Executive's employment . . . and *which information, knowledge or data shall not be or become public knowledge* . . . .

Bremer Decl. Ex. 1,§ 9, at 15 (emphasis added). The Business Information and Additives are generally known as a matter of law, and therefore do not come within the scope of DeBlandre's agreement. Moreover, because the DeBlandre agreement does not identify any specific categories of protected information, it must be interpreted to prohibit disclosure only of information that is actually confidential. Readily ascertainable information is not considered "confidential" as a matter of settled law. E.g., Signergy Sign Group, Inc. v. Adam, Nos. A04-70, A04-147, 2004 WL 2711312, at *3 (Minn. Ct. App. Nov. 30, 2004).

Similarly, the Reipa confidentiality provision – which is also omitted from Plaintiffs' brief – only restricts him from divulging "secrets":

> (2) The EMPLOYEE was thoroughly informed and is completely aware that he shall learn of or come across confidential knowledge and business secrets that will particularly concern production methods, chemical formulas, chemical compounds, client information, calculations and price lists, etc. of the COMPANY during his employment relationship with the COMPANY, and he is prepared and committed:
>
> (a) not to divulge ***the secrets*** outlined more specifically in the aforesaid paragraph to other entities, businesses, relevant institutes etc. to his personal

> advantage or to the advantage of others during the duration of his employment relationship with the COMPANY as well as after termination of the same, regardless of the basis for the labor contract termination.

Bremer Decl. Ex. 2, ¶ 2.[4]

Here, the Court has ruled as a matter of law that the ornament customers, historical Business Information and Additives are not "secret," but rather are "generally known or readily ascertainable." Thus, based on the plain language of the contracts alone, any alleged disclosure or use of such information by Reipa would fall outside the scope of the confidentiality provisions at issue, and could not form a basis for a claim for breach of those agreements, much less a claim that Spraylat intentionally induced DeBlandre or Reipa to provide Spraylat with confidential information.[5]

### 2. Disclosure of "Generally Known or Readily Ascertainable" Information Cannot Constitute Breach of a Confidentiality Agreement as a Matter of Law

Even if the DeBlandre and Reipa agreements purported to prevent disclosure of information that is generally known or readily ascertainable – and Spraylat submits that they do not – they would be unenforceable as a matter of law, and could not support Plaintiffs' claim for tortious interference with contracts against Spraylat. Employers are not permitted to restrict employees' post-termination use of non-secret information except through valid non-competition

---

[4] This brief is not intended to, and does not, set forth all of Spraylat's defenses to Plaintiffs' putative claims for tortious interference with contracts, and Spraylat expressly reserves its right to assert and litigate all such defenses whether or not addressed herein.

[5] Although not at issue in this case, it is worth noting that the alleged confidentiality agreements of Kotschenreuther and Luettgens also are limited in scope to information that actually is secret. Kotschenreuther's alleged agreement states that he will not use or disclose Plaintiffs' confidential information "*unless and until it becomes generally known*." Bremer Ex. 3 ¶ 1. The Luettgens contract does not mention "confidential information" at all, protecting only such information as could be considered company trade "secrets," without any further definition of the word "secrets." Id. Ex. 4, ¶ 6.

agreements. No such agreements exist here, and Plaintiffs cannot be permitted to turn DeBlandre's and Reipa's confidentiality agreements into *de facto* covenants not to compete.

Under Minnesota law, "the tort of breach of confidentiality is basically the common law version of misappropriation of trade secrets"; thus, information that does not satisfy the statutory definition of a trade secret also cannot be considered "confidential" for purposes of a claim for breach of a confidentiality agreement. Signergy, 2004 WL 2711312, at *3. The Court of Appeals specifically rejected the plaintiff's claim

> that because [its former employee] signed a confidentiality agreement covering, among other things, customer lists, customer contact information, price lists, pricing information and product and service information, then any use of this information by [the former employee] was a breach of his confidential[ity] agreement.

Id. at *2. Instead, the court held that none of this information, even if so labeled, falls within the ambit of "confidential" information, since all of it could be readily ascertained through legitimate sources. Id. at *3. The court therefore granted judgment to the defendants because "the mere compilation and use of data that is readily known or available does not transform that compilation or use into confidential or trade secret information," and is not actionable either as a claim for misappropriation of trade secrets, or as a claim for breach of a confidentiality agreement. Id.

Thus, under Signergy, any alleged use and/or disclosure of information deemed "generally known or readily ascertainable" as a matter of law cannot be actionable as a breach of Reipa's and DeBlandre's respective confidentiality agreements. Id.; see also Surgidev Corp. v. Eye Tech., Inc., 648 F. Supp. 661, 697 n. 19 (D. Minn. 1986) (holding that, to the extent information "constitutes a trade secret, it may be protected by a valid contractual covenant, *and conversely, to the extent the information is not a trade secret, a contractual covenant which purports to restrict its use is to that extent invalid.*")(emphasis added); Cherne Indus., Inc. v.

Grounds & Assocs., Inc., 278 N.W.2d 81, 90 (Minn. 1979) ("It is commonly recognized that 'matters of general knowledge within the industry may not be classified as trade secrets *or confidential information* entitled to protection.'") (emphasis added) (citation omitted).

Signergy, Surgidev and Cherne recognize that an employee must be permitted to use non-secret information, skills, experience and knowledge he or she gains through employment elsewhere in his or her career. E.g, Jostens, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691, 701-02 (Minn. 1982). "These abilities, to the extent derived from generally known sources, are not considered confidential: a computer programmer, like a real estate salesperson, should be able to ply his trade." Id. Such knowledge is deemed "confidential" only where it "takes on the characteristics of a trade secret." Id. at 702. Absent the existence of a trade secret, or a covenant not to compete, "a former employer may not prevent a former employee from exploiting this kind of knowledge with a new employer." Vigoro, 82 F.3d at 790.

