UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| The Valspar Corporation,<br>Valspar Sourcing, Inc., and<br>Valspar Industries GmbH,<br><br>Plaintiffs,<br><br>v.<br><br>Spraylat Corporation and Spraylat GmbH,<br><br>Defendants. | Civil Action No. 01-CV-1605 JEL/JGL |

**VALSPAR'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR LEAVE TO AMEND THE COMPLAINT TO CLAIM PUNITIVE DAMAGES**

# TABLE OF CONTENTS

PAGE


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Summary of the Parties and the Dispute ..... 2

B. Spraylat's Purchase of Valspar's U.S.-Only Mirror Business Whet Its Appetite for a European Business ..... 2

C. Contemporaneous With Its Purchase of Hilemn, Spraylat Began Plotting to Steal Valspar's European Mirror Business ..... 3

1. DeBlandre Improperly Disclosed to Spraylat a European Mirror Business Plan That Was Based on Valspar Information ..... 4

2. Deblandre Improperly Gave Spraylat a Complete Financial Analysis Using Information Obtained From an Insider At Valspar ..... 5

a. The Financials Were Based on Lilly Data ..... 5

b. The Financials Were Invaluable to Spraylat ..... 9

c. Spraylat Knew It Was Using Valspar's Confidential Financial Information ..... 10

D. Spraylat Was Able to Enter the European Market Almost Immediately By Using Valspar's Trade Secret Mirror Solution Formulas ..... 12

1. Valspar's Trade Secret Mirror Solution Formulas ..... 12

2. Spraylat Entered the European Market Using Valspar's Formulas ..... 13

3. Spraylat's Misappropriation of Valspar's Mirror Solution Formulas Was Knowing and Intentional ..... 15

E. Spraylat Has Continued to Try to Hide Its Wrongful Conduct In the Course of this Lawsuit ..... 17

III. DISCUSSION ........ 19

A. The Legal Standard for the Motion for Leave to Plead Punitive Damages ........ 19

B. Valspar Has Presneted a *Prima Facie* Case Sufficient to Seek Punitive Damages With Respect to Several Counts Of The Complaint ........ 21

1. Valspar Is Entitled to Puntive Damages On Its Claim For Tortious Interference with Contracts, Tortious Interference with Business Relations, and Unfair Competition ........ 21

2. Valspar is Also Entitled to Exemplary Damages On Its Trade Secret Misappropriation Claim ........ 22

C. Leave Should Be Granted To Amend the Complaint At This Time ........ 23

IV. CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Abbett v. County of St. Louis,
474 N.W.2d 431 (Minn. Ct. App. 1991) ........ 21

Bunker v. Meshbesher,
147 F.3d 691 (8th Cir. 1998) ........ 20

Goewey v. United States,
886 F. Supp. 1268 (D.S.C. 1995) ........ 24

Hern v. Bankers Life Casualty Co.,
133 F. Supp. 1130 (D. Minn. 2001) ........ 21

Kay v. Peter Motor Co. Inc.,
483 N.W.2d 481 (Minn. Ct. App. 1992) ........ 20

Malt-O-Meal Company v. MRM Communications, Inc., et al.,
Civil No. 3-96CV-1014 ........ 23

Marcum v. Zimmer,
163 F.R.D. 250 (S.D.W.Va. 1995) ........ 24

McKenzie v. Northern States Power Co.,
440 N.W.2d 183 (Minn. Ct. App. 1989) ........ 20

Moore v. Columbia Pictures Industries, Inc.
1990 U.S. Dist. LEXIS 15197 at *7 ........ 21

Mrozka v. Archdiocese of St. Paul & Minneapolis,
482 N.W.2d 806 (Minn. Ct. App. 1992) ........ 20

Northwest Airlines, Inc. v. American Airlines, Inc.,
870 F. Supp. 1499 (D. Minn. 1994) ........ 21

Olson v. Snap-On, Inc.
29 F. Supp.2d 1027 (D. Minn. 1998) ........ 19

Swanlund v. Shimano Ind. Corp., Ltd.,
459 N.W.2d 151 (Minn. Ct. App. 1990) ........ 20, 21

Thompson-El v. Jones,
876 F.2d 66 (8th Cir. 1989) .......... 24

Ulrich v. City of Crosby,
848 F. Supp. 861 (D. Minn. 1994) .......... 19, 20

Zawels v. Edutronics, Inc.,
520 N.W.2d 520 (Minn. App. 1994) .......... 22

**STATUTES**

Minn. Stat. § 325C .......... 12, 22, 23
Minn. Stat. § 549.191 (1994) .......... 19, 20, 21, 22
Minn. Stat. § 549.20 (1994) .......... 19, 20, 22

**OTHER**

Fed. R. Civ. P. 16(b) .......... 24
Fed. R. Civ. P. 50(a) .......... 21

Black's Law Dictionary
1190 (6th ed. 1990) .......... 20

Minnesota Uniform Trade Secret Act .......... 12

## I. INTRODUCTION

In this case, Defendants (collectively "Spraylat") crafted and executed a plan to steal a business from Plaintiffs (collectively "Valspar") using Valspar's trade secrets and confidential information. Spraylat's plan involved hiring virtually all of Valspar's employees in the targeted business area. Although they knew that these employees were under an obligation of confidentiality to Valspar, Spraylat nonetheless sought valuable and proprietary information from these employees regarding both financial and technical aspects of Valspar's business. Using this information, Spraylat almost immediately established a business selling products having virtually identical chemical formulas to Valspar's trade secret formulas.

Some of the information stolen by Spraylat was solicited from at least one of the former employees while he was still employed by Valspar. When it became evident that the employee was leaving behind evidence of Spraylat's wrongful activity, Spraylat instructed the employee to destroy the evidence. Spraylat also carefully crafted its documents to hide its use of Valspar's trade secrets. Spraylat has continued its deception in this lawsuit by its knowing failure to produce key documents and misstatements to this Court regarding its theft from Valspar.

