COPY

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL ACTION NO. 01 CV1605 JMR/FLN

| | | |
|---|---|---|
| THE VALSPAR CORPORATION and VALSPAR SOURCING, INC., Plaintiffs | : | Deposition of: JOHN F. RAGAZZINI |
| against | : | |
| SPRAYLAT CORPORATION and SPRAYLAT GmbH, Defendants | : | NON-ATTORNEYS' EYES ONLY PORTION |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before Sandra M. Mierop, a Certified Shorthand Reporter and Notary Public, held at AKIN, GUMP, STRAUSS, HAUER & FELD, 590 Madison Avenue, New York, New York, on Thursday, September 19, 2002, commencing at 9:30 a.m.

confidentiality and some degree of noncompetition in it. I don't know exactly what it might have. We'll get to details if we can.

A. Let me just read this.

Q. All right. I'll repeat the question. Have you signed an agreement with Spraylat that has some provision for confidentiality and/or some provision for noncompetition?

A. I believe I signed a confidentiality agreement when I first joined.

Q. Okay. How about a noncompetition? Did you sign an agreement that prevented your competing -- strike that -- that prevented you working for a company that competed with Spraylat for a certain period of time?

MR. HURLEY: Objection.

A. I don't recall signing any such document.

Q. (BY MR. CARLSON) But you do recall you signed a document dealing with confidentiality?

A. I believe that to be correct.

Q. Did it have the provision that is Paragraph 5 of Exhibit 266?

MR. HURLEY: Objection.

A. I -- I can't remember what I signed specifically.

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL ACTION NO. 01CV1605 JMR/FLN

CONFIDENTIAL

THE VALSPAR CORPORATION
AND VALSPAR SOURCING, INC.,

Plaintiffs,

vs.

SPRAYLAT CORPORATION and
SPRAYLAT GmbH,

Defendants.

CONFIDENTIAL
DEPOSITION UPON
ORAL EXAMINATION OF:
MICHAEL E. BORNER

ATTORNEYS' EYES ONLY
PORTION

- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT of the deposition notes of MICHAEL E. BORNER, witness, called for oral examination in the above-entitled action, by and before MARY G. VAN DINA, a Notary Public and Certified Shorthand Reporter, License No. XI01017, at the offices of AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, 590 Madison Avenue, New York, New York, on Friday, August 16, 2002, commencing at 8:45 a.m.

ATTORNEYS
EYES ONLY

can't say that I was familiar with it because I've seen this document.

Q. Have you seen a document that was different than that, though, that delineated the plan for Silver Mountain?

A. I don't recall.

MR. ZENSKY: Off the record.

(A brief recess is taken.)

Q. Here's Exhibit 111. This refers to the fact that Michael Borner signed the contracts, and I think that was in May, wasn't it?

A. Yes.

Q. I don't have a copy of that.

A. Yes, May 25.

Q. Were those contracts in English?

A. What I signed was in German.

Q. I'm going to show you an Exhibit 139, which is an e-mail from DeBlandre to Kovarik, attaching an English translation of the Ludwig contract. I think it was Ludwig.

There's a clause in there dealing with non-compete. I think it's Paragraph 7.

A. Uh-huh.

Q. Did you have any part in deciding that

these technical folks, Kotschenreuther and Reipa, would be subject to a non-compete?

A. Yes.

Q. Tell me about your thinking.

MR. ZENSKY: Objection.

A. Often times, we will establish a non-compete for certain individuals.

Q. More often for technical people than others?

MR. ZENSKY: Objection.

A. No, it's a variety of people we would do it for.

Q. You might do it as regularly for financial people as technical people?

A. No, not -- probably not financial.

Q. Not financial. Who would be as often as technical people?

MR. ZENSKY: Objection.

A. Sales managers, general managers.

Q. And why would sales managers be subject to a non-compete?

MR. ZENSKY: Objection.

A. What we're trying to establish with the non-compete is a means of retaining employees, and

a non-compete is a way of doing that, and we can establish a definition of opportunities that they can't leave Spraylat for.

It would be a lot more difficult to do that than for, say, a financial person.

Q. Do you tend to pay people more money if they're willing to sign a non-compete?

MR. ZENSKY: Objection.

A. In terms of salary?

Q. Yes.

A. You're asking if we're going to pay them a higher salary if they sign a non-compete?

Q. Right.

A. Generally not.

Q. Does it strike you as unfair, then, that if they sign a non-compete, then they can't as readily get another job?

MR. ZENSKY: Objection.

