COPY

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

CIVIL ACTION NO. 01 CV1605 JMR/FLN

| | | |
|---|---|---|
| THE VALSPAR CORPORATION and VALSPAR SOURCING, INC., Plaintiffs | : | Deposition of: JOHN F. RAGAZZINI |
| against | : | |
| SPRAYLAT CORPORATION and SPRAYLAT GmbH, Defendants | : | NON-ATTORNEYS' EYES ONLY PORTION |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before Sandra M. Mierop, a Certified Shorthand Reporter and Notary Public, held at AKIN, GUMP, STRAUSS, HAUER & FELD, 590 Madison Avenue, New York, New York, on Thursday, September 19, 2002, commencing at 9:30 a.m.

A. Correct.
Q. And that occurred in the second half of 2000, didn't it, when you did your due diligence and all that?
A. Correct.
Q. So you'd been with the company for about a year and a half by that time?
A. Correct.
Q. And what did you do relative to the Hilemn acquisition?
A. I was primarily involved in doing the financial analysis for the acquisition and in conducting some of the financial due diligence.
Q. Did you acquire assets of Hilemn?
A. Yes.
Q. And the assets of Hilemn went into a subsidiary of Spraylat Corporation?
A. Yes.
Q. And what's the name of that subsidiary?
A. Hilemn, LLC.
Q. So, you didn't acquire any of the stock of Hilemn? Right?
A. No.
Q. Did you acquire any of the debts of Hilemn?
A. No.

Q. Just assets?

A. Correct.

Q. So, was that one of the things you did to evaluate the value of those assets?

A. No.

Q. Did somebody else do that?

A. No.

Q. So, did you evaluate it as a going business?

A. We evaluated it primarily as a going business. Although, we did do some testing of the receivables asset prior to purchase.

Q. Did you pay about 7 million for that?

A. Yes.

Q. And what was the value placed on the receivables?

A. The receivables were approximately $1 million.

Q. Now, that's on the books, and they're shown as a million?

A. We put them on the Hilemn LLC books, approximately $1 million.

Q. What did they appear at on the Valspar books, a million, too?

A. The same number.

Q. The same number. What you did is you booked them at their face value, let's say?

A. No. They allowed us a reserve for questionable accounts.

Q. Who is "they" now?

A. Valspar.

Q. When you say "allowed you a reserve," you mean that after the sale they were willing to rebate something if you did not collect the full million?

A. No.

Q. Would you explain what you mean by allowing a reserve?

A. When we looked at their receivables asset, we asked them to age the asset, how many accounts were how old. They and we agreed to discount the receivable asset by a certain number reflecting questionable accounts.

Q. Okay. So, what was the value of the receivable on Valspar's books before it was discounted on to your books?

A. I don't quite know how to answer that.

Q. All right. It's probably not a good question.

I'm just wondering how much the discount was. Maybe I shouldn't be talking about

books then. How much was the discount?

A. The receivable that we purchased had a -- the receivable asset that we purchased had a book value of approximately 1,050,000. They and we agreed on a questionable account reserve of approximately 50,000.

Q. Okay. So, the remaining $6 million was for the value of a -- an ongoing business, then?

A. No.

Q. Okay. Can you explain why?

A. We also purchased inventories and fixed assets.

Q. What was the value of inventories?

A. Approximately a million dollars.

Q. And how about the fixed assets, what was the value of that?

A. We mutually agreed to value them at approximately $500,000.

Q. Okay. So, that leaves about 4.5 million?

A. Correct.

Q. So, when you say -- strike that.

So, is the 4.5 million, then, the same thing as goodwill or the value of an ongoing business?

MR. HURLEY: Objection.

A. Correct.
Q. (BY MR. CARLSON) I see. Okay. And some of the things that are part of that would be the formulas?
A. Correct.
Q. Customers? Customer relations, let's say?
A. Customer lists.
Q. Customer lists. Customer relations?
A. I don't know what you mean by that.
Q. All right. What else would go into an accountant's assessment of what you're paying 4.5 million for besides formulas and customer lists?
A. It depends on the transaction.
Q. Well, this transaction here.
A. The goodwill represented the difference between what we felt the business was worth paying and the fixed assets.
Q. Okay. The goodwill being the 4.5 million?
A. Correct.
Q. Let me ask you this: Did you use any multiple or -- let's leave it at that. Did you use a multiple to assess the value of what you should pay for this? It may not have been your only means of assessing the value, but was it one of the ways you did it?