Here, it is undisputed that none of Plaintiffs' former employers is subject to a non-compete agreement, and the Court has ruled as a matter of law that the Business Information and Additives are generally known or readily ascertainable, and thus not trade secrets. Under Minnesota law, Plaintiffs' bid to prevent its former employees from using that information through an overly broad definition of "confidential" must be rejected.[6]

The law of Indiana, which governs DeBlandre's agreement, is in accord with Minnesota law. See Bremer Decl. Ex. 1, § 11 at 16 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana, U.S.A., without reference to principles of conflict of laws."). Under Indiana law, information that is generally known or readily

ascertainable – such as the Business Information and Additives in this case – cannot form the basis for breach of a confidentiality or non-disclosure agreement. Franke v. Honeywell, Inc., 516 N.E.2d 1090, 1093 (Ind. Ct. App. 1987) (court's determination as to whether information constitutes trade secrets controls for purposes of enforcing confidentiality agreement); Ackerman v. Kimball Int'l, Inc., 652 N.E.2d 507, 510 (Ind. 1995) (restrictive covenant must protect trade secrets to be enforceable); Donahue v. Permacel Tape Corp., 234 Ind. 398, 407 127 N.E.2d 235, 239 (1955) (same).

In Franke, the defendants were former employees who had agreed, among other things, not to use or disclose any of the plaintiff's "proprietary information," defined in the contract to include the "identities of current and prospective customers, contract scope, expiration dates, services, prices and bidding and estimating practices." 516 N.E. 2d at 1091-92. The Indiana Court of Appeals overturned an injunction prohibiting defendants from using such information on behalf of themselves and their new employer. Id. at 1093. The Court held that, under Indiana law:

> It is of little importance that [plaintiff] labeled certain information as proprietary, because the law is clear that what constitutes proprietary or trade secret information is a determination for the court to make as a matter of law. For the type of information involved here the threshold factors for the court to consider are the extent to which the information is known by others and the ease by which the information could be duplicated by legitimate means.

Id. Because the information at issue was "readily available from sources unconnected with" plaintiff, the Appellate Court held that the identified information was not confidential or

[6] As discussed below, Plaintiffs do not cite a single case holding that a mere confidentiality agreement, unaccompanied by a non-compete agreement, prohibits an employee from using information that has been determined to be "generally known or readily ascertainable" as a matter of law.

proprietary as a matter of law, and dissolved the trial court's order enjoining defendants from using that information. Id.

Here, Judge Ericksen already has determined as a matter of law that the Business Information is "generally known or readily ascertainable." As such, Plaintiffs cannot restrict their ex-employees' use of the ornament customer names, the historical Business Information or the Additives based on their arbitrary definition of such information as "confidential." Standard Register Co. v. Cleaver, 30 F. Supp. 2d 1084, 1094 (N.D. Ind. 1998) (information regarding costs and pricing, customer identities and other business information was generally known or readily ascertainable, and therefore not confidential for purposes of non-disclosure agreement).

The majority of jurisdictions agree with Minnesota and Indiana that non-trade secret information cannot be restricted by resort to a confidentiality agreement. Many courts simply apply the same analysis to the determination of whether information can be considered "confidential" as they apply to the determination of whether information is a "trade secret." Thus, for these courts, information that is not a "trade secret" is also not "confidential," and disclosure of such information simply is not actionable under either a misappropriation or contract theory. See, e.g., Wright Med. Tech., Inc. v. Grisoni, 135 S.W.3d 561, 588-91 (Tenn. Ct. App. 2002); Unisource Worldwide, Inc. v. Carrara, 244 F. Supp. 2d 977 (C.D. Ill. 2003); Labor Ready, Inc. v. Labor, Nos. 3264, 121759, 2001 WL 1807932, at *1 (Pa. Com. Pl. Jan. 25, 2001); Standard Register, 30 F. Supp. 2d at 1094-95; Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992); Heyer-Jordan & Assocs., Inc. v. Jordan, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990); Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 629-630 (1988).

Other courts reason that a confidentiality agreement that purports to protect non-secret information is an unreasonable restraint on trade and therefore void and unenforceable. See, e.g., Harvey Barnett, Inc. v. Shidler, 143 F. Supp. 2d 1247, 1253-54 (D. Colo. 2001); Hickory Specialties, Inc. v. Forest Flavors Int'l, 26 F. Supp. 2d 1029, 1032 (M.D. Tenn. 1998); Roll Sys., Inc. v. Shupe, No. CIV. A. 97-12689-GAO, 1998 WL 1785455, at *4 (D. Mass. Jan. 22, 1998) (applying California law); Cambridge Filter Corp. v. Int'l Filter Co., 548 F. Supp. 1301, 1306 (D. Nev. 1982); Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324 (9th Cir. 1980); Dynamics Research Corp v. Analytic Scis. Corp., 400 N.E.2d 1274, 1288 (Mass. App. Ct. 1980); Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis.2d 202, 217-18 (1978); North Pac. Lumber Co. v. Moore, 275 Or. 359, 371, 551 P.2d 431, 438 (1976); Thomas v. Best Mfg. Corp., 234 Ga. 787, 788-89 (1975).