Minnesota law permits a party to amend its pleading to assert punitive damages based on a *prima facie* showing that the defendant acted with deliberate disregard for the rights of others. Discovery in this case shows that Spraylat's conduct easily meets this threshold. Valspar's motion for leave to amend should be granted.

## II. BACKGROUND

### A. Summary of the Parties and the Dispute

Valspar is a coatings manufacturer headquartered in Minneapolis, Minnesota. Valspar has been developing and selling coatings and solutions for a wide variety of substrates for close to 200 years. Spraylat Corp. is also a manufacturer of coatings, and is headquartered in Mount Vernon, New York. Spraylat GmbH is a wholly-owned subsidiary of Spraylat Corp. headquartered in Germany.

The essence of the case is that Spraylat stole a European coating business from Valspar. The business was the manufacturing and sale of special silver solutions and paints, generally called mirror coatings. These mirror coatings are sold to customers in Europe and elsewhere, who then apply the coating to glass in order to make mirrors. In its Complaint, Valspar has asserted counts for tortious interference with contracts, misappropriation of trade secrets, conversion, tortious interference with business relations, and unfair competition.

### B. Spraylat's Purchase of Valspar's U.S.-Only Mirror Business Whet Its Appetite for a European Business

In 2000, Valspar signed an agreement to purchase another coatings company called Lilly Industries Inc., effective in December of 2000. At that time, Valspar already owned a mirror coating company in the United States called Hilemn. Lilly also had a substantial mirror coatings business. As a condition for approving Valspar's purchase of Lilly, the Federal Trade Commission required that Valspar divest itself of either the Hilemn business or the Lilly mirror coating business in the United States. See Declaration of Brian Hayes, Ex. 5. Lilly had both U.S. and European operations and customers; Hilemn operated only within the United States. Declaration of Michael Seidler, ¶ 3. Previously, Valspar had tried to sell Hilemn's mirror solutions in Europe through another Valspar subsidiary, but had met with very little commercial

success. Id. ¶ 4. Valspar decided it wanted to keep the Lilly business and sell the Hilemn business. Id., ¶ 5. In late 2000, Valspar hired a business broker to assist in the sale of Hilemn, and Spraylat was one of the companies contacted.

Spraylat was not in the mirror coating business. However, Spraylat's President, Ray Chlodney, had previously worked for Lilly, and as he knew the value of the Lilly mirror coating business he was in favor of the purchase. Chlodney Dep., p. 72[1]. Accordingly, Spraylat signed an agreement in late 2000 to purchase Hilemn effective January of 2001.

### C. Contemporaneous With Its Purchase of Hilemn, Spraylat Began Plotting to Steal Valspar's European Mirror Business

Lilly's general manager of European operations was Alain DeBlandre. DeBlandre Dep., pp. 33, 35, 36. He was in charge of Lilly's European mirror coatings business. Id., p. 36. DeBlandre was not offered a position at Valspar in late 2000 as Valspar prepared to take over Lilly. Id., p. 110-111. DeBlandre therefore exercised his Lilly "Golden Parachute" agreement that required Valspar to pay him approximately $1.1 million Canadian dollars as part of his severance package. Id., pp. 75-79; Hayes Decl., Ex. 6. DeBlandre's agreement obligated him to "hold in a fiduciary capacity … all secret or confidential information, knowledge or data relating to the Company …which … shall have been obtained by the Executive during the Executive's employment …." It also obligated him to "not … communicate or divulge any such information, knowledge or data …" after the termination of his employment. Hayes Decl., Ex. 6, Section 9. However, despite taking advantage of his Golden Parachute, and in violation his confidentiality obligations under the agreement, DeBlandre orchestrated the theft of confidential financial and technical information, and assisted Spraylat's take-over of the Lilly European business from Valspar.

---

[1] Deposition testimony cited herein will be cited by witness name, i.e., "Chlodney Dep., p. ___." Copies of the cited pages of deposition testimony are attached to the Hayes Declaration, filed herewith.

Chlodney and DeBlandre had worked together at Lilly, and they were friends. Chlodney Dep., pp. 48-50. The same day DeBlandre received written notice he would not be retained by Valspar, December 12, 2000, he called and wrote to his friend Chlodney. Chlodney Dep., pp. 82-84; Hayes Decl., Ex. 7. From his experience at Lilly, Chlodney knew that Lilly employees had non-disclosure agreements, Chlodney Dep., pp. 26-27, and DeBlandre sent Chlodney a copy of his change of control agreement containing a non-disclosure clause. Chlodney Dep., pp. 26-27, 83. Chlodney gave the agreement to the company lawyer, Bill Borner. Id., p. 87. Therefore, from the time DeBlandre first contacted Spraylat, Spraylat management knew that Lilly/Valspar people had non-disclosure agreements.

1. **DeBlandre Improperly Disclosed to Spraylat a European Mirror Business Plan That Was Based on Valspar Information**

Spraylat's president, Chlodney, and the company CEO, Michael Borner, went to Brussels to meet with DeBlandre in early February of 2001 to discuss the European mirror coating business. Prior to the meeting, DeBlandre prepared a three-page business plan based on Valspar confidential business information. See Hayes Decl., Ex. 8. He gave a copy to Chlodney and Borner during their meeting in Brussels. They went over the document, item by item, over a couple of hours. Chlodney Dep., pp. 90-92.

The business plan prepared by DeBlandre was full of confidential business information that DeBlandre knew from his employment at Lilly. In the plan, DeBlandre stated Valspar's approximate sales in Europe and elsewhere. Hayes Decl., Ex. 8. DeBlandre told Spraylat which parts of Valspar's operation were the most lucrative, describing Valspar's Christmas ornaments business as "the butter" and "the most profitable and vulnerable market for Valspar." Id. DeBlandre also described a plan for teaming with a key customer to supply that customer with solutions and encourage the customer to assert a patent against Valspar. Id.