A. No.

Q. Why not?

MR. ZENSKY: Objection.

A. I think if it was -- if they felt that it was terribly unfair, they wouldn't take the job with us and sign the non-compete.

They know that's a condition of the offer.

Q. Did you make it clear to Kotschenreuther and Reipa, sometime before May of 2001, that a part of the contract they would sign would be a non-compete?

MR. ZENSKY: Objection.

A. Yes, and that they would be compensated for that.

Q. So you did give them more compensation than they would get in the absence of a non-compete?

MR. ZENSKY: Objection.

A. We agreed to pay them during the non-compete period.

Q. I see. In some cases, you write contracts with your employees where you have a non-compete, but you don't have a payment during the non-compete period. Is that true?

A. That's true.

Q. But in this case, with those two folks, where you did a non-compete, you agreed that if during the non-compete period, they couldn't find another position, that you would pay them?

MR. ZENSKY: Objection.

A. It's my understanding that that's what's needed to make it enforceable.

MR. ZENSKY: That's the one issue our clients agree on.

Q. I'm showing you what's been marked as Exhibit 116. This is an e-mail from DeBlandre and you to Chlodney, referring to the famous agreement, asking you all to stand by the confidential fax machine and let him know what to dial.

What is that about?

MR. ZENSKY: Objection.

A. It sounds like he's going to send us an agreement, and he wants us to be there to receive it.

Q. Well, you don't have a recollection of the so-called "famous agreement"?

A. I have no idea what the famous agreement was.

Q. He was alleging in his own mind, but it wasn't famous to you. Is that right?

A. That's correct. I don't know what agreement he's referring to as famous.

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil Action No. 01CV1605 JMR/FLN

THE VALSPAR CORPORATION AND
VALSPAR SOURCING, INC.,

Plaintiffs,

vs.

CONFIDENTIAL
Volume I
DEPOSITION OF:
ALAIN DEBLANDRE

SPRAYLAT CORPORATION and
SPRAYLAT GmbH,

Defendants.

THIS TRANSCRIPT IS MARKED CONFIDENTIAL
AND ATTORNEYS' EYES ONLY WHERE DESIGNATED

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified Shorthand Reporter of the State of New Jersey, and Notary Public of the State of New Jersey, held at the HOTEL DORINT QUELLENHOF MONHEIMSALLEE, 52 D-52062, Aachen, Germany, on Thursday, June 20, 2002, commencing at 9:04 a.m.

DeBlandre - direct by Mr. Carlson

(Transcript designated AEO.)

Q. Now, this contract contains a prohibition of competition clause, paragraph seven, right?

A. Um-hum.

Q. And this is what you call non-compete?

A. As per our German legal requirements, so this is a --

(Witness conferring with German counsel.)

A. So in accordance with German law.

Q. Well, but this is -- paragraph seven is what is called a non-compete?

MR. ZENSKY: Objection.

A. As I said, if you look at the end of paragraph seven, the very last line, it says:

"Further regulation 34 HGB and following applicable." And, also, it refers to paragraph 36. So those are references to German contractual or legal requirements.

Q. Well, but what this does is to prevent the employee from competing for a period of two years after leaving employment, right?

MR. ZENSKY: Objection.

DeBlandre - direct by Mr. Carlson

A. The answer is yes.

Q. Now, why did you want that? Why did you negotiate that?

MR. ZENSKY: Objection.

A. I wonder if I wanted it, or they wanted it. I mean, I'm not sure of that.

Q. You just don't recall?

A. Specifically, no. And I would not speculate.

Q. Was there a meeting in New York then about June 20?

MR. ZENSKY: Objection.

A. I was at a meeting in New York around June, late June.

Q. Did Mr. Kotschenreuther come along?

A. In New York?

Q. Yes.

A. Yes.

Q. Did he go down to the Hilemn business?

A. Yes.

Q. Did you go down there when he went down there?

A. The first day.

Q. How many days was he down there?

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
CIVIL ACTION NO. 01CV1605 JMR/FLN

THE VALSPAR CORPORATION AND VALSPAR SOURCING, INC.,

Plaintiffs,

vs.

SPRAYLAT CORPORATION and SPRAYLAT GmbH,

Defendants.