A. A multiple was considered as a triangulating mechanism to what we should pay.
Q. What do you mean triangulating? You mean as a way of doing it among others?
A. Correct.
Q. Multiple was one thing. What was some of the other things you looked at as a way to evaluate what you should pay for the business?
A. The primary method was a discounted cashflow.
Q. Any other methods besides multiple and discounted cashflow?
A. Internal rate of return.
Q. Okay. Anything else?
A. Net present value.
Q. Anything else?
A. Not as a valuation methodology.
Q. But the discounted cashflow was the primary technique, did you say?
A. Yes.
Q. Now, is a multiple a way of saying you pay a certain number times the earnings of the company?
A. That's one multiple.
Q. Okay. Were there other multiples that you looked at besides that multiple?

MR. HURLEY: Did you look at that multiple?

THE WITNESS: Yes.

MR. HURLEY: The first question assumed that you looked at the multiple.

Q. (BY MR. CARLSON) You looked at the multiple of earnings?

A. Yes.

Q. And what multiple did you consider realistic in this case?

A. We had information from other industry transactions that a multiple of 5 to 6 times EBITDA was an approximate industry benchmark.

Q. Were there any other multiples besides earnings that you looked at?

A. We used a multiple of sales as a triangulating mechanism.

Q. And how does that work -- or what was the multiple?

A. Well, it was the price we paid versus the revenues of the business.

Q. When you look at these factors like the multiple and discounted cashflow, is this the value that you should be on the goodwill or are these factors that tell you what you should pay for the

totality, the goodwill plus the assets you're buying?
MR. HURLEY: Object to the form.
A. These multiples are used to confirm the total acquisition price.
Q. (BY MR. CARLSON) How does the discounted cashflow work -- let me ask it this way: What did you guys do?
A. I'm sorry, can you clarify?
Q. Yes. In applying a discounted cashflow analysis, which you say is your primary technique, how did you apply it in this case?
A. We estimated the future years' P & Ls, developed future year cashflows, and then discounted them over time.
Q. To arrive at a present value?
A. Correct.
MR. HURLEY: Are you anywhere near a time where it makes sense to take a break?
MR. CARLSON: Sure.
(Break.)
Q. (BY MR. CARLSON) Okay. On the discounted cashflow analysis, I'm not certain how you do that, because if you get your future years' P & L and you get your future years' earnings, how do you apply the cashflow to that?

A. P & L is an approximation of cashflow, which is then adjusted for certain items that are in the P & L. We made assumptions about how to do that and derived an approximate cashflow.

Q. So, cashflow to you, then, is sort of an adjustment to your P & L; is that what you're saying?

A. That would be a lay term.

Q. Okay. And to use lay terms here, I gather, then, what you're saying is a P & L is your theoretical profit; but the fact is because you had some obligations like maybe to buy some insurance or something like that, your actual cash for that year might be less; and for evaluating the business, you're really wanting to know what you're really putting in your pocket?

MR. HURLEY: Object to form.

Q. (BY MR. CARLSON) That's your cashflow?

MR. HURLEY: Object to form.

A. Roughly speaking, yes.

Q. (BY MR. CARLSON) Okay. And then you discounted -- what factor did you use for a discount in 2000? What percent?

A. We used 8 percent for negative cashflow, and 16 percent for positive cashflow.

Q. Now, how does this discounted cashflow

technique work? Once you arrive at your cashflow and you know, for instance, how much you're going to be able to put in your pocket in the year 2003, for instance, how do you determine after you discount it what you're willing to pay for that amount of money?

MR. HURLEY: Object to the form.

A. We use the measurement called net present value and internal rate of return.

Q. (BY MR. CARLSON) Oh, okay. Internal rate of return and net present value are internal analysis?

A. Yes. Correct.

Q. Can you tell how internal rate of return and net present value are used to figure out what you're willing to pay today for a business that your cashflow analysis indicates will derive a certain amount of money for you to put in your pocket going forward?

MR. HURLEY: Object to the form.

A. Yes.

Q. (BY MR. CARLSON) Would you do that, please?

A. The internal rate of return is the single discount rate at which the discounted cash flows in future years can be reduced to zero.