Still other courts focus on the pre-emptive effect of the Uniform Trade Secrets Act, holding that the UTSA displaces all common law claims based on misappropriation, even if the information at issue does not qualify as a trade secret. Burbank Grease Services, LLC v. Sokolowski, 693 N.W.2d 89, 100-1 (Wis. Ct. App. 2005) (Wisconsin UTSA preempts all common law claims for use of confidential information that does not rise to the level of a trade secret, noting this to be majority rule); Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943, 948-50 (W.D. Mich. 2003); Savor, Inc. v. FMR Corp., 812 A.2d 894, 898 (Del. 2002); Auto Channel, Inc. v. Speedvision Network, LLC, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001); Frantz v. Johnson, 116 Nev. 455, 465 999 P.2d 351, 357-58 (2000).

Plaintiffs do not cite a single case that supports their argument that a confidentiality agreement, standing alone, can be used to prohibit an employee from using information that has been determined by a court to be "generally known or readily ascertainable." Pls. Br. at 5. In

Eaton Corp. v. Giere, 971 F.2d 136 (8th Cir. 1992), the case on which Plaintiffs primarily rely, the information at issue had *not* been determined to be generally known or readily ascertainable as a matter of law (unlike the Business Information and Additives in this case).

Moreover, the "confidentiality agreement" at issue in Eaton also included a provision vesting ownership of all inventions designed during the term of employment in the employer, and plaintiff offered evidence that defendant had secretly developed a new product and shopped it to one of plaintiffs' customers while still employed by the plaintiff, thus violating the agreement by selling a device that rightfully belonged to plaintiff. Id. at 139 n.5. Indeed, the language cited by Plaintiffs in their brief does not even appear in the section discussing defendant's agreement, but rather in the court's discussion of breach of fiduciary duty, a claim not asserted by Plaintiffs in this case. Id. at 141. Finally, the agreement in Giere did not limit itself to information which was not public knowledge; DeBlandre's and Reipa's, in contrast, at best protect only information which is not public knowledge.

Plaintiffs' citation of Ecolab Inc. v. Paolo, 753 F. Supp. 1100 (E.D.N.Y. 1991), is flat out misleading. In Ecolab, the court granted a preliminary injunction based on breach of a confidentiality agreement only after specifically finding that information disclosed by defendant constituted protectable "trade secrets." Id. at 1112. Plaintiffs cite only to the court's alternative holding (applying the law of New York, a non-UTSA jurisdiction) suggesting that liability could be imposed for *unfair competition* even if the information did not otherwise qualify as a trade secret *if accompanied by the unauthorized physical taking and exploitation of internal company documents*. Id. at 1111. Plaintiffs have no unfair competition claim under Minnesota law, there is no evidence that DeBlandre or Reipa took "physical" documents from Plaintiffs when they left

their employ, and the information at stake has been determined *not* to be trade secrets as a matter of law. Ecolab is thus wholly inapposite, and does not support Plaintiffs' motion.

Structural Dynamics Research Corp v. Eng'g Mechs. Research Corp., 401 F. Supp. 1102, 1114 (E.D. Mich. 1975), the final case Plaintiffs cite for the proposition that a confidentiality agreement may protect disclosure of information that "is not itself a trade secret" also fails to support Plaintiffs' motion. The Structural Dynamics case was decided by the District Court more than twenty years before Michigan's 1998 adoption of the Uniform Trade Secrets Act. In a case decided just two years ago, the District Court held that the UTSA pre-empts common law claims based on alleged disclosure of information that does not rise to the level of a "trade secret":

> Because the purpose of the UTSA is 'to preserve a single tort cause of action under state law for misappropriation . . . and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation,' *allowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA. Thus, '[u]nless [Midwest] misappropriated a (statutory) trade secret, [it] did no legal wrong.'*

Bliss Clearing Niagara, 270 F. Supp. 2d at 949 (W.D. Mich. 2003) (alterations in original) (citations omitted). In the instant case, the Court has determined as a matter of law that any use by Plaintiffs' former employees of the Business Information and Additives would *not* constitute misappropriation of a statutory trade secret; thus under the logic of Bliss Clearing Niagara, those employees "did no legal wrong" with respect to that information, and cannot be determined to have breached their confidentiality agreements.[7]

As discussed above, use or disclosure by Plaintiffs' former employees of the Business Information and the Additives, even if proven, would not constitute a breach of their respective

---

[7] The Bliss Clearing Niagara court permitted the plaintiff's tortious interference claim to proceed because it was not solely based on disclosure of allegedly confidential information, but also depended on alleged misuse of the plaintiff's trademark. Id. at 949-50.

confidentiality agreements, and therefore would not support Plaintiffs' claim for tortious interference with those contracts against Spraylat. Evidence concerning the Business Information and Additives therefore is irrelevant to Plaintiffs' claims and inadmissible at trial.

**B. If Evidence Concerning the Business Information and Additives is Admitted, Spraylat Must Be Permitted to Reference the Summary Judgment Decision**

If the Court permits Plaintiffs to offer evidence concerning the Business Information and Additives at trial, Spraylat must be permitted, in turn, to reference the Court's decision on summary judgment. Otherwise, the effect intended by Judge Ericksen of narrowing the issues and evidence for trial will be defeated, and the jury inevitably will be misled concerning the significance – and lack of significance – of this information.