DeBlandre also identified the key employees Spraylat would need to hire. Hayes Decl., Ex. 8. DeBlandre characterized the employees that knew the Valspar formulas as "brilliant people." Id. DeBlandre had inside Valspar information that these two persons, Kotschenreuther and Reipa, were ripe for hiring; DeBlandre's earlier decision to close the Lilly production facility where these employees worked had made them unnecessarily insecure about their jobs. M. Borner Dep., pp. 134-37; DeBlandre's plan noted that hiring them would have the added advantage of hurting Valspar. His plan stated: "Valspar will struggle without them--double hit." Hayes Decl., Ex. 8. Five days later, DeBlandre wrote and confirmed that he could get the two key people and that he had talked to the key customer. Id., Ex. 9.

This information was previously unknown to Spraylat, and Chlodney characterized it as "very promising." See Chlodney Dep., pp. 98-101, 106-07; Hayes Decl., Ex. 10. DeBlandre confirmed the confidentiality of the information when he advised that the information should be kept confidential and secret and limited to a closed group at Spraylat. Chlodney Dep., pp. 102-03.

The Spraylat executives must have been ecstatic. They had just paid Valspar $7 Million for Valspar's U.S. business, and now DeBlandre was laying out a plan to acquire the core of Lilly's European business for nothing. After the meeting, Mr. Borner wrote DeBlandre saying, "we are at a unique moment in time ... to do great things together." Hayes Decl., Ex. 11.

### 2. DeBlandre Improperly Gave Spraylat a Complete Financial Analysis Using Information Obtained From an Insider At Valspar

#### a. The Financials Were Based on Lilly Data

Following the Brussels meeting with Chlodney and Borner, DeBlandre prepared a detailed, two-part financial projection. The first part was a profit and loss analysis, detailing how much money the European mirror operation would make each year for the next five years.

Chlodney Dep., p. 113. The second part was a cash flow analysis detailing how much money the business would require from Spraylat for each year.

This financial projection was based on fact, not speculation. DeBlandre had been the general manager, so he knew Lilly's financial information. However, Spraylat wanted very accurate information for the bottom line profit picture as well as items such as the manufacturing costs, sales costs and administrative costs. M. Borner Dep., pp. 163-65, 181. To accomplish this, DeBlandre induced Valspar's financial controller, Willi Luettgens, to obtain the necessary information for him.

In early March, 2001, while Luettgens was still working for Valspar, DeBlandre asked Luettgens to draft a profit and loss analysis ("P&L") for Spraylat's planned new business. DeBlandre Dep., pp. 176-181. DeBlandre directed Luettgens to use specific Valspar business information. For example, to calculate Spraylat's manufacturing costs, DeBlandre told Luettgens to "use Eschweiler Mfg cost."[2] Hayes Decl., Ex. 12, p. 3. For sales prices to specific customers, DeBlandre told Luettgens to "use prices for last coatings shipment." Id. For employee costs, DeBlandre identified the Valspar employees he wanted to hire and told Luettgens to "use Y2001 salaries." Id.

As requested, Luettgens provided absolutely accurate data, straight out of Valspar company computers. On March 13, 2001, Luettgens sent to DeBlandre a sales forecast that contained detailed financial information for specific Valspar customers DeBlandre planned to target, including the 2000 Lilly sales of mirror solutions and coatings products, pricing, cost and profit financial information. Seidler Decl., Ex. 1. In many instances, the data was copied *exactly* as it was stated on confidential Valspar sales and financial documents. Seidler Decl., ¶ 7.

---

[2] Eschweiler is the name of the town in Germany where Valspar's predecessor, Lilly, manufactured its mirror coatings.

Incredibly, along with this data Luettgens even included the internal Valspar customer number corresponding to each customer's purchases. Id. Luettgens testified that, other than the German "social cost" and the way to lay out a spreadsheet, all of the financial information came strictly from Valspar. Luettgens Dep., pp. 98-100, 105-09.

Using the information provided by Luettgens, DeBlandre prepared a six-page, profit and loss analysis ("the DeBlandre P&L"), which he sent to Spraylat on March 20, 2001. Hayes Decl., Ex. 13. The DeBlandre P&L detailed the following financial information:

1) the selection of specific Valspar customers that Spraylat would target, Chlodney Dep., pp. 128;
2) the volume of product purchased by each customer, Chlodney Dep., p. 128;
3) the plan to sell product at a set price under Valspar's price, Chlodney Dep. p. 129;
4) the market share of the Valspar volume at each customer that Spraylat would take from Valspar on a yearly basis for the next five years, Chlodney Dep., p. 128-29;
5) the cost of raw materials, the cost of labor, the manufacturing cost, the freight cost, the selling expenses, and the administrative expenses for the amount of business that Spraylat would take from Valspar on a yearly basis over the next five years, Chlodney Dep., pp. 129-30;
6) the Valspar people to hire and their projected salaries at Spraylat, Chlodney Dep., p. 125; and
7) the projected profit on a yearly basis for the next five years. Chlodney Dep., pp. 124-25.

In addition to using the information provided by Luettgens, it is also evident from the DeBlandre P&L that DeBlandre also used Valspar confidential documents that he took with him

when he left Lilly. When DeBlandre was running Lilly's European business, he had prepared for him on a monthly basis an Excel spreadsheet showing the expenses and profits associated with each segment of Lilly's European business (hereinafter "the Pieters report"), prepared by a Lilly accountant named Monika Pieters. Declaration of Monika Pieters, ¶ 3. The Pieters report was password protected and the only people who had access to it were DeBlandre and Ms. Pieters. Id.