ATTORNEYS' EYES ONLY PORTION
CONFIDENTIAL
DEPOSITION UPON ORAL EXAMINATION OF:
WILLIAM BORNER

- - - - - - - - - - - - - - -

TRANSCRIPT of the deposition notes of WILLIAM BORNER, witness, called for oral examination in the above-entitled action, by and before MARY G. VAN DINA, a Notary Public and Certified Shorthand Reporter, License No. XI01017, at the offices of AKIN, GUMP, STRAUSS, HAUER & FELD, LLP, 590 Madison Avenue, New York, New York, on Thursday, August 15, 2002, commencing at 9:30 a.m.

ATTORNEYS EYES ONLY

Borner - direct

employees dealing with confidentiality, or dealing with non-competes, or anything of that sort?

MR. ZENSKY: Objection.

A. Yes.

Q. Would you tell me, in 1996, what the nature of these intellectual property agreements dealing with confidential or non-competes was?

MR. ZENSKY: Objection.

A. Well, I'm not sure that question follows from the one before. Are you now talking about intellectual property agreements, where previously you were talking about employment agreements?

Q. Okay. I'm referring to them in the same vein here.

Let me -- let's talk about employment agreements then. We'll just say that.

A. Okay.

Q. In 1996, would you tell me what the status was of employment agreements, or any other agreements that dealt with non-competes or confidentiality?

MR. ZENSKY: Objection.

A. You're a little over-broad there.

Borner - direct

Again, for --

Q. All right.

A. Can you break that down?

Q. Sure. I'll try to.

Tell me, in 1996, after you started, you learned what was in place at the company, agreement-wise, what did you learn the nature was of the non-competes and the confidentiality agreements?

MR. ZENSKY: Objection.

A. With employees?

Q. Yes.

A. There, as a general matter, were agreements with employees regarding the disclosure of trade secrets and post-employment work with competitors.

Q. Were there any non-competes in existence?

MR. ZENSKY: Objection.

A. Is your question whether the company had any agreements with any of its employees regarding, or limiting their ability to compete with the company after they were no longer working with the company?

Borner - direct

Q. Yes.

A. I believe there were.

Q. And we're talking about agreements already in existence when you started.

I don't want to deal now with anything that you created.

I would like to know what the status of the agreements was when you started. Okay?

So there were some non-competes with the definition of non-compete that you just gave?

A. Yes, sir.

Q. Do you know who the persons were that had signed non-compete agreements?

A. As I sit here today, I can't tell you who, in 1996, had signed such agreements.

Q. Do you know today who you have non-compete agreements with?

A. You mean employees, still?

Q. Yes.

A. I believe I know some of them.

I think there are dozens of such agreements. So I can't tell you everybody.

Q. Have you written any?

A. Have I written any --

Borner - direct

Q. Non-compete agreements.

A. -- non-compete agreements with Spraylat employees?

Q. Yes.

A. Yes.

Q. And you, as well, see to the signing of some of these agreements by Spraylat employees?

MR. ZENSKY: Objection.

A. When you say "see to," I don't know what you make reference to, but I have, in fact, signed such agreements with employees, yes.

Q. Are you the person who signs on behalf of the company?

MR. ZENSKY: Objection.

A. Are we still in the area of non-compete agreements with employees?

Q. Yes.

A. I am one of them, yes, not the exclusive one.

Q. You say that there are dozens of such agreements today, so that you're saying there may be, what, 24 or so? Is that your point?

MR. ZENSKY: Objection.

A. No, I think that there are more than

Borner - direct

24.

Q. More than 50?

MR. ZENSKY: Objection.

A. I believe so.

Q. Okay. More than a hundred?

MR. ZENSKY: Objection.

A. I believe so.

Q. More than 200?

MR. ZENSKY: Objection.

A. I believe so.

Q. Well, how many would you put it at --

MR. ZENSKY: Objection.

Q. -- from your best estimate?

And we're talking about non-compete agreements right now.

A. Correct.

Q. Yes.

A. 300 maybe.

Q. And a non-compete agreement is an agreement where, after leaving Spraylat, an employee is prohibited, for a certain period of time, from working for somebody that would be either a competitor or somebody who could benefit from the knowledge that the employee learned at

Borner - direct

Spraylat. Is that right?

MR. ZENSKY: Objection.

Q. Is that how we're interpreting it?

MR. ZENSKY: Objection.