Q. Okay. And how do you use that?

A. We use the internal rate of return to compare against other investments or a company hurdle rate.

Q. Company what?

A. Hurdle.

Q. H-u-r-d-l-e?

A. Correct.

Q. Did you all have a figure for other investments or a company hurdle rate that you were comparing with?

A. I'm sorry. Say that again.

Q. Did you have other investments or a hurdle rate that was your standard that you were comparing against?

A. Yes.

Q. Okay. What was that?

MR. HURLEY: Which?

(The following is restricted record for attorneys' eyes only.)

Q. (BY MR. CARLSON) Well, did they differ, the other investments and the hurdle rate?

A. The hurdle rate is the primary one we use.

Q. Okay.

A. And our hurdle rate, which is company confidential, was 16 percent.

MR. HURLEY: Let's designate that attorney's eyes only.

MR. CARLSON: Okay.

Q. (BY MR. CARLSON) When you applied that hurdle rate and your present net value and your internal rate against your cashflow analysis, did you arrive at a figure that was consistent with what you paid?

MR. HURLEY: Object to the form.

A. That was how we determined what to pay.

Q. (BY MR. CARLSON) Okay. What I'm saying is that if you do this analysis with this hurdle rate and do your discounted cashflow analysis, you end up with a figure that was consistent with what you paid as opposed to ending up with a figure that was, let's say, twice of what you paid; and you got one heck of a bargain.

MR. HURLEY: Object to form.

Q. (BY MR. CARLSON) Do you know the

distinction I'm drawing?

A. No. Can you phrase it in a question?

Q. Let me give you an explanation here. You might do your analysis and say, you know, I'm willing to pay 15 million for this thing, but I can get it for 7. That's a great deal. I've done all my analysis. I've done my discount cashflow analysis, and it tells me 15 million would be a good deal; so I can get it for 7 through my negotiations because of all the factors that are part of my negotiations, and I'll be buying it for 7. That wasn't the case, I gather, that your analysis said that the value was 15? I gather your analysis said that the value was about 7; is that true?

MR. HURLEY: Object to the form.

A. Yes.

Q. (BY MR. CARLSON) Do you recall what your analysis said the value, in fact, was? Can you be more specific than 7 million?

MR. HURLEY: Object to the form.

A. Yes.

Q. (BY MR. CARLSON) What was that?

MR. HURLEY: Designate this attorney's eyes only as well.

A. Approximately 7.3 million.

Q. (BY MR. CARLSON) Okay.

A. Which, by the way, is the number we paid.

Q. Oh, it is?

A. We were approximately 7 million in earlier discussion. The number we calculated is the number we paid.

Q. Well, it wasn't the case, was it, that you kind of worked backwards and said: Look, 7.3 is the figure we're going to pay, let's work backwards through all of our discounted cashflow and arrive at a hurdle, then, of 16 and 16 seems acceptable?

A. No.

MR. HURLEY: Object to the form.

Q. You had this hurdle of 16 percent already in place?

A. Yes.

Q. (BY MR. CARLSON) Tell me -- I'm not familiar with this hurdle rate. I'm not familiar with many things that are financial, so you're way above my head on this. Is the hurdle rate something that you will find written down within the company?

A. Only in my analyses.

Q. Okay. Had you used that rate for any other purchases?

A. Yes.

Q. And was 16 in the case of earlier purchases?

A. Yes.

Q. And when did you do purchases earlier?

A. We did one in early 2000.

Q. And who was that of?

A. Chromatics, C-h-r-o-m-a-t-i-c-s.

Q. And that has a hurdle rate of 16 percent?

A. Yes.

Q. I know the hurdle rate that you want to have, and I have, then, the P & L and the cashflow analysis from a company; I then have all I need to know to figure out how much your company would be willing to pay for it?

MR. HURLEY: Object to form.

Q. (BY MR. CARLSON) Is that true?

A. Generally speaking, yes.

Q. Is there anything else I need to know?

MR. HURLEY: Object to form.

A. The -- the cashflows are the most critical part of any determination of value, and that's -- there's a lot more to it than just saying I know what the cashflows are.

Q. I don't understand what you mean "by a lot more to it than." If you know what the cashflow is,