Partial summary judgment is a pre-trial adjudication "that certain issues shall be deemed established for the trial of the case," and, among other things, "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed. R. Civ. P. 56 advisory committee's note. By her Order, Judge Ericksen has determined as a matter of law that any alleged disclosure or use of the Business Information or Additives by Spraylat cannot constitute a basis for liability under the MUTSA. In their opening statement, Plaintiffs undoubtedly will advise the jury that they are pressing claims for both misappropriation of trade secrets and breach of alleged confidentiality agreements. Plaintiffs intend to proceed to offer extensive evidence during the trial concerning the allegedly confidential nature of the Business Information and Additives. As the jury considers Plaintiffs' arguments and evidence, it must be made to understand that the Business Information and Additive evidence is relevant only to Plaintiffs' claim of tortious interference with contract, and not to Plaintiffs' claim of trade secret misappropriation. See Nutri-Metics Int'l, Inc. v. Carrington Labs., Inc., No. 89-56253, 1992 WL

389246, *2, 4-5 (9th Cir. Dec. 22, 1992) (permitting trial court's ruling on partial summary judgment to be read to the jury, "both during the trial and as part of the instructions").

Waiting until the end of the trial to share this crucial information with the jury, as Plaintiffs suggest, would be too late. If Plaintiffs are permitted to offer evidence at the trial concerning the Business Information – thus requiring Spraylat to offer its own rebuttal evidence – this trial will last at least three weeks. In the meantime, the jury cannot be kept in the dark about the relevance of Plaintiffs' evidence – which could consume the majority of their presentation – to do so would risk jury confusion and severe unfair prejudice to Spraylat.

Given the near-metaphysical distinction Plaintiffs are trying to draw with their claim that the Business Information, though "generally known or readily ascertainable" and thus not a trade secret, is somehow still "confidential" – a concept closely linked with trade secret analysis – there is substantial risk that the jury will conflate the two claims, and base a ruling of trade secret misappropriation in whole or in part on Plaintiffs' evidence concerning the Business Information. That risk will diminish appreciably if Spraylat can direct the jury to Judge Ericksen's decision granting judgment to Spraylat on Plaintiffs' claims for trade secret misappropriation insofar as those claims are based on the Business Information. See Lies v Farrell Lines, Inc., 641 F.2d 765, 769, n.3 (9th Cir. 1981) (noting that partial summary judgment is "intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit").

Use of the Order is equally crucial with respect to the Additives. The Court has determined as a matter of law that all of the individual ingredients contained in Plaintiffs' formulas, including the Additives and their particular uses in mirror formulas, are generally known or readily ascertainable. It is undisputed the Spraylat uses the Additives in its own mirror

solutions formulas. If Plaintiffs are permitted to focus their evidence on the Additives themselves, and their uses in solutions formulas, the jury could mistakenly conclude that the Additives are trade secrets standing alone, and erroneously render a verdict against Spraylat on misappropriation based solely on Spraylat's use of the Additives, without even reaching the actual trade secret issues remaining in the case: whether the combinations of known elements embodied in Plaintiffs' *overall* Formulas are trade secrets, and, if so, whether Spraylat misappropriated those Formulas. To avoid a verdict contrary to Judge Ericksen's ruling, Spraylat must be permitted to inform the jury that the Additives, standing alone, are *not* Plaintiffs' trade secrets, but rather are generally known or readily ascertainable as a matter of law.

Plaintiffs cite to no decision in which a court hid its partial summary judgment from the jury as they suggest here. Instead, Plaintiffs argue that admission of the Order will "waste time," supposedly because it will require "each party to explain the summary judgment proceedings, the affect to be ascribed to the various arguments made during the proceedings, and the affect to be ascribed to this Court's Order based on such arguments." Pls. Br. at 6. Plaintiffs are wrong. Judge Ericksen's ruling is clear, and requires no explanation of any kind: she determined as a matter of law that the Business Information and Additives are generally known or readily ascertainable. The "effect to be ascribed to this Court's Order" is equally clear, and will cause no juror confusion. <u>See</u> Order at 7 ("Defendants are entitled to summary judgment insofar as Plaintiffs' misappropriation claim rests on the identities of the ornament manufactures"); <u>Id</u>. at 8-9 ("Defendants are entitled to summary judgment insofar as Plaintiffs' misappropriation claim rests on their financial information"); <u>Id</u>. at 11-13 (granting summary judgment to Spraylat insofar as Plaintiffs' misappropriation claim rests on use of the Additives). Far from "wasting

time," use of the Order will free Spraylat from having to introduce days' worth of testimony and evidence establishing for the jury what already has been determined by the judge.

Plaintiffs also claim that they will be unfairly prejudiced if the jury is allowed to know about Judge Ericksen's Order. According to Plaintiffs, the jury might be swayed if it knew that the Court "believes" that the Additives and Business Information are not trade secrets. The Court does not have a "belief" as to whether or not this information can be considered trade secrets; *the Court has ruled as a matter of law that it cannot*. There is no question of "swaying" the jury; the issue already has been decided, and the jury must know that in order to avoid being confused about exactly what it is being asked to decide.

**II. PLAINTIFFS' MOTION TO PRECLUDE REFERENCES TO THE LACK OF NON-COMPETE CLAUSES IN VALSPAR'S AGREEMENTS WITH EX-EMPLOYEES SHOULD BE DENIED**

In this suit, Plaintiffs argue that confidentiality agreements executed by certain of their former employees, and/or the law of trade secrets, prevent their former employees from working for defendant Spraylat GmbH. Incredibly, Plaintiffs seek to keep the jury from learning that none of these former employees were bound by enforceable non-competition agreements. Because the absence of non-competition agreements clearly is relevant to Plaintiffs' remaining claims and Defendants' defenses thereto, and because apprising the jury of such facts would in no way be *unfairly* prejudicial, Plaintiffs' motion must be denied.