Attached as Exhibit 1 to the Pieters Declaration is a printout of part of the Pieters report for Lilly's mirror solution business for the fiscal year 2000 (Dec. 1999-Nov. 2000). The printout shows the various breakdown of categories that Mr. DeBlandre asked Ms. Pieters to create, as well as the totals for fiscal year 2000 in Deutschmarks and as a percentage of total sales.

A comparison of Exhibit 1 of the Pieters Declaration with page 3 of the DeBlandre P&L (Hayes Decl., Ex. 13) shows that DeBlandre must have taken a copy of the Pieters report with him when he left Lilly, and used it to create the DeBlandre P&L for Spraylat. First, each of the categories of RMC Additions and Manufacturing Costs on the DeBlandre P&L is contained *identically* on the Pieters report (even down to the same abbreviations and punctuation). Compare Pieters Decl., Ex. 1 with Hayes Decl., Ex. 13, p. 3. It is inconceivable that DeBlandre could have independently reproduced these individual categories in this detail unless he had an actual copy (probably electronic) of the Pieters report.

Moreover, most of the percentages for these categories used in the DeBlandre P&L are drawn directly from the Pieters report. For example, the values for Sieb- u. Filtermaterial (screening and filtering material), Mahlmaterial (grinding material), Hilfs-u.Betriebsstoffe (auxiliary and operational substances), Etiketten/Paletten/Packhilfsmittel (labels, pallets, and

packaging material) and sonstiger Verbrauch (other consumption) are all identically drawn from the Pieters report.[3] Id.

Thus, the information in the DeBlandre P&L was accurate and reliable, as it was based exclusively on Valspar information stolen by DeBlandre and Luettgens as well as what they had known from their Lilly/Valspar experience. Chlodney assured other Spraylat managers that DeBlandre "had a very good sense of financial statements and what went into running a business in general, and that we could be pretty sure that if that's what Alain [DeBlandre] felt was an estimate of what the costs and the financial data would be, that it would probably be that." Chlodney Dep., p. 138.

**b. The Financials Were Invaluable to Spraylat**

Without the DeBlandre-Luettgens stolen information, Spraylat wouldn't have had a clue about whether a European business made financial sense. This is vividly shown by comparing the P&L prepared by DeBlandre and Luettgens using Valspar's confidential business information with a crude and inaccurate P&L prepared by Chlodney after the initial meeting with DeBlandre in Europe. Compare Hayes Decl., Ex. 13 and Ex. 14. Indeed, the Chlodney P&L shows that, but for the DeBlandre-Luettgens information, Spraylat would never have pursued a European mirror business -- with the operating expenses factored in, Chlodney projected millions of dollars of net losses over the first four years, followed by a very modest net profit in year 5. Hayes Decl., Ex. 14, p. 2. In contrast, using Valspar's confidential business information, DeBlandre showed Spraylat that only about an 800,000 Deutschmark (around $440,000) investment was required over the first 18 months, followed by substantial net profits in year 3.

[3] It is also interesting that several of these items have a value of "0.00%." Why would DeBlandre bother to include items in his P&L for Spraylat that had no cost associated with them? The answer is obvious – DeBlandre wasn't creating the P&L from scratch, but rather was using the stolen Pieters report as a template.

Id., Ex. 13, p. 5. Obviously, Chlodney's opinion changed after an analysis of the Lilly confidential information contained in DeBlandre's financial analysis.

### c. Spraylat Knew It Was Using Valspar's Confidential Financial Information

Luettgens, DeBlandre, Chlodney and others at Spraylat knew that they had no right to know or use this Lilly confidential financial information.

First, Luettgens and DeBlandre were keenly aware that they were stealing confidential information. Luettgens signed his confidentiality agreement on August 22, 2000, less than a year before he started stealing Valspar financial information. Hayes Decl., Ex. 15. DeBlandre signed the agreement on behalf of Lilly. Id. Luettgens' employment agreement obligated him "not to disclose any business secrets to third parties." Luettgens Dep., p. 13. Luettgens testified that he knew that a business secret was something that "would give an advantage to a third party." Hayes Decl., Ex. 15. He was also obligated to "put his full activities into the services of the company… [and he was prohibited to] accept any other jobs or business activities which might be competing … prior to having received a written authorization from the company." Id. Luettgens and DeBlandre knew they were illegally stealing information.

Further evidence that DeBlandre knew that Luettgens was improperly taking proprietary information from Valspar can be found in DeBlandre's instruction to Luettgens to destroy evidence of his wrongful activity. Between March and June of 2001, while Luettgens was still working for Valspar, DeBlandre and Luettgens continued to exchange financial information and plans for the new Spraylat European business. In June of 2001, however, DeBlandre realized that Luettgens was using his Valspar computer to correspond with him. DeBlandre sent Luettgens the following message:

> Although I understand emergency, please do not use your Lilly e-mail address for anything that has to do with Spraylat -- insure this message is deleted from your equipment -- call me if you need assistance for this.

Seidler Decl., Ex. 2. Thus, DeBlandre sought to hide the evidence of Spraylat's improper activity by directing Luettgens to destroy evidence.[4] Among the other persons copied in this particular email are Spraylat General Counsel William Borner and Spraylat Vice President of Finance John Ragazzini. Id.