A. Can I hear the question back, please?

(The pertinent portion is read back by the reporter.)

A. That wouldn't be my definition, but if that's how you want me to define it.

Q. No, I don't want you to define it any way, other than what you said.

You said you have about 300 of them, and I want to make sure we're on the same page about what a non-compete is, and I understood you to say that it's something that prohibits an employee from working for a certain period of time under certain circumstances.

Would that be true?

MR. ZENSKY: Objection.

A. Yes, sir.

Q. You're getting hung up about where they can't work, that definition?

MR. ZENSKY: Objection.

A. You built into your question a

Borner - direct

reference to somebody who might benefit from things that they did during the company -- while they worked for Spraylat, and I have no idea what that is.

MR. ZENSKY: The witness gave you a very clear definition three or four pages ago of what he understood it to be.

MR. CARLSON: I understand.

Q. What is your best recollection of who it is, under the agreements, that the employee cannot work for for a certain period of time?

MR. ZENSKY: Objection.

A. A direct competitor of Spraylat.

Q. What is the criteria for deciding which employees will be asked to sign non-compete agreements?

MR. ZENSKY: Objection.

A. I think all employees are asked to sign them.

Q. Okay. Would that be all technical employees, or all employees, regardless of where they're working?

A. I believe it is all employees, regardless of where they're working.

Borner - direct

Q. So do you have approximately 300 employees at the company?

A. Approximately.

Q. So are you saying that clerical staff would sign such an agreement as well?

A. I think that they are given a document when they join the company that has a provision such as that, yes.

I may be wrong on this, but I'm not -- I don't do it on a day-to-day basis, but that's my general understanding.

Q. It's the HR department that's in charge of getting agreements signed when people hire on?

MR. ZENSKY: Objection.

A. Or somebody they designate, yes.

Q. Are there separate agreements that we might call confidentiality agreements?

Do you know what I mean by that?

MR. ZENSKY: Objection.

Q. Let me restate the question.

A. Okay.

Q. Are there agreements that the company has in place where the employee is not prohibited from working for a competitor, but the employee is

Borner - direct

prohibited from using or disclosing confidential information of the company if they should leave?

A. To try and cut through this, I think that there are two separate provisions in one agreement that provides for both of those circumstances.

Q. Okay. So the non-compete agreements, as well, say that after you leave the company, you're not going to use or disclose confidential information.

MR. ZENSKY: Objection.

A. The employee agreement has a provision that treats post-employment competition, and a separate provision that discusses disclosure of confidential information post-employment.

Q. To get back to my original question then, there aren't any agreements where all that is prohibited is post-employment disclosure or use?

MR. ZENSKY: Objection.

A. I don't know whether there are any that just deal with that one topic.

Q. And is the -- well, let me ask you this.

Borner - direct

Is this employment agreement that we've been talking about that is also a non-compete agreement, does it have a name?

Does it have a title, or something we can call it by?

A. I believe it states, "Employee agreement."

Q. Now, is the employee agreement that's in place today the same one that was in place in 1996 when you started?

A. No, sir.

Q. So there have been some changes?

A. Yes, sir.

Q. Did you make the changes?

MR. ZENSKY: Objection.

A. Some of them.

Q. Can you tell me what some of the changes are that are in the agreement today that weren't in it in 1996?

A. Well, just so that your record is clear, there is not one employee agreement in place even today.

Q. I see. Are they kind of tailor-made for the situation?

MR. ZENSKY: Objection.

A. Sometimes.

Q. All right. Well, what are the other reasons, if any, for there being differences in the agreements, besides being tailor-made for a particular employee?

MR. ZENSKY: Objection.

A. There -- the agreement that is entered into with an employee might vary, depending on the area that they work in, what their -- individual negotiations with the employee, and the time frame that it's entered into, a whole variety of things.

Q. Quite apart from changes that have occurred since 1996 in agreements because of the nature of the employee, have there been some changes that have been made to all of the agreements from 1996 to the present?

MR. ZENSKY: Objection.

A. No.

Q. So any changes deal with the uniqueness of the employee?

MR. ZENSKY: Objection.

A. Not necessarily. I can't tell you, in 1996, what period of the -- for example, the

Borner - direct

non-compete provision was, and it may be different for the majority of employees who start in 2002, so that would not be tied to the uniqueness of the employee. It just might be tied to a corporate decision to shorten or lengthen that period of time.