**INTRODUCTION**

Spraylat GmbH is a German company formed in June 2001. Its employees include Alain DeBlandre, its managing director, Willi Luettgens, its accountant, Gerhard Fischer, a manufacturing employee, Ludwig Kotschenreuther, its Technical Director and Guenther Reipa, its Business Director. Spraylat GmbH is engaged in the manufacture and sale of mirror solutions, in competition with Plaintiff Valspar GmbH. At the time Spraylat GmbH was

organized, Valspar GmbH had a virtual monopoly on the sale of silver solutions in Europe and the other markets at issue. This suit is an effort by Plaintiffs to protect that monopoly. See Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 2, 8-9, dated July 24, 2003 ("SJ Motion").

From 1998 to 2000, DeBlandre was a managing director of Lilly Industries GmbH in Europe with operational oversight for several of its plants and business units. During 2000, Plaintiff Valspar contracted to buy Lilly, and DeBlandre was terminated just before the deal closed in December 2000. DeBlandre was a talented executive with close to twenty years of experience in the coatings industry, and following his termination by Valspar, he contacted a number of potential employers, including Spraylat.

Reipa, Kotschenreuther, Luettgens and Fischer were four of the approximately 45 employees of Lilly Industries GmbH involved (full time or part time) in Lilly's mirror solutions and coatings business in Europe. Like DeBlandre, Fischer and Luettgens were terminated in June 2000 and February 2001, respectively. Kotschenreuther and Reipa lawfully resigned from Plaintiff Valspar GmbH in May 2001 before accepting employment with Spraylat GmbH.

Kotschenreuther and Reipa were extremely talented and valuable employees. Before ever working for Plaintiffs, Kotschenreuther had 13 years of university education and two chemistry degrees, focusing on the very type of chemistry at issue in this case. Reipa had worked in the mirror solutions business as a technical service representative for many years and knew as much about the various customers' manufacturing operations as anyone in Europe.

Significantly, Plaintiffs have admitted for purposes of this action that they believed they were placed at a competitive disadvantage when Kotschenreuther and Reipa resigned and came

to work at Spraylat, *even if there never was any use or disclosure of Plaintiffs' alleged trade secrets or confidential information*.[8] See RFA Response 451.

None of DeBlandre, Kotschenreuther, Luettgens or Fischer ever executed non-compete agreements. After DeBlandre was terminated, Valspar initially sought to obtain a non-compete agreement from DeBlandre, but then failed to pursue it. See Declaration of Alain DeBlandre, dated October 15, 2001, at ¶ 20 (copy attached to the Declaration of Michelle Paninopoulos, dated March 30, 2005 ("Paninopoulos Decl.") as Ex. E). Reipa did allegedly execute a non-compete agreement in 1981 with a company called London Laboratories, but Plaintiffs have conceded it to be unenforceable under German law. See RFA Responses 636; Transcript of Deposition of Michael Seidler, dated June 19, 2002, at 182-83 (copy attached to Paninopoulos Decl. as Ex. F).

Thus, none of the employees hired by Spraylat GmbH had any legal proscription preventing them from working for Spraylat GmbH. Nonetheless, throughout this case, Plaintiffs have contended that Defendants acted improperly merely in hiring these employees. For example, in their complaint Plaintiffs allege that "Spraylat's wrongful conduct includes systematically recruiting away Lilly/Valspar employees" in order to obtain Plaintiffs' trade secrets. Second Amended Cmplt ¶ 13. Likewise, in their summary judgment papers, Plaintiffs asserted that Defendants executed a plan to "steal" Valspar's European mirror solutions business by hiring away their "key employees." See Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment, dated July 24, 2003, at 1.

[8] Relevant excerpts of Plaintiffs' Supplemental Responses to Re-Service of Defendants' First Set of Requests for Admissions, dated February 12, 2003 ("RFA Responses") are annexed to the Paninopoulos Decl. as Ex. D.

Following Judge Erickson's summary judgment ruling, Plaintiffs are left with the following basic claims: (1) that Spraylat GmbH's solutions formulas, developed by Kotschenreuther, misappropriate the combinations of known elements embodied in Plaintiffs' solutions formulas, and (2) that Defendants tortiously induced DeBlandre and Reipa to breach their confidentiality agreements and disclose confidential information.

Based on these claims, Plaintiffs contend that DeBlandre and Reipa are effectively unemployable by a competitor. In their responses to Defendants' Requests for Admission, Plaintiffs expressly claim that DeBlandre and Reipa's confidentiality agreements forbid them from competing with Valspar GmbH.

> **Request:** Admit that Guenther Reipa was not subject to any binding *non-competition* agreement.
>
> **Response:** Denied to the extent that Guenther Reipa was subject to an agreement pursuant to which he would not improperly use or disclose Valspar trade secret and confidential information.

RFA Responses 455 (emphasis added) and 456 (same request and response with respect to DeBlandre). Thus, although Plaintiffs concede that neither DeBlandre nor Reipa is subject to any valid non-compete agreement, Plaintiffs assert that their confidentiality provisions have the effect of a "binding non-competition agreement." Indeed, in their complaint, Plaintiffs seek an order permanently enjoining Defendants from employing DeBlandre and Reipa. Second Amended Cmplt. at p 14.

Defendants have argued, and continue to believe, that Plaintiffs brought this case simply to harass and box out a new competitor who they feared would take market share from them. For example, in a panicked e-mail between two of Plaintiffs' executives sent less than three weeks before this suit was brought, the establishment of Spraylat GmbH was termed a "scary situation", not because of any potential use of Plaintiffs' trade secrets but solely because, in the

author's view, Spraylat now had more qualified employees than Plaintiffs. See SJ Motion at 1, 8-9. Defendants steadfastly maintain they did nothing wrong, much less tortious, in offering any of Plaintiffs' former employees work, and contend that Plaintiffs have taken an unsupportable, over-expansive view of the law of trade secrets and their alleged confidentiality agreements in order to create ex-post facto non-compete agreements.