Moreover, Spraylat's President, Chlodney, specifically knew from having worked at Lilly that the type of information received from DeBlandre was confidential and proprietary. Lilly's policy was that that financial information was not to be shared with competitors outside Lilly. Chlodney Dep., p. 51. He admitted that he knew that Lilly profit and loss statements, sales forecasts, strategic plans, marketing plans, customer lists, and quantities purchased from a customer were Lilly confidential. Id., pp. 37-38, 56-59. He testified he would never have given to a competitor: the identity of Lilly customers, Chlodney Dep., pp. 56-67; information about how much product was sold to a customer, Chlodney dep., pp. 58-59; gross profit and operating income information, Chlodney Dep., pp. 141; raw material costs, Chlodney Dep., pp. 142-43; manufacturing costs, id.; or selling expenses or administrative expenses. Id.[5]

As further proof, the information business plan that DeBlandre sent to New York on March 20, 2001 included a key page stating the origin of numbers in DeBlandre's plan. Hayes Decl., Ex. 13, p. 6. This page clearly indicates that Valspar trade secrets had been misappropriated. For example, with regard to price of coatings for the customer PFG,

---

[4] DeBlandre was at least partially unsuccessful in his endeavor to destroy this evidence. Many of the documents discussed herein did not come from Spraylat's production of documents in this case, but rather were found on Luettgens' Valspar computer after he finally left Valspar to join Spraylat. Seidler Decl., ¶ 9.

[5] Spraylat's CEO, Michael Borner, testified that Spraylat also considers the type of information it was getting from DeBlandre to be confidential. M. Borner Dep. pp. 34, 37, 45-46. Spraylat's confidentiality agreement with its employees specifically states that such business information is confidential and proprietary, and must not be disclosed. Hayes Decl., Ex. 16, ¶ 5. No reasonable businessman could believe that a competitor would have a different policy.

DeBlandre stated that Spraylat should "use prices for last coatings shipment." Id. As Spraylat had not even *started* their European business yet, Spraylat's New York executives knew (or should have known) that DeBlandre could only be referring to the Valspar confidential financial information that he and Luettgens had misappropriated.

Finally, in his cover letter to Spraylat enclosing the business plan based on Valspar confidential information, DeBlandre ironically urged that the information be "handled with the appropriate confidentiality." Id., p. 1. Thus, DeBlandre and Spraylat were using stolen information for their unlawful purposes while agreeing that the material should be kept confidential.

**D. Spraylat Was Able to Enter the European Market Almost Immediately By Using Valspar's Trade Secret Mirror Solution Formulas**

**1. Valspar's Trade Secret Mirror Solution Formulas**

Formulas are the quintessential example of a trade secret. The first example given in the Minnesota Uniform Trade Secret Act ("MUTSA") to delineate the type of information that may qualify as a trade secret is a formula. Minn Stat. § 325C.01, Subd. 5.

Valspar's mirror solution formulas are no exception. While the basic chemical components used to make a mirrored surface are well known, those basic components do not, by themselves, result in a commercially viable product. Bahls Decl., ¶ 3. Valspar has created multi-part mirror solution formulas that contain a number of secret additives. Id., ¶ 4. These additives are used in specific combinations and concentrations that vastly improve both the mirror-making efficiency and the quality of the mirrored surface. Id. Valspar's predecessors developed the formulas with these secret ingredients many years ago, but chose to maintain the additives as trade secrets rather than obtain patents on them. Id., ¶ 5. The additives are used in very small amounts, making it extremely difficult for competitors to reverse-engineer them by

identifying the additives through chemical analysis. Id., ¶ 6. Indeed, Valspar's competitor Hilemn has not been able to identify and adopt certain key additives that give Valspar a competitive advantage over Hilemn, even though those additives have been in use by Valspar and its predecessors for more than 20 years. Id., ¶ 7.

In imposing the requirement that Valspar divest itself of either its Hilemn business or the Lilly mirror business, the FTC recognized that formulas for making the mirror coating are crucial to the business and difficult to develop. The FTC's basis for requiring that Valspar divest either the Lilly or Hilemn mirror business was because there were barriers to entry into the business due to, among other things, "the difficulty in developing formulas...." Hayes Decl., Ex. 5, Para. 18. Spraylat's Chlodney said he agreed that "it would be difficult to enter the market developing it from the ground up ...." Chlodney Dep., pp. 67-69.

### 2. Spraylat Entered the European Market Using Valspar's Formulas

Spraylat began its European operation on July 1, 2001. DeBlandre became the Managing Director/General Manager of the new entity. Hayes Decl., Ex. 17. As planned by DeBlandre, every employee of the new European business came from Valspar and/or Lilly's European mirror business, including:

- Alain DeBlandre, Spraylat GmbH's managing director and general manager;
- Natalie Schroer, DeBlandre's executive assistant while he was at Lilly, was put in charge of adminstration and customer service;
- Ludwig Kotschenreuther, one of the "2 brilliant people" that DeBlandre told Spraylat in February of 2001 he could get for the new venture, became technical manager in charge of R&D and technical service;

- Gunther Reipa, the other of the "2 brilliant people," became business manager in charge of sales, marketing and production;
- Willi Luettgens, the former Valspar Controller and DeBlandre's "mole" for obtaining financial information, became finance director; and
- Gerhard Fischer, Valspar's production manager who knew all of the details of how to manufacture Valspar's mirror solutions, was put in charge of manufacturing.

Id. These employees were intimately familiar with the Valspar formulas; they had used them for years. Hayes Decl., Ex. 17. They knew the customers and the contacts at those customers, having worked with them for years. Seidler Decl., ¶ 11. They contacted Valspar's customers with full knowledge of Valspar's price to those customers and Valspar's costs of manufacturing, raw materials, etc.

Spraylat made its first delivery of mirror solutions in Europe on July 18, 2001, *less than three weeks after it started business in Europe*! Seidler Decl., Ex. 3. This is remarkable considering that, as the FTC recognized and Chlodney admitted, the difficulty in developing formulas is a major barrier to entering the mirror solutions business. How did Spraylat do it? The answer is simple: Spraylat didn't develop new formulas. The former Valspar employees (Kotschenreuther and Reipa) simply continued to use the same formulas that they knew from working for Valspar. As explained in the declaration of Valspar's technical expert, Dr. Kenneth Brown, filed herewith, Spraylat's European mirror formulas are virtually identical to Valspar's formulas. Brown Decl., ¶¶ 5-7 and Ex. 2. There is an exact match of ingredients, including all of the key secret additives. Id. Spraylat only changed the amount of some ingredients slightly to hide its theft.