Q. That's what I was looking for. I was looking for some changes that have been made that apply to all of them, such as maybe you changed the period of time, or changed the compensation.

Let me ask you, during this time frame, do you have some provision where they sort of have to mitigate damages, as we say as lawyers, find another job, and if they can't find another job, then you're going to pay them some portion or all of their salary? Is that in there?

MR. ZENSKY: Are you asking him if that's a provision that's been added since 1996?

Q. Let's say, is that in there today? Is that in there today, some provision like that?

A. We have, from time to time, entered into a provision like that with some employees.

Q. All right. So they don't all have that.

Borner - direct

A. They do not.

Q. Some of them just say you're not going to work for a competitor.

A. That's an over-simplification, but some of them have words to that effect.

Q. Okay. Now, what I'm trying to figure out is, there must be some standard agreements that would apply. For instance, if a secretary gets hired, they don't call you and say, "Draft a new agreement for this person." They must be able to take one that's a standard for that type of position. Right?

A. That is true, but that standard, as you've termed it, has changed over the years.

Q. Okay. Well, how many different standard agreements are there, if you know?

A. My guess is that there are probably dozens of different agreements of this nature, employee agreements of this nature that we've entered into with employees since 1996, or earlier, to the present.

Q. So it would be within the judgment of somebody at the company to decide which agreement to use, or to ask you to modify an existing

Borner - direct

agreement. Is that true?

MR. ZENSKY: Objection.

A. Yes.

Q. And who would that be?

A. The decision which agreement to be used, in most cases, would be made by the human resources staff, potentially in consultation with the general manager of the facility in which the employee would work, or the person hiring the new employee, and depending on the circumstances, there's consultation of legal personnel, meaning me.

MR. CARLSON: Why don't we take a five-minute break.

(A brief recess is taken.)

(266, Letter dated 5/16/02 from Raymond Chlodney to Alain DeBlandre, Bates Nos. SLS 27-35, is received and marked for identification.)

Q. Mr. Borner --

A. Yes, sir.

Q. -- I'm showing you a document that's been marked as Exhibit 266.

This has the production designation SLS 30 through 35, and then SLS 27 through 29 at

Borner - direct - attorneys' eyes only

trade secret information regarding formulas?

MR. ZENSKY: Any other way you can try that? I'm struggling with the privilege implications of the question.

MR. CARLSON: I don't think --

MR. ZENSKY: I mean, posing that to a business person, I think is different than posing it to the chief legal officer of the company.

MR. CARLSON: I'm talking about in his own mind. I'm not talking about any communications that he had with anybody. I'm talking about whether he stopped to think about that issue.

MR. ZENSKY: I understand, but the problem I'm having is any concern that he did or did not have would be predicated from communications that he had with his client, and if he reached a conclusion or a concern.

MR. CARLSON: It's sort of like the yes or no.

MR. ZENSKY: I don't think so.

A. Are we talking about prior to July 1, 2001?

Q. Prior to the filing of the lawsuit.

MR. ZENSKY: Do you want to consult for a minute?

(The witness and his attorney leave the conference room.)

MR. ZENSKY: I'm prepared to let the witness answer, again, as long as it's not asserted to be a waiver of any applicable attorney-client privilege.

MR. CARLSON: No, it's simply a yes or no-type question.

A. No.

MR. ZENSKY: Are you getting to the end?

MR. CARLSON: Close.

Q. I'm showing you what's been marked as Exhibit 139, which is an e-mail from Chlodney -- I'm sorry -- from DeBlandre to Kovarik, and he sends a translated version of the -- it says "the Ludwig contract."

I gather that that means that the original was in German.

Did you prepare the English version or the German version of this contract that's attached here?

Borner - direct - attorneys' eyes only

A. No.

Q. This contract has got a non-compete in it.

Did you instruct whoever prepared it to put the Section 7 prohibition of competition in it?

A. That's not quite how I would term it.

I discussed it with the principal draftsperson.

I don't recall instructing him to put it in, which is the term you used in your question.

Q. Who was the principal draftsperson?

A. Thomas Schmitz.

Q. What did you do? Did you give him some examples of the non-competes that you used in the United States?

MR. ZENSKY: Objection to form.

A. No.

Q. What did you give him to assist him, if you gave him anything, assist him in writing this paragraph?

A. I didn't --

MR. ZENSKY: Wait, wait, wait. Again,