**A. The Absence of Non-Competition Agreements Is Relevant**

Plaintiffs contend that the absence of non-competes is not relevant. Plaintiffs are wrong. The recitation above of the parties' positions and themes alone indicates the obvious relevance of the fact that none of Plaintiffs' former employees executed non-compete agreements. Defendants must be permitted to apprise the jury of such facts.

Plaintiffs have taken an extremely broad view of the type of information which DeBlandre and Reipa may not use or disclose following the termination of their employment. Plaintiffs contend the alleged confidentiality agreements signed by DeBlandre and Reipa prevent their use of information which is generally known or readily ascertainable. In fact, as noted earlier, Plaintiffs expressly take the position that the alleged confidentiality agreements signed by Reipa and DeBlandre are so broad as to operate as non-competes. RFA Responses 455-56.

As such, Plaintiffs are clearly seeking to obtain a property right in their ex-employees' talent and experience. Given that, Defendants must be free to inform the jury of the different types of agreements employers might seek from their employees, and the fact that Plaintiffs have no non-competition agreements with any of Defendants' employees.

In fact, it may not be intuitive to jurors that the law of Minnesota favors the freedom of employees to join or form competing businesses, absent appropriate restrictive covenants. E.g., E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1112-13 (8th Cir. 1969). If Defendants

are precluded from apprising the jury of the different types of employment agreements, there is a grave danger that the jury might believe that confidentiality agreements are *the only* types of agreements available to employers, and be led improperly to construe such agreements as necessary for the protection of Plaintiffs against competition by former employees. Clearly, the jury should not be permitted to confuse the lawful scope and objectives of these two different types of agreements.

Similarly, in evaluating the merits of Plaintiffs' remaining trade secret claim, the jury must be allowed to consider whether Plaintiffs' formulas truly constitute trade secrets and whether Spraylat's formulas constitute misappropriation, or whether Plaintiffs simply are using this action to try to compensate for their failure to bargain for and obtain non-competition agreements with their former employees. E.g., Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 900 (Minn. 1983). In Minnesota, employees' talent, industry knowledge, and experience may only be protected by a properly drawn non-compete agreement, and the cases make clear that the law of trade secrets *cannot be used* to render a company's employees "unemployable in the field of their experience should they decide to resign." Bliss, 408 F.2d at 1112-13.[9]

In essence, non-competition agreements pick up where the law of trade secrets leaves off, *and to draw this line* the jury must be advised of the role of non-compete agreements and the fact that none exist here. See generally Vigoro, 82 F. 3d at 790 ("*Absent an enforceable covenant not to compete,* a former employer may not prevent a former employee from exploiting this kind of

---

[9] "Th[e] protection given to trade secrets is a shield, sanctioned by the courts, for the preservation of trust in confidential relationships; it is not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience should they decide to resign. This shield is not a substitute for an agreement by the employee not to compete with his employer after the termination of employment." Bliss, 408 F.2d at 1112-13.

knowledge [sales experience and knowledge of local customers] with a new employer") (emphasis supplied); Electro-Craft, 332 N.W.2d at 901 (listing trade secret law, restrictive covenants and patents as the means by which employers can protect information).

Defendants must be permitted to apprise the jury of the absence of non-competes for additional reasons. From the first days of this case, Plaintiffs have contended that Defendants acted improperly merely by hiring these employees, and that by hiring five of Plaintiffs' ex-employees – three of whom Plaintiffs fired – Defendants conspired to "steal" Plaintiffs' European mirror solutions business. Defendants have no reason to believe Plaintiffs will cease making such inflammatory (and false) accusations at trial. As such, Defendants must be free to respond and tell the jury that none of these employees had restrictive covenants and that Defendants did nothing wrong in extending offers of employment to any or all of them.

Finally, Plaintiffs' tortious interference claim puts Defendants' internal state of mind and motives at issue. For example, Plaintiffs' tortious interference claims require proof of, *inter alia*, a breach of an enforceable confidentiality agreement, defendants' *intentional procurement of such breach*, and the absence of *justification*. Order at 14. Here, Defendants had every legal right to establish a competing business in Europe, and when DeBlandre was offered a job in April 2001 (more than four months after Lilly fired him), DeBlandre had no non-compete, and Spraylat knew he had no non-compete. Such knowledge is clearly relevant in judging Defendants' *intent and justification* in hiring him to direct the operations of Spraylat GmbH.

**B. The Absence of Non-Competes is Not Unduly Prejudicial**

In the alternative, Plaintiffs seek the exclusion of this evidence under Fed. R. Evid. 403. The sole ground Plaintiffs urge is purported jury confusion. See Plaintiffs' Memorandum of Law in Support of its Motion in Limine to Preclude Reference to Any Purported Lack of Non-

Compete Clauses in Valspar's Employment Contracts with Former Employees at 6-7. Specifically, Plaintiffs argue that "the distinction between non-competition clauses and confidentiality agreements will not be apparent to jurors."

Plaintiffs' dim view of the jurors' intelligence is unwarranted. With the aid of counsel and the Court, the jury will easily understand the different types of agreements employers may seek from employees. Indeed, Plaintiffs expect the jury in this case to understand and apply concepts concerning the chemistry of electroless deposition of metals in determining whether Plaintiffs' formulas are trade secrets, and whether Defendants' formulas constitute misappropriation. To suggest, as Plaintiffs do, that this same jury will not understand and not be able to judge the differences between a promise not to compete, and a promise not to use or disclose secret information, is disingenuous at best.