It is also interesting to note that Spraylat did *not* use the Hilemn formulas in Europe. Brown Decl., ¶ 6 and Ex. 2. This is important because Spraylat owned the Hilemn formulas (having purchased Hilemn from Valspar) and, thus, was free to use them without claim of misappropriation. So why did Spraylat not do so? Again, the answer is simple: customers, particularly in Europe, are very hesitant to switch to a new mirror solution formula. Seidler Decl., ¶ 12. As Chlodney admitted, in order to get a customer to even consider a new mirror formula, the formula must go through a qualification procedure. Chlodney Dep., pp. 156-157. This process is very difficult and time consuming, and Hilemn failed when it tried to enter the European solutions market. Seidler Decl., ¶ 12. Spraylat decided to misappropriate Valspar's formulas in Europe rather than use Hilemn's formulas because it knew that was the only way to meet DeBlandre's aggressive business plan that Spraylat relied on in deciding to enter the European market.

### 3. Spraylat's Misappropriation of Valspar's Mirror Solution Formulas Was Knowing and Intentional

Spraylat's misappropriation of Valspar's formulas was no innocent mistake. Spraylat knew full well that it was using Valspar's formulas and that those formulas were considered to be valuable trade secrets.

Spraylat wanted its new European business to use Valspar's formulas. In April of 2001, one of the goals set by Spraylat's executives for DeBlandre's development of the European business was to "Migrate European Mirror Technology to U.S. Operations." Hayes Decl., Ex. 19. Thus, Spraylat's executives in New York knew and intended that its new European operation would use Valspar's technology and were hoping to transfer that technology to Hilemn. Id.

Ludwig Kotschenreuther, the former Valspar chemist and now Spraylat GmbH's technical director, was responsible for developing Spraylat's European formulas. While at Valspar, Kotschenreuther had access to Valspar's formulas and knew that those formulas were considered to be highly confidential. Hayes Decl., Ex. 19. ("Streng Vertraulich" means "strictly confidential"). As noted above, the formulas that Kotschenreuther developed for Spraylat's European business are virtually identical to the formulas that he knew from working for Valspar. Spraylat has produced no documentation showing that Kotschenreuther did any meaningful development work to come up with these formulas. To the contrary, the only "development" documents produced by Spraylat consist of Kotschenreuther's search of the patent literature. See Hayes Decl., Ex. 20. While Spraylat contends that this search helps its case by showing that Valspar's secret additives are known in the literature, in fact it does the exact opposite: it shows that Kotschenreuther knew that he was stealing trade secrets and that he needed to try to justify his actions through an after-the-fact, legally insufficient literature search.

With respect to Spraylat Corp., Chlodney, Borner, and others at Spraylat Corp. know that mirror formulas are highly sensitive, secret information –they treat their mirror formulas the same way. See, e.g., Chlodney Dep., p 44. Spraylat Corp. also had to know that Kotschenreuther and Reipa would be selling the Lilly formula. After all, Borner gave no directive not to use the Lilly formulas. He was asked about his only meeting with Reipa and Kotschenreuther before they started:

Q. Well, was there anything discussed about the formulas.
A. One area that I believe was discussed about the formulas was whether we were going to produce a silver solution from silver nitrate or silver bars.

Borne Dep., p. 191. Discussing the form of the silver is a far cry from discussing what the formula will be, so he was asked:

Q. What else was discussed regarding formulations?
A. That was all that I recall.

Borner Dep. pp. 191-92. Thus, there was no discussion about formulas. Mr. Borner was asked what he assumed Reipa and Kotschenreuther would use for formulas when they started the Spraylat business.

Q. All right. And so you know that they were shown the Hilemn formulas, and you presume that had some knowledge of the Lilly/Valspar formulas; and so what did you assume, if you did, the formulations were going to be that they were going to use in July through August of 2001 [when Spraylat started up]?
A. I really didn't make an assumption, although I knew that the Hilemn formulas would have to be modified to a large extent for Europe.

Id., p. 196. Finally, he was asked whether he gave any instructions about what to use:

Q. Did you give any instructions, as the CEO, regarding what the formulations would be when you started out as Spraylat GmbH?
A. No.

Id., p. 197. He gave no instructions because he didn't need to. He knew that Kotschenreuther and Reipa would use the only formulations they had ever used – Valspar's formulas, the ones that customers had already accepted and would not require time consuming trials before any product would be purchased.

### E. Spraylat Has Continued to Try to Hide Its Wrongful Conduct in the Course of this Lawsuit

As noted above, Valspar found evidence on Luettgens' Valspar computer showing that he improperly used Valspar confidential information for the benefit of Spraylat, and that Spraylat instructed him to delete evidence of that improper activity. In addition, Valspar found that Kotschenreuther and Reipa had erased substantial amounts of information from their Valspar computers right before they left, strongly suggesting that they, too, were trying to conceal evidence of theft of information. Logically, Valspar therefore served a discovery request

specifically directed to all documents (including electronic documents) taken from Valspar by the former Valspar employees.

The former Valspar employees indignantly denied taking any Valspar-related documents with them when they left Valspar. One of the former employees, Kotschenreuther, refused to produce the documents that he downloaded from his Valspar computer, claiming that they were all personal documents. Hayes Decl., Ex. 21. In response to a motion to compel, Spraylat submitted Kotschenreuther's declaration to this Court wherein he stated unequivocally that the files he removed from his Valspar computer "have nothing to do with Lilly, Valspar, Spraylat or the mirror business." Id.