Plaintiffs cite no cases (from Minnesota or elsewhere) holding that a jury should not be told in a trade secret/tortious interference case that the subject employees did not execute non-competition agreements. As set forth above, evidence that non-compete agreements were not executed in this case is relevant and not prejudicial and should be permitted at trial.

## III. PLAINTIFFS' MOTION TO PRECLUDE REFERENCE TO TESTIMONY, EVIDENCE, OR ARGUMENT CONCERNING FACTS FORMING THE BASIS OF PLAINTIFFS' DISMISSED CLAIM FOR CONVERSION

By its motion, Plaintiffs seek to preclude all evidence relating to (1) its now-dismissed claim for conversion, and (2) the trespassing of four Valspar employees on Spraylat property, all in an effort to scout out the competition. While Defendants are willing to agree not to reference Plaintiffs' assertion of the conversion claim and the subsequent dismissal of the claim, the Valspar employees' trespassing onto Spraylat property to ascertain the progress of their new competitor is plainly relevant to Plaintiffs' motivation in bringing this action against Spraylat and

should be presented to the jury. Therefore, Plaintiffs' motion to exclude this evidence should be denied.

In their Complaint, Plaintiffs alleged that Defendants "converted" certain tangible equipment, including some mixing bowls, microscopes and pallets which allegedly were missing from Valspar's former manufacturing facility in Wallenfels, Germany. The purported basis for Valspar's claim were certain photographs taken by Valspar employees through the window of Spraylat GmbH's new production facility in Wallenfels, which supposedly showed that Spraylat had in its possession the missing manufacturing equipment.

According to Valspar's own testimony, Valspar employees Rainer Wingensiefen, Michael Seidler and Dieter Schneiders, accompanied by Mr. Behrschmidt, Jr. (a business associate of Valspar in Germany), visited the Spraylat GmbH facility in June 2001. See Transcript of Deposition of Dieter Schneiders, dated June 18, 2002 ("Schneiders Tr."), at 159-60 (copy attached to the Paninopoulos Decl. as Ex. G). Standing on top of a garbage can on Spraylat property, Mr. Behrschmidt and Mr. Wingensiefen apparently took photos through the window of the facility of the allegedly converted equipment. See Transcript of Deposition of Rainer Wingensiefen, dated June 21, 2002, at 170-71 (copy attached to the Paninopoulos Decl. as Ex. H). However, as testified to by Valspar's Business Director Europe Dieter Schneiders, Valspar's true motivation for the trip was to ascertain the progress made by its new competitor in the market, Spraylat. Schneiders Tr. 166-67, 172-73.

Other than the aforementioned grainy photos, Plaintiffs were unable to provide any other proof that the items they photographed were either owned by Valspar or "converted" by Spraylat. Defendants, on the other hand, had invoices proving that they had lawfully purchased the identified equipment. Unsurprisingly, the Court ruled in favor of Spraylat in its March 31, 2004

decision, finding that "Plaintiffs' reliance on conclusory allegations [was] insufficient to avoid summary judgment." Order at 17.

While Defendants agree that evidence solely relating to Plaintiffs' now-dismissed conversion claim is inadmissible, Defendants do oppose a blanket preclusion of the facts mentioned in Valspar's motion, specifically, the Valspar employees' trespassing onto Spraylat property ostensibly to photograph the equipment in the Spraylat facility. Contrary to Plaintiffs' assertion that any evidence or argument relating to their conversion claim is irrelevant, Plaintiffs' actions in "investigating" the bases for their claim is directly relevant to this case.

As Spraylat has contended repeatedly in this case, this lawsuit is a response by Valspar to what they perceived to be a serious competitive threat by Spraylat, due in part to its hiring of Guenther Reipa and Ludwig Kotschenreuther. At the time Spraylat GmbH was established, Valspar enjoyed a near monopoly of the European market. The hiring of Reipa and Kotschenreuther set off alarm bells and put Valspar GmbH at a severe competitive disadvantage that threatened its monopoly position. Seidler Tr. 209; RFA Responses 451; see also supra at 24.

Against this backdrop, the desperation that drove Valspar's employees to conduct their clandestine mission onto Spraylat property becomes clear. Already reeling from the loss of Reipa and Kotschenreuther, Valspar was so concerned about its new competitor that its officers and employees were willing to trespass onto Spraylat private property, climb onto a garbage can, and take photographs through the window to see what progress their new competitor had made. Indeed, Valspar's European Business Director for Glass Coatings and Solutions himself, Dieter Schneiders, admitted during his deposition that *this* was his motivation for the trip, *not* the allegedly converted equipment:

Q: Did Mr. Behrschmidt put the camera up next to the window to take these photographs?

A: I can't tell you how it all happened in great detail because, quite honestly, because, for me, it was far more important to …[t]o see something that could have been of interest to me, just to be quite honest, to see the size of the whole, and how far one is in readiness to produce, to manufacture.

* * *

Q: Okay. On the visit you were interested to find out how close Spraylat was to being able to begin manufacturing?

A: Yes, that is true.

Q: Why were you interested in that?

A: One is interested because one's future competitor is of interest. One has to reckon with them.

Q: …what do you mean, one has to reckon with them?....

A: The point in time is, when…the competition can produce and when the competition is capable of satisfying the needs of the market.

Q: And that was your major concern on the visit?...

A: This is everything that was interesting and important.

Schneiders Tr. 166-67, 172-73.