Valspar has recently obtained unequivocal evidence that these employees lied about what they took from Valspar and that Spraylat knew about it. In addition to starting this civil proceeding against Spraylat, Valspar also filed a criminal complaint against the former Valspar employees in Germany. In February of 2002, the German police conducted searches relevant to this complaint and seized various documents, computers and computer disks. The German prosecutor prepared an Evidence File containing the most relevant documents found in this search. Valspar was given access to this evidence file late last year. This evidence file shows that Leuttgens had numerous confidential Valspar financial documents in his possession, both in hard copy form and on a data CD. Seidler Decl., ¶ 12. The evidence file also showed Kotschenreuther's Spraylat computer contained several files that had been originally created at Valspar's predecessor, Lilly. Id., See also Seidler Decl., Ex. 4. Thus, Spraylat's claim that these employees turned over everything that they took from Valspar and Kotschenreuther's sworn statement to this Court that he took nothing from Valspar relating to the mirror business are both simply false.

Spraylat cannot claim that it was unaware of these employees' theft of documents. Spraylat's German lawyer obtained the Evidence File for inspection and review during the middle months of 2002. Hayes Decl., Ex. 22, ¶ 11. Yet Spraylat made no effort to produce these documents in compliance with its obligations under the Federal Rules, or to correct its misrepresentation about the absence of documents taken by these employees. Instead, Spraylat tried to hide its employees' theft by urging the German authorities not to give Valspar access to the documents in the Evidence File. Hayes Decl., Ex. 22, ¶¶ 9-10.

## III. DISCUSSION

### A. The Legal Standard for the Motion for Leave to Plead Punitive Damages

The pleading of punitive damages in cases involving Minnesota state law claims in Federal Court is governed by the pleading requirements of Minn. Stat. §§ 549.191 and 549.20 (1994). Olson v. Snap-On, Inc., 29 F. Supp.2d 1027, 1034 (D. Minn. 1998); Ulrich v. City of Crosby, 848 F. Supp. 861, 867 n. 5 (D. Minn. 1994). In all instances in which Minn. Stat. § 549.191 applies, a plaintiff may not assert a punitive damages claim in its complaint in the first instance, but rather must seek leave of court to amend its pleading pursuant to that section. Id.

Under Minn. Stat. § 549.191, a motion for leave to amend a complaint to add a claim for punitive damages must allege the "applicable legal basis under section 549.20 or other law for awarding punitive damages in the action," and must be supported by one or more affidavits showing the factual basis for the claim. The "applicable legal basis" reads as follows:

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(a). A defendant has acted with deliberate disregard for the rights of others, supporting a punitive damages claim, if the defendant has knowledge of facts or

intentionally disregards facts that create a high probability of injury to the rights of others and (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights of others; or (2) deliberately proceeds to act with indifference to the high probability of injury to the rights of others. M.S.A. § 549.20 (1996); see also Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806, 812 (Minn. Ct. App. 1992); Kay v. Peter Motor Co. Inc., 483 N.W.2d 481, 485 (Minn. Ct. App. 1992). At trial, the right to obtain punitive damages must be proven by clear and convincing evidence. M.S.A. § 549.20 (1996); see also Bunker v. Meshbesher, 147 F.3d 691, 696 (8th Cir. 1998).

At the amendment stage, however, the plaintiff is not required to demonstrate an entitlement to punitive damages per se, but rather need only show an entitlement to *allege* such damages. Ulrich v. City of Crosby, 848 F. Supp. 861, 867 (D. Minn. 1994). As such, the supporting affidavits provided by the plaintiff need only present a *prima facie* showing of an entitlement to punitive damages. Swanlund v. Shimano Ind. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). *Prima facie* evidence is "[e]vidence which, if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports, but which may be contradicted by other evidence." Black's Law Dictionary 1190 (6th ed. 1990); McKenzie v. Northern States Power Co., 440 N.W.2d 183, 184 (Minn. Ct. App. 1989) ("*prima facie* evidence is that evidence which, if unrebutted, would support a judgment in that party's favor"); Swanlund, 459 N.W.2d at 154. Under the *prima facie* standard, "the Court makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof." Ulrich, 848 F. Supp. at 867.

Moreover, in ruling on a motion for to amend under Minn. Stat. § 549.191, the Court reviews the evidence in support of a Motion to Amend as the Court would review a Motion for a

Directed Verdict, delineated in the Federal Rules of Civil Procedure as a Motion for the Entry of Judgment as a matter of law. See Fed. R. Civ. P. 50(a); Swanlund, 459 N.W. 2d at 155 ("Minn. Stat. § 549.191 essentially requires the trial court to direct a portion of the verdict against the plaintiff if the evidence of willful indifference is insufficient"). Therefore, the Court must view the evidence most favorably to the moving party, and give the moving party the benefit of all reasonable inferences from the evidence. Abbett v. County of St. Louis, 474 N.W.2d 431, 433 (Minn. Ct. App. 1991). Because the evidence must be viewed in the light most favorably to the movant, the motion must be ruled on "without considering evidence submitted in opposition." Northwest Airlines, Inc. v. American Airlines, Inc., 870 F. Supp. 1499, 1503 (D. Minn. 1994).

### B. Valspar Has Presented a *Prima Facie* Case Sufficient to Seek Punitive Damages With Respect to Several Counts of the Complaint

#### 1. Valspar Is Entitled to Punitive Damages On Its Claims For Tortious Interference with Contracts, Tortious Interference with Business Relations, and Unfair Competition

In its Amended Complaint, Valspar has pled, *inter alia*, tortious interference with contracts, tortious interference with business relations, and unfair competition. Each of these claims will support a claim for punitive damages. Northwest Airlines v. American Airlines, 870 F. Supp. 1499, 1502-04 (D. Minn. 1994) (tortious interference with contract); Hern v. Bankers Life Casualty Co., 133 F. Supp.2d 1130, 1137 (D. Minn. 2001) (tortious interference with business relations); Moore v. Columbia Pictures Industries, Inc., 1990 U.S. Dist. LEXIS 15197 at *7 (unfair competition).