Throughout this litigation, Defendants have contended that Plaintiffs' motivation for bringing this lawsuit had nothing to do with the purported misappropriation of trade secrets and everything to do with stamping out the competition. Valspar's trespassing and cloak-and-dagger tactics, which demonstrate just how far Plaintiffs are willing to go to combat a new competitive threat, offer further support for Spraylat's view of the case, and should not be kept from the jury.

## IV. RESPONSE TO PLAINTIFFS' MOTION IN LIMINE CONCERNING GERMAN CRIMINAL INVESTIGATION

In 2001 Plaintiffs asked the local German prosecutor to conduct a criminal investigation into the alleged actions of certain of their former employees undertaken between March and July, 2001. Significantly, neither of the actual Defendants in this case, Spraylat Corp. and Spraylat GmbH, is a subject of that or any other investigation.

The prosecutor's investigation included, *inter alia*, the seizure of various documents from the employees and Defendant Spraylat GmbH, and the receipt of various submissions from

counsel to Valspar and counsel to the subject employees. Three and one-half years later, however, that investigation has resulted in no charges of any kind, and according to Plaintiffs themselves, the German prosecutor has decided not to pursue any charges whatsoever against Ludwig Kotschenreuther or Guenther Reipa.

Defendants timely filed a motion in limine to preclude all references to the German investigation.[10] Plaintiffs have filed a somewhat narrower motion in which they seek to preclude Defendants from referring to the fact that the German prosecutor has brought no charges of any kind, while purporting to reserve the right to tell the jury of the existence of the investigation itself.

Defendants oppose Plaintiffs' motion to the extent it is narrower than Defendants' motion. Both sides should be precluded from referring to any matter concerning the German investigation in front of the jury. If, as Plaintiffs maintain, a prosecutor's forbearance from pressing charges is not admissible, the same must hold true for the prosecutor's willingness to undertake an investigation in the first place. Conversely, if Plaintiffs are permitted to disclose the fact of the investigation to the jury, Defendants must be free to tell the jury, *inter alia*, what has and has not come of it and that neither Defendant has ever been the subject of any investigation.

In a footnote to their brief, Plaintiffs mention the potential need for them to refer to the investigation in order to authenticate certain documents allegedly obtained by the prosecutor from their former employees. Plaintiffs have since provided Defendants with a list of the subject documents, and as part of the parties' good faith pre-trial discussions concerning proposed

---

[10] Spraylat incorporates herein by reference the portions of its Third Omnibus Motion in Limine, dated March 4, 2005, concerning the German criminal investigation.

exhibits, Defendants, while reserving all rights to object to the relevance or admissibility of such documents, will endeavor to alert Plaintiffs if there is any disagreement about where the documents were found.

However, even if there is a dispute about such documents, it will in no way prevent the granting of Defendants' broader motion. Assuming, *arguendo*, there is a dispute and Plaintiffs seek to prove a documents' authenticity by reference to its alleged seizure during the criminal investigation, matters respecting the admissibility of documents and other evidence are for *the Court* to decide, not the jury, and the Court can receive the alleged foundation evidence outside the presence of the jury. See Fed Rule Evid. 104(a),(c). In that way, the Court can determine the admissibility of the documents without apprising the jury of the investigation, something both sides apparently desire.

## V. RESPONSE TO PLAINTIFFS' MOTION TO PRECLUDE QUESTIONS THAT WOULD LEAD TO INVOCATION OF PRIVILEGE BY WITNESSES

Plaintiffs' final motion in limine seeks to bar Defendants from asking questions of Plaintiffs' officers or employees that would lead to the assertion of an objection based on attorney-client privilege, and/or from submitting deposition excerpts in which Plaintiffs' counsel invoked such privilege.

Provided such a bar is reciprocal, Defendants do not oppose this request. In other words, Plaintiffs also should be forbidden from asking questions of Defendants' witnesses that would lead to the assertion of a privilege objection, or refer to deposition testimony in which such an objection was made. Of course, to the extent Plaintiffs seek to offer evidence on a matter they declined to answer during discovery, Defendants must be free to object to such testimony and/or offer into evidence their prior refusal to provide such information.

The one exception with respect to the bar on asking Defendants' witnesses such questions would be in the context of a *separate* evidentiary hearing concerning Plaintiffs' claims for punitive damages under Minn. Stat. Ann. 549.20 and/or enhanced damages under Minn. Stat. Ann. 325C.03(b). See Minn. Stat. Ann. 549.20, subd. 4 (on the request of any party, a hearing on punitive damages shall be bifurcated from liability, and evidence relevant only to punitive damages will only be admissible in the separate hearing). To the extent such a hearing ever becomes necessary and Defendants choose to waive their attorney-client privilege by offering evidence in support of their reliance on the advice of counsel defense, Plaintiffs would be permitted to ask appropriate questions on cross examination concerning Defendants' legal advice.

**CONCLUSION**

For all the foregoing reasons, Spraylat respectfully requests that the Court enter an order denying Plaintiffs' motions in limine, and grant such other and further relief as the Court deems just and proper.

Dated: March 30, 2005

**FAEGRE & BENSON LLP**

By: /s Michelle Paninopoulos

Kenneth A. Liebman, #90438
John Edward Connelly, #237656
Michelle A. Paninopoulos, #312411
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

-and-

David M. Zensky (DZ 5913)
Mitchell P. Hurley (MH 0740)
Blossom Kan (BK 6617)
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
590 Madison Avenue, 42nd Floor
New York, New York 10022-4616

***Attorneys for Defendants Spraylat Corporation and Spraylat GmbH***