The evidence gathered in discovery meets the standard required for assertion of a claim of punitive damages. As set forth in the background section, Valspar has shown prima facie evidence that Spraylat acted with deliberate disregard for Valspar's rights. Specifically, Spraylat knew of Valspar's contractual and trade secret rights and relationships with its customers, and set

out to deliberately undermine and devalue those rights and relationships. The pattern of Spraylat's conduct was that of a deliberate, harmful scheme from beginning to end – a textbook example of the statutory need for punitive damages.

Spraylat wrongfully induced the former Valspar/Lilly employees to breach their contractual obligations of confidentiality to Valspar; misappropriated Valspar's trade secret and confidential information for the specific purpose of stealing customers away from Valspar; and targeted all of the key people at Valspar's European mirror business unit (and subsequent hiring of those people) for the purpose of obtaining confidential information from them. As noted by the preceding sections, there is substantial evidence of Spraylat's deliberate disregard for Valspar's contractual rights and confidential information. See Section II., supra. Accordingly, Valspar is entitled to punitive damages with regard to its claims for tortious interference with contracts, tortious interference with business relations and unfair competition.

### 2. Valspar is Also Entitled to Exemplary Damages On Its Trade Secret Misappropriation Claim

Valspar does not believe that it is necessary to amend its Complaint to seek punitive damages for trade secret misappropriation. The reason is that punitive damages are separately authorized under the Minnesota Uniform Trade Secrets Act. Minn. Stat. § 325C.03(b) provides that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under paragraph (a)." This specific section relating to "exemplary" damages overrides the general provisions of Minn. Stat. §§ 549.191-20. Zawels v. Edutronics, Inc., 520 N.W.2d 520, 523-24 (Minn. App. 1994). Hence, a party may seek exemplary damages under Minn. Stat. § 325C.03(b) without moving to amend under Minn. Stat. § 549.191 and without meeting the standard for punitive damages in Minn. Stat. § 549.20.

Id. Consistent with this ruling, Valspar's original Complaint explicitly requests enhanced damages under Minn. Stat. § 325C.03(b) in its prayer for relief.

To the extent the Court disagrees, however, and believes that it is necessary to comply with Minn. Stat. § 549.191 for trade secret claims, Valspar has met the standard for doing so. For the reasons discussed above with respect to Valspar's other counts, Spraylat's misappropriation of Valspar's trade secret business and technical information has been both willful and malicious. As such, Valspar should be permitted to seek exemplary damages at trial.

**C. Leave Should Be Granted to Amend the Complaint At This Time**

Spraylat will undoubtedly claim that the present motion is untimely based on the fact that the original Scheduling Order set the date for amending the pleadings as March 15, 2002.

However, this Court has recognized that a motion to amend to add a claim of punitive damages should generally not be brought until after the close of discovery. Order of July 14, 1997 Magistrate Judge Jonathan Lebedoff, Malt-O-Meal Company v. MRM Communications, Inc., et al., Civil No. 3-96CV-1014 (copy attached as Hayes Decl., Ex. 23). The reason is obvious: the evidence relevant to whether the defendant's conduct meets the standard to assert punitive damages is often not fully developed until discovery is completed. The present case is perfect example of why this reasoning makes sense. At the time the deadline for amending the pleadings passed, each party had taken only one deposition. Hayes Decl., ¶ 26. Valspar was not able to take the deposition of the Spraylat executives in New York until September of 2002. Id. Valspar was not able to take the deposition of Gunther Reipa or complete the deposition of Ludwig Kotschenreuther until December of 2002. Id. Valspar did not become aware of the key documents in the German Evidence File until approximately November of 2002. Id. It made perfect sense to wait until the case was fully factually developed to bring the present motion.

Hence, to the extent it is necessary to show good cause to modify the Scheduling Order, Valspar has done so. Fed. R. Civ. P. 16(b); see also Marcum v. Zimmer, 163 F.R.D. 250, 253-55 (S.D. W.Va. 1995) (quoting Goewey v. United States, 886 F. Supp. 1268, 1283 (D.S.C. 1995)). Indeed, the Eighth Circuit has held that "[l]eave to amend shall be granted absent a good reason for the denial, such as undue delay, bad faith, undue prejudice to the nonmoving party, or futility." Thompson-El v. Jones, 876 F.2d 66, 67 (8th Cir. 1989). Accordingly, Valspar should be granted leave to amend the Complaint.

## IV. CONCLUSION

The evidence supports the conclusion that Defendant Spraylat intentionally procured Valspar's trade secrets, knowing of Valspar's common law and contractual rights to those secrets material, and then deliberately set out to make an end run around those rights. Viewed through the unrebuttable lens of the *prima facie* standard, this evidence demonstrates the requisite "deliberate disregard" by Spraylat with respect to Valspar's rights. Therefore, Valspar's motion to amend its complaint to assert a claim for punitive damages should be granted.

Dated this 31 day of March, 2003.

**THE VALSPAR CORPORATION,**
**VALSPAR SOURCING, INC. AND**
**VALSPAR INDUSTRIES GMBH**

By their attorneys,

By ______________________________

Alan G. Carlson (MN ID #14,801)
J. Derek Vandenburgh (MN ID #224,145)
CARLSON, CASPERS, VANDENBURGH
& LINDQUIST, P.C.
225 South Sixth Street, Suite 3200
Minneapolis, Minnesota 55402
Ph. (612) 436-9600
Fx. (612) 436-9605

Andrew Ubel (MN ID #235,799)
VALSPAR
1101 Third Street South
Minneapolis, Minnesota 55415
Ph. (612) 375-7322
Fx. (612) 375